UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JENNIFER FUNG-SCHWARTZ, D.P.M.,
individually and/or on behalf of patients, and
JENNIFER FUNG-SCHWARTZ, D.P.M., L.L.C.,

                    Plaintiff,

              v.

CERNER CORPORATION and CERNER
HEALTHCARE SOLUTIONS, INC.,

                  Defendants.

**Amended Complaint
and Jury Demand**

---

## The Parties, Jurisdiction and Venue

1.      Plaintiff, Jennifer Fung-Schwartz ("Dr. Fung-Schwartz") is a medical doctor with a principal place of business at 50 West 97th Street, Suite 1A, New York, NY 10025.

2.      Plaintiff, Jennifer Fung-Schwartz, D.P.M., L.L.C. ("the Practice") is a New York Professional Service Limited Liability Company with a principal place of business at 50 West 97th Street, Suite 1A, New York, NY 10025.

3.      Dr. Fung-Schwartz's patients ("Patients") sign a form which states, "I authorize that all payments for financial benefits for professional services rendered be made to Dr. Jennifer Fung-Schwartz, DPM."

4.      Upon information and belief, Defendant Cerner Corporation ("Cerner Corp.") is a Delaware corporation with a principal place of business at 2800 Rockcreek Parkway, Kansas City, Missouri, 64117.  Upon information and belief

Cerner Corp. is registered with the New York State Department of State to do business in New York State.

5.     Upon information and belief, Defendant Cerner Healthcare Solutions, Inc. ("Cerner Solutions") is a Delaware corporation with a principal place of business at 2800 Rockcreek Parkway, Kansas City, Missouri, 64117.  Upon information and belief Cerner Healthcare Solutions, Inc. is not registered with the New York State Department of State to do business in New York State.

6.     Upon information and belief, Cerner Corp. directs the day-to-day activities of Cerner Solutions and also provides services to Cerner Solutions clients, including but not limited to acting as the contract manager for Cerner Solutions, providing customer service and support for Cerner Solutions' customers and providing eBilling to Cerner Solutions' customers.

7.     The 2014 contract between the Practice and Cerner Healthcare Solutions, Inc. directed the Practice to fax the contract to Cerner Corporation.  The contract also advised the Practice "To gain access to eBill, contact the Cerner Client Care Contact Center at 866-221-8877 or e-mail ClientCareCenter@cemer.com."

8.     Upon information and belief, cerner.com is owned by Cerner Corp.

9.     Upon information and belief, 866-221-8877 is registered to Cerner Corp.

10.    Dr. Fung-Schwartz believed the Practice was doing business with Cerner Corp.

11.    According to Cerner Corp.'s 10K SEC filing for the fiscal years ending December 31, 2016 and December 31, 2015, "Cerner solutions are offered on the unified Cerner Millennium® architecture."  To use electronic prescription services, Dr. Fung-Schwartz accesses a webpage with the Cerner Millennium® name and the

statement, "© 2011 Cerner Corporation.  All right reserved.  Access and use of this solutions system (including components thereof) require, and are governed by, license(s) from Cerner Corporation…."

12.    Monthly metric reports generated for the Practice were titled, "Jennifer Fung-Schwartz DPM LLC," and stated on the front page "© Cerner Corporation. All rights reserved.  This document contains confidential and/or proprietary information belonging to Cerner Corporation and/or its related affiliates…"

13.    As used herein "Cerner" refers to Defendants collectively.

14.    Jurisdiction is conferred by 28 U.S.C. § 1332.

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## Background

16.    Dr. Jennifer Fung-Schwartz is a medical doctor, board certified in podiatry, with a practice located at 50 West 97th Street in Manhattan.  The Practice is the entity which runs Dr. Schwartz's private office practice.

17.    In March 2006, the Practice contracted with Cerner Corp., dba Cerner Physician Practice, Inc. to provide Electronic Medical Records (EMR) services to Plaintiff.  Exhibit 1 is a copy of that contract.

18.    In 2006 the EMR software and the EMR data resided on a computer in the Practice's office.

19.    At some point between 2006 and 2016, the desktop EMR software was replaced by an online version.  Dr. Fung-Schwartz and the Practice could access the records, but the data was stored remotely.

20.    Prior to 2014, medical billing (also called "RCM" for revenue cycle management) for the Practice was handled by two separate entities depending

on the type of billing:  (1) an outside vendor was engaged to handle Medicare billing; and (2) all other billing was handled by Practice personnel.

21.    During that time, Dr. Fung-Schwartz used tools within the Cerner EMR to generate bills.

22.    RCM is almost all conducted electronically.  Insurers will accept paper forms, but it is the exception and it slows down payment of the claims.

23.    Dr. Fung-Schwartz and the Practice also used tools within the EMR to manage all the financial information for the office.

24.    In 2014, a serious illness affecting a Practice employee made it unfeasible for the Practice to continue to handle the billing.  The personnel issue did not necessitate changing the outside vendor for the Medicare billing.

25.    Dr. Fung-Schwartz discussed her options with Cerner personnel to move non-Medicare medical billing to Cerner.  She had discussions with one or more Cerner sales representatives who prepared a proposal and sales orders.

26.    Exhibits 2 is the September 2, 2014 Cerner Sales Order prepared by Rick Goodman for signature by Kim Hlobik.  Upon information and belief, Rick Goodman was Senior Manager, Ambulatory Sales for Cerner Corp. from January 2010 to September 2015.  Upon information and belief, Kim Hlobik has been an employee of Cerner Corp. since August 2000.

27.    Exhibit 3 is the November 19, 2014 Cerner Sales Order prepared by Mark Banville and Cerner Ambulatory Business Office Services Proposal.  Upon information and belief, Mark Banville has been a Sales Executive for Cerner Corp. Since March 2010.

28.     The proposal represented Cerner's services include, "Well trained and experienced revenue cycle and billing professionals."

29.     Cerner said it delivers performance up to industry standards:

> We align ourselves to the Healthcare Financial Management Association (HFMA) and Medical Group Management Association (MGMA) standards for measuring and improving billing and collection performance.  Cerner Ambulatory Services also adheres to the OIG third party medical billing guidelines to provide you a high level of compliance with applicable laws and regulations.

30.     Cerner assured Dr. Fung-Schwartz it would "Review, scrub and process claims (primary, secondary, tertiary) daily.  Cerner stated:

> Prior to processing Client's claims, Cerner will review – for completeness – claim details, including patient demographic information, procedure and diagnosis coding, and other detail son the claim.  Cerner will use a combination of human review and automated claim scrubbing to maximize clean claim percentage. After the claim has been scrubbed, Cerner will submit the claim to the appropriate payer through a clearinghouse.  Cerner will also submit secondary and tertiary claims as necessary.

31.     As part of "Patient Responsibility Management," Cerner would "Generate and mail patient statements in the Client's name and according to a standard statement cycle."

32.     Cerner represented "Cerner's Consumer Care team manages calls for all Cerner Revenue Cycle Ambulatory Services Clients.  Patient statements include a toll-free number that can be used to speak directly to a member of our team regarding any questions on their account."

33.     For Accounts Receivable ("A/R"), Cerner claimed that "Cerner will assume the primary responsibility and will first attempt to research and correct all denied or rejected claims."

34.     Under this Scope of Services and Responsibilities, Cerner represented that only Dr. Fung-Schwartz could "Approve bad debt write-offs/adjustments." Cerner assured Dr. Fung-Schwartz that, "To ensure A/R metrics are accurate and meaningful, Client will approve writing off or turning over to a collection agency, uncollectible patient balances.  Cerner will seek Client's approval to write off balances where the patient has received three statements and no response of potential payment by the patient."

35.     Prior to contracting with Plaintiff, Cerner sales personnel represented that Cerner was capable of handling her billing and timely obtaining re-imbursement for her services from private insurers and government insurance programs, such as Medicare.

36.     They further represented that the new billing would work well with the existing Cerner EMR tools Dr. Fung-Schwartz was already using to do her billing.  This was a factor in her choice of Cerner over the process of starting with a different company.

37.     Cerner represented that the Practice would be billed at a rate of 9.21% of "total net revenue" with a monthly minimum of $1750 and that price would include the EMR as well as the RCM.  The price was set based on the Practice's previous levels of billings.  Cerner represented to Dr. Fung-Schwartz that if she maintained her then-current level of billing the new Cerner contract would not cost more than her previous combined costs for RCM and EMR services.

**Medicare Billing**

38.     Cerner personnel persuaded Dr. Fung-Schwartz that she should move
all her billing – including the Medicare billing – to Cerner by representing, *inter
alia*, that (1) Cerner was capable of meeting the requirements for Medicare
billing, (2) Cerner would be no more expensive than her then-current vendor and
(3) having only one vendor would simplify billing and support.

39.     Accordingly, in 2014, the Practice contracted with Cerner Solutions for
Cerner Solutions and Cerner Corp. to provide billing services by submitting a
signed sales order to Cerner Corp.

40.     Upon information and belief, at the time Cerner was making
representations to Dr. Fung-Schwartz to induce her to sign the RCM sales order,
Cerner knew it had problems with its system for processing claims and obtaining
reimbursement from insurers, particularly for Medicare claims.

41.     As early as June 2013 at least one doctor had problems with Cerner's
RCM for submitting Medicare claims and complained to Cerner.

42.     The Practice began submitting its claims through Cerner RCM in or
about December 2014.

43.      Soon after starting with Cerner RCM, the Practice's revenues fell off
dramatically.  Dr. Fung-Schwartz noticed a marked decline in revenue even
though her workload and billing remained consistent.  A large proportion of the
decline was for claims submitted to Medicare.

44.     Exhibit 4 is a redacted version of two paper claims Cerner submitted to
Medicare, close-ups of the addresses and a notice indicating why the claims were

rejected.  (Dr. Fung-Schwartz wrote, "spoke to Samantha about this" on one of the forms.)  The forms have the following defects:

> a.  The computer-generated name and address of the insurer is wrong.
> b.  The computer-generated insured's ID number (redacted on the exhibit) is wrong.
> c.  The incorrect information is whited-out on the form.
> d.  A different address and ID number (redacted) are handwritten onto the forms.

45.   Upon information and belief, Cerner was attempting to submit paper claims because Cerner had a problem with its computer system and could not submit the form electronically.

46.   Upon information and belief, the computer-generated information on the form is wrong because the Cerner system did not have the ability to consistently prepare proper claims.

47.   Upon information and belief, Cerner improperly attempted to correct the forms by handwriting onto them because Cerner knew it could not fix the problems in its computer system and generate either (1) an electronic claim or (2) a properly printed form.

48.   Exhibit 4, p. 5 shows that Medicare rejected the claim for using white-out.

49.   Either Cerner did not know the requirements for submitting paper claims to Medicare or it knew the claims would be rejected for having white-out on them and deliberately submitted the improper claims.

50.   Upon information and belief, Cerner's improper submission of Medicare claims affected patients of other practices as well.

51.     If a Medicare recipient has secondary insurance, Medicare automatically submits the claim to the secondary insurer.  Submitting a claim to a secondary insurer will result in a duplicate claim that gets rejected. Nevertheless, Cerner repeatedly submitted claims to secondary insurers of Medicare insureds.

52.     As a result of Cerner's improper actions, Dr. Fung-Schwartz repeatedly received letters from a secondary insurer, Emblem Health, telling her that duplicate claims had been submitted by her and "we can initiate a fraud investigation if we see a pattern of duplicate billing."

## Relationship to Patients and Insurers

53.     Dr. Fung-Schwartz and the Practice participate as providers in various insurance plans and Medicare through contracts with the insurers.

54.     Insured patients authorize the insurers to pay their benefits directly to the provider.  So it is Dr. Fung-Schwartz or the Practice who submits the claim to obtain the insured patient's benefits.

## Late Billing and Accounts Receivable

55.     The Cerner caused the Practice to lost money because Cerner submitted claims late and/or wrote off charges without consulting Dr. Fung-Schwartz. Exhibit 5 is an example.

56.     The insurer was supposed to be billed for a surgical procedure on August 12, 2015 which cost $475.  The patient paid $20 as a co-pay.

57.     Cerner did not submit a claim to the insurer, Oxford, until January 18, 2016, more than 120 days after the procedure.  According to Cerner employee,

Samantha Wright, the claim got "stuck in emr and was submitted late due to system issues."  Cerner submitted the claim twice, both times on paper.

58.     Under New York law, insurers do not have to pay medical bills if they are submitted more than 120 days after the services were provided.

59.     Oxford refused to pay the late claim.  Cerner claims it appealed.

60.     One inducement for the Practice to sign the Cerner RCM sales order was that Cerner represented it would "provide you a high level of compliance with applicable laws and regulations."

61.     New York law requires a late claim to be paid when it "was a result of an unusual occurrence and that he or she [the provider] has a pattern or practice of timely submitting claims."

62.     Upon information and belief, either (1) Cerner was not able to claim that the late submission was unusual and it had a pattern or practice of timely submitting claims on behalf of the Dr. Fung-Schwartz or, (2) Cerner did not make the proper argument under New York law.

63.     Oxford denied the appeal on the claim.

64.     One inducement to enter into the contract was that Cerner represented that it would not write off Accounts Receivable without approval from Dr. Fung-Schwartz.  Cerner did not consult Dr. Fung-Schwartz about the write-off or even disclose that it had submitted the claim late.  Instead on April 20, 2016 Cerner unilaterally wrote off $475 from the account.

65.     The amount that Cerner wrote off – $475 – was also a incorrect.  The patient had paid the $20 co-pay, so the amount the insurer should have been billed for was $455.  The account was left with a -$20 balance.  When Cerner

unilaterally wrote off the incorrect $475 amount, Cerner made it look like the money had been collected.  They may have charged 9.21% to the Practice.

66.     Upon information and belief, either Cerner's system does not flag accounts with a negative balance (so they can be reviewed and the overage returned to the proper party) or Cerner intentionally and deliberately concealed the flag so Dr. Fung-Schwartz would not know about the write-off.

67.     Upon information and belief, this is not an isolated incident and Cerner repeatedly hid botched claims from the Practice and Dr. Fung-Schwartz and wrote them off without the authorization which Cerner had promised to obtain from Dr. Fung-Schwartz.

68.     Upon information and belief, if a claim was not written off, then after the insurer rejects the claim, Cerner still sent statements in Dr. Fung-Schwartz's name to patients that make it look like they owe the money.  Upon information and belief, patients also received a document from their insurer stating that the claim was denied.

69.     One patient contacted the Practice because she knew she had insurance that was supposed to cover the claim and, upon information and belief, Cerner had sent her a statement which led her to believe Dr. Fung-Schwartz was attempting to collect the claim from the patient.

**Cerner Personnel, Reporting and The Practice's Termination of RCM Services**

70.     To induce Dr. Fung-Schwartz to enter accept the RCM sales order, Cerner represented that it had "Well trained and experienced revenue cycle and billing professionals."  Upon information and belief, at the time Cerner made that statement, it knew that it had a problem with inadequate training of its

personnel, high turnover and inexperienced workers and it would not live up to its representation.

71.    Cerner had received complaints from customers about the inadequacy of its employees.  The issue of high turnover, inexperienced and poorly trained Cerner personnel being assigned to clients is an issue in at least one litigation against Cerner.

72.    Cerner represented to Dr. Fung-Schwartz that Cerner terminated the employment of Samantha Wright (referenced in ¶ 57 and Exhibit 5) for incompetence.

73.    Dr. Fung-Schwartz repeatedly contacted Cerner Solutions, Cerner customer support and her account representative, Melissa Jones, to attempt to resolve the problems.  Upon information and belief, Melissa Jones has been en employee of Cerner Corp. since August 2011.  For example, Dr. Fung-Schwartz had a conference call with Ms. Jones and other Cerner personnel in July 2015 after the Practice's revenue had plummeted.  Dr. Fung-Schwartz explained that there was no reason to stay with Cerner when the Practice already had a vendor who could properly submit claims to Medicare.  Ms. Jones and Cerner falsely represented that they could fix the problems to induce Dr. Fung-Schwartz not to leave Cerner.

74.    Cerner was never able to consistently submit Medicare claims properly.

75.    Dr. Fung-Schwartz also periodically reviewed the monthly metrics reports with Ms. Jones and other Cerner personnel.  The reports showed increasing amounts of Accounts Receivable, meaning that Cerner was not collecting insurance claims.  Dr. Fung-Schwartz repeatedly demanded that

Cerner address the Accounts Receivable issue and collect the claims.  Cerner refused.

76.     Finally, on a conference call with Ms. Jones and Cerner personnel in February 2016, Cerner acknowledged that the Practice had the right to withdraw from the RCM sales order. Cerner again refused to collect the outstanding Accounts Receivable.

77.     Upon information and belief, Cerner caused the Practice and Dr. Fung-Schwartz to lose at least $220,000 of revenue.

78.     Dr. Fung-Schwartz had to borrow money to cover her expenses.

79.     In April 2016, Melissa Jones contacted Dr. Fung-Schwartz to set a termination date for the RCM services.  Dr. Fung-Schwartz informed her that the practice would cease using the RCM services on June 1, 2016.

80.     After leaving the billing arrangement with Cerner, Dr. Fung-Schwartz obtained another service provider for the Practice's billing.  With the new vendor, the Practice's revenues returned to the level they were before she contracted with Cerner.

### Cerner's Illegal Conversion of the Electronic Medical Records

81.     None of the Defendants owns the Electronic Medical Records.

82.     Under HIPAA, 42 U.S.C. § 1320d and/or related regulations, Cerner was required to continue to provide access to the EMR.

83.     By May 31, 2016 the Practice has stopped submitting claims with Cerner RCM.  The Practice and Dr. Fung-Schwartz continued to use the EMR software.

84.     In March 2016, New York State implemented a mandatory electronic prescription program.  Dr. Fung-Schwartz had Cerner add this feature to her EMR software.

85.     In April 2016, Dr. Fung-Schwartz made a $6000 payment to Cerner. The cost of the EMR software was approximately $700/month.

86.     In New York State, patients are entitled to examine and copy medical records even if there is a fee dispute.  HIPAA also requires patients have access to medical records.

87.     On September 23, 2016 at 3:51 p.m., Cerner Corp.'s outside counsel, Nathan Neuman, Esq., sent an e-mail to Plaintiff stating in relevant part:

> Dear Dr. Schwartz:
> **This email will confirm that this office represents Cerner Corp.** dba Cerner Physician Practice, Inc. (collectively hereafter "Cerner") regarding a debt obligation owed to it by Jennifer Fung-Schwartz, DPM [alleged to be over $100,000] per  Section 3.2 of the attached Cerner Physician Practice Software License, Hardware Purchase, [sic. and] Support Services Agreement (hereafter the "Agreement") with a services start date of March 24, 2006…

(emphasis added).

88.     Dr. Fung-Schwartz retained counsel, Joseph Paterno III, Esq., to respond to Mr. Neuman.  Dr. Fung-Schwartz's counsel talked and wrote to Mr. Neuman.  On October 10, 2016 Mr. Paterno wrote to Cerner Corp.'s counsel, Mr. Neuman, offering $10,000 to settle the dispute.  He also sought to have the patient information returned to the Practice and Dr. Fung-Schwartz as required by law:

> Cerner shall archive and allow access to all of Dr.'s patient files and records, such that the entire physical and electronic patient files may be

read and printed by Dr. at a commercially reasonable fee, which fee shall be expeditiously disclosed by Cerner to Dr. in advance

89.     Mr. Neuman wrote back that day, affirming that his client, Cerner Corp. was a party to the contract and stating in part:

> **Cerner has just recently terminated the contract** … and all services with Dr. Fung-Schwartz including EMR

(emphasis added).  Cerner Corp.'s counsel, Mr. Neuman, refused to address the issue of returning the patient medical records.

90.     Without prior notice, Cerner abruptly cut off access to Dr. Fung-Schwartz's Electronic Medical Records on October 13, 2016.

91.     Without access to the EMR, Dr. Fung-Schwartz could not treat patients or even view her patients' records.  The Practice could not see the calendar or basic patient contact information, so they could not call patient to cancel appointments.  The Practice could not schedule appointments, enter lab results into the system or verify insurance coverage.  Dr. Fung-Schwartz could not prescribe medications without access to the EMR.

92.     Neither Dr. Fung-Schwartz nor Practice employees could view any financial information for the Practice.

## Count 1:  Conversion

93.     Plaintiffs restate and reallege paragraphs 1 through 92 as if fully set forth herein.

94.     Defendants do not have any property interest in Patients' confidential electronic medical records (EMR).

95.     Cerner illegally withheld patient medical information from their treating physician so that patients could not receive treatment.

96.     Defendants actions caused injury and continues to harm Patients' interests.

### Count 2:  Deceptive Business Practices under  NY GBL § 349

97.     Plaintiffs restate and reallege paragraphs 1 through 96 as if fully set forth herein.

98.      Defendants engaged in the deceptive business practices described herein, including (1) systematically failing to timely submit claims to insurers, (2) representing to Dr. Fung-Schwartz that Defendants had the capability to properly process the claims, (3) representing to Dr. Fung-Schwartz that Cerner complied with OIG third party medical billing guidelines, (4) representing to patients that patients owed balances which were actually amounts covered by insurance, and (5) intentionally cutting off access to patient medical records in violation of federal and New York law so she would not be able to treat patients or write prescriptions and her patients would be denied access to treatment.

99.     Patients were injured as a result of Defendants' deceptive business practices.

### Count 3:  Negligence

100.    Plaintiffs restate and reallege paragraphs 1 through 99 as if fully set forth herein.

101.    Defendants owed Patients a duty to comply with, *inter alia*, Office of the Inspector General third party medical billing guidelines, federal law and New York law to properly submit claims to insurers.

102.   Defendants owed Patients a duty to comply with federal and New York law to keep patient medical records available to their physician.

103.   Cerner failed to timely submit Patient insurance claims properly and Cerner wrongfully withheld patient medical information from their treating physician.

104.   Patients were injured by Defendants' action.

**Count 4:  Fraud**

105.   Plaintiffs restate and reallege paragraphs 1 through 104 as if fully set forth herein.

106.   Prior to entering the 2014 RCM contract, Defendants knowingly made the false statements to Dr. Fung-Schwartz described herein, including (1) representing to Dr. Fung-Schwartz that Defendants had the capability to properly process the claims, (2) representing to Dr. Fung-Schwartz that Cerner complied with Office of the Inspector General third party medical billing guidelines, (3) representing to Dr. Fung-Schwartz that she would have to approve any instance of writing off unpaid claims and (4) representing her total cost for RCM and EMR services would not increase.

107.   Dr. Fung-Schwartz and the Practice relied on Cerner's false representations when she signed and returned the sales order to Cerner Corp. and switched over her Medicare billing from her prior vendor to Cerner.

108.   As a result of Cerner's representations and Dr. Fung-Schwartz's reliance on them, Dr. Fung-Schwartz and the Practice were injured.

## Count 5:  Fraud

109.   Plaintiffs restate and reallege paragraphs 1 through 108 as if fully set forth herein.

110.   During the course of the RCM contract, Defendants knowingly made the false statements to Dr. Fung-Schwartz described herein and withheld material information to induce her not to terminate the RCM contract, including (1) representing to Dr. Fung-Schwartz that Defendants were capable of fixing the billing problems, (2) representing to Dr. Fung-Schwartz that Defendants were capable of fixing the personnel problems and (3) concealing from Dr. Fung-Schwartz the fact that Cerner was writing off claims without her approval.

111.   Dr. Fung-Schwartz and the Practice relied on Cerner's false representations and continued to use Cerner's RCM services until June 1, 2016.

112.   As a result of Cerner's representations and Dr. Fung-Schwartz's reliance on them, Dr. Fung-Schwartz and the Practice were injured.

## Count 6:  (alternate) Fraud By Cerner Corp.
## In Claiming It Was A Party to the Contact

113.   Plaintiffs restate and reallege paragraphs 1 through 112 as if fully set forth herein.

114.    Cerner Corp. falsely represented to Dr. Fung-Schwartz that it had contracted with her and that she owed Cerner Corp over $100,000.

115.   Cerner Corp. falsely represented to Dr. Fung-Schwartz that Cerner Corp. was the entity that terminated the agreement to provide services, including EMR services.

116.   Cerner Corp. knew that it was not a proper party to the contract and that the contract was with the Practice, not Dr. Fung-Schwartz individually, and upon information and belief, Cerner Corp. intended to mislead Dr. Fung-Schwartz to obtain money from her.

117.   Dr. Fung-Schwartz relied on Cerner Corp.'s false representation.  That reliance included (1) retaining outside counsel to negotiate with Cerner Corp. on her behalf, (2) offering to settle Cerner Corp.'s claims for $10,000, (3) retaining litigation counsel to investigate Cerner Corp., name it in the lawsuit 16 Civ. 8019 and contact it about the TRO motion, and (4) retaining litigation counsel to name Cerner Corp. in this action, 17 Civ. 233.

118.   As a result of Cerner Corp.'s representations and Dr. Fung-Schwartz's reliance on them, Dr. Fung-Schwartz was injured and continues to be injured.

### **Count 7:  Deceptive Business Practices under NY GBL § 349**

119.   Plaintiffs restate and reallege paragraphs 1 through 119 as if fully set forth herein.

120.   Defendants engaged in the deceptive business practices described herein, including (1) systematically failing to timely submit proper claims to insurers, (2) representing to Dr. Fung-Schwartz that Defendants had the capability to properly process the claims, (3) representing to Dr. Fung-Schwartz that Cerner complied with OIG third party medical billing guidelines and (4) representing to patients that patients owed balances which were actually amounts covered by insurance.

121.   Dr. Fung-Schwartz and the Practice were harmed as a result of Defendants' deceptive business practices.

## Count 8:  Deceptive Business Practices under NY GBL § 349

122.   Plaintiffs restate and reallege paragraphs 1 through 121 as if fully set forth herein.

123.   Defendants engaged in the deceptive business practices described herein, including intentionally cutting off access to patient medical records in violation of federal and New York law.

124.   Dr. Fung-Schwartz and the Practice were harmed as a result of Defendants' deceptive business practices.

## Count 9:  Conversion

125.   Plaintiffs restate and reallege paragraphs 1 through 124 as if fully set forth herein.

126.   Defendants' do not have any property interest in Dr. Fung-Schwartz's electronic medical records (EMR) or patients' insurance claims.

127.   Defendants took patients' insurance claims and destroyed their value.

128.   Dr. Fung-Schwartz repeatedly asked Cerner to properly submit or re-submit patient claims.  Cerner failed to do so.

129.   Patients were injured by Defendants' actions.

130.   Dr. Fung-Schwartz requested the electronic medical records be turned over to her and even offered to pay Defendants any reasonable costs to archive the records so she could access them.  Cerner refused.

131.   Plaintiffs were injured by Cerner's actions.

### Count 10:  Tortious Interference with Contract

132.    Plaintiffs restate and reallege paragraphs 1 through 131 as if fully set forth herein.

133.    Dr. Fung-Schwartz had valid contracts with the insurers which entitled her to payment for claims.

134.   Defendants were aware of those contracts.

135.   Defendants intentionally caused the insurers not to issue payment, for by example, knowingly submitting paper claims with white-out and claims with other deficiencies which Cerner knew would not be accepted by the insurers and by double-billing insurers, which exposed Dr. Fung-Schwartz to allegations of fraud..

136.   Defendants actions caused injury to Dr. Fung-Schwartz and the Practice.

### Count 11:  Tortious Interference with Business Relations

137.   Plaintiffs restate and reallege paragraphs 1 through 136 as if fully set forth herein.

138.   Defendants caused the insurers not to issue payment, for by example, knowingly submitting paper claims with white-out and claims with other deficiencies which Cerner knew would not be accepted by the insurers and by double-billing insurers, which exposed Dr. Fung-Schwartz to allegations of fraud.

139.   Defendants actions caused injury to Dr. Fung-Schwartz and the Practice.

## Count 12:  Tortious Interference with Contract

140.    Plaintiffs restate and reallege paragraphs 1 through 139 as if fully set forth herein.

141.     Dr. Fung-Schwartz had valid contracts with the Patients which entitled her to payment for claims.

142.    Defendants were aware of those contracts.

143.    Defendants illegally cut off Dr. Fung-Schwartz's access to the EMR, including the ability to prescribe medications.

144.    Defendants intentionally caused the insurers not to issue payment, for by example, knowingly submitting paper claims with white-out and claims with other deficiencies which Cerner knew would not be accepted by the insurers.

145.    Defendants intentionally caused Dr. Fung-Schwartz to cancel appointments and shut down her practice during the time she was denied access to the EMR.

146.    Defendants falsely told patients they owed Dr. Fung-Schwartz money.

147.    Defendants actions caused injury to Plaintiffs.

## Count 13:  Tortious Interference with Business Relations

148.    Plaintiffs restate and reallege paragraphs 1 through 147 as if fully set forth herein.

149.    Defendants maliciously and illegally cut off Dr. Fung-Schwartz's access to the EMR, including the ability to prescribe medications.

150.   Defendants intentionally caused the insurers not to issue payment, for by example, knowingly submitting paper claims with white-out and claims with other deficiencies which Cerner knew would not be accepted by the insurers.

151.   Defendants intentionally caused Dr. Fung-Schwartz to cancel appointments and shut down her practice during the time she was denied access to the EMR.

152.   Defendants falsely told patients they owed Dr. Fung-Schwartz money.

153.   Defendants actions caused injury to Plaintiffs.

## Count 14: (alternate) Prima Facie Tort

154.   Plaintiffs restate and reallege paragraphs 1 through 153 as if fully set forth herein.

155.   Defendants intentionally cut off Dr. Fung-Schwartz's access to the EMR system.

156.   Defendants caused Dr. Fung-Schwartz to cancel appointments and shut down her practice during the time she was denied access to the EMR.

157.   Defendants had no justification or excuse because Dr. Fung-Schwartz had made a payment for the EMR services in April 2016 after she had terminated the RCM contract in February 2016.

158.   If Defendants actions are found not to be illegal, then Defendants inflicted the harm through a lawful act.

159.   Defendants actions caused injury to Dr. Fung-Schwartz, the Practice and Patients.

## Count 15:  Unfair Competition

160.   Plaintiffs restate and reallege paragraphs 1 through 159 as if fully set forth herein.

161.   Defendants (1) made false and misleading statements to insurers and patients under Dr. Fung-Schwartz's name and or signature, including (a) submitting duplicate claims to insurers under Dr. Fung-Schwartz's signature, (b) sending statements to Dr. Fung-Schwartz's patients which falsely stated or implied that they owed money to Dr. Fung-Schwartz, (2) knowingly submitted claims that would be rejected and (3) secretly wrote off botched claims.

162.   Defendants acts, omissions and concealments were done intentionally for their commercial advantage.

163.   Defendants deprived Dr. Fung-Schwartz and the Practice of benefits and property rights belonging to them.

## Count 16:  Unfair Competition and Misappropriation of Trade Secret

164.   Plaintiffs restate and reallege paragraphs 1 through 163 as if fully set forth herein.

165.   Defendants maliciously misappropriated and concealed from Dr. Fung-Schwartz and the Practice their (1) patient medical records and (2) trade secrets including the Practice's (a) financial information, (b) calendar and (c) customer lists when Defendants illegally cut off access to the EMR system.

166.   Defendants acts and concealments were done intentionally for their commercial advantage.

167.   Defendants deprived Dr. Fung-Schwartz and the Practice of benefits and property rights belonging to them.

**Count 17:  Breach of Contract**

168.    Plaintiffs restate and reallege paragraphs 1 through __ as if fully set forth herein.

169.    As described herein, Defendants' breached the terms of the contract.

170.    The Practice performed under the contract.

171.    Defendants' material breach harmed the Practice.

**Count 18:  Negligence**

172.    Plaintiffs restate and reallege paragraphs 1 through 171 as if fully set forth herein.

173.    Defendants owed Dr. Fung-Schwartz and the Practice a duty to comply with, *inter alia*, OIG third party medical billing guidelines, federal law and New York law to properly submit claims to insurers.

174.    Defendants owed Dr. Fung-Schwartz and the Practice a duty to comply with federal and New York law to keep patient medical records available to their physician.

175.    Cerner failed to timely submit Patient insurance claims properly.

176.    Cerner wrongfully withheld patient medical information from their treating physician.

177.    Dr. Fung-Schwartz and the Practice were injured by Defendants' action.

WHEREFORE Plaintiff demands judgment:

(1)      That Defendants, their agents, servants, employees, attorneys and those persons in active concert or participation with Defendants be preliminarily and permanently enjoined and restrained throughout the United States from deleting, destroying, altering, amending or otherwise changing any of Dr. Fung-Schwartz's electronic medical records;

(2)      That Defendants, their agents, servants, employees, attorneys and those persons in active concert or participation with Defendants be preliminarily and permanently enjoined and restrained throughout the United States from withholding electronic medical records from Dr. Fung-Schwartz;

(3)      That Defendants be required to make available the electronic medical records at issue and cooperate with Dr. Schwartz and any vendor she hires so that she can export, download, print and/or otherwise obtain her own electronic and hard copies of the records;

(4)      That Defendants reimburse Dr. Fung-Schwartz and the Practice for the fees paid for the billing services;

(5)      That Defendants reimburse Dr. Fung-Schwartz and the Practice for the costs of migrating EMR and RCM services to other products and vendors;

(6)      That Defendants pay Dr. Fung-Schwartz and the Practice $220,000 or such other amount proved which Defendants failed to submit or obtain from third parties;

(7)     That Defendants pay such other damages as are proved suffered by Plaintiffs as a result of Defendants' conduct;

(8)     That Defendants pay punitive damages;

(9)     That Defendants pay treble damages for each insurance claim pursuant to, *inter alia*, NY GBL § 349;

(10)    That Defendants pay the supplemental civil penalty under NY GBL § 349-c and that such damages be assessed for each insurance claim involving a person 65 years of age or older;

(11)     That Defendants pay costs and attorney fees pursuant to, *inter alia*, NY GBL § 349;

(12)     That Defendants pay pre-judgment interest;

(13)    That Plaintiffs be awarded such other and further relief as this Court may deem just and proper.

## Jury Demand

Plaintiff demands trial by jury.

Dated:  June 15, 2017                    By:  *Elizabeth Shieldkret*
                                              Elizabeth Shieldkret (ES 0625)
                                              67-20 Exeter Street
                                              Forest Hills, NY 11375

                                              (718) 997-0290
                                              es@eshieldkret.com

                                              Attorney for Plaintiffs,
                                              Jennifer Fung-Schwartz, D.P.M.
                                              individually and/or on behalf of patients,
                                              and
                                              Jennifer Fung-Schwartz, D.P.M., L.L.C.

<u>Certification of Service</u>

I, Elizabeth Shieldkret, hereby certify that a true and correct copy of the foregoing Amended Complaint and Jury Demand is being electronically filed with the court on June 15, 2017 and is, therefore, being served on Defendants' counsel of record by the court's CM/ECF system.


By:    <u>/s/ Elizabeth Shieldkret</u>
Elizabeth Shieldkret