UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JENNIFER FUNG-SCHWARTZ, D.P.M.,
individually and/or on behalf of patients, and
JENNIFER FUNG-SCHWARTZ, D.P.M., L.L.C.,

                            Plaintiff,

          v.

CERNER CORPORATION and CERNER
HEALTHCARE SOLUTIONS, INC.,

                            Defendants.

17 Civ. 233 (VSB)

ECF Case

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION**

**Table of Contents**

Page

I.    INTRODUCTION ...................................................................................................... 1

II.   BACKGROUND ...................................................................................................... 4

    A. THE PARTIES AND THEIR RELATIONSHIP ................................................. 4

    B. CERNER BLATENTLY IGNORED ITS OBLIGATIONS
    CONCERNING PROTECTED PATIENT HEALTH INFORMATION
    WHEN IT HELD PATIENTS' HELATHCARE HOSTAGE ............................. 7

    C. CERNER HAD NO LEGAL RIGHT TO HOLD PATIENTS'
    HEALTHCARE HOSTAGE .............................................................................. 8

    D. CERNER ACTIVATES THE KILL SWITCH ................................................ 12

    E. CERNER'S PROBLEMS RESTORING ACCESS ........................................... 13

III.  ARGUMENT ......................................................................................................... 15

    A. THE LEGAL STANDARD ............................................................................. 15

    B. LIKELIHOOD OF SUCCESS ........................................................................ 15

        1.  Conversion ............................................................................................. 15

        2.  Tortious Interference With Business Relations ........................................ 17

        2.  Tortious Interference With Contract ........................................................ 18

    C. IRREPARABLE HARM ................................................................................. 19

    D. THE BALANCE OF THE HARDSHIPS DECIDEDLY FAVORS ISSUING
    A PRELIMINARY INJUNCTION ................................................................... 21

    E. THE PUBLIC INTEREST DECIDEDLY FAVORS ISSUING A
    PRELIMINARY INJUNCTION ....................................................................... 23

    F. THE SCOPE OF THE INJUNCTION .............................................................. 24

IV.  CONCLUSION ...................................................................................................... 25

# Table of Authorities

Page

**Cases**

*16 Casa Duse, LLC v. Merkin,*
    791 F.3d 247, 252 (2d Cir. 2015)..........................................................................18

*Albany Medical College v. McShane,*
    66 N.Y.2d 982, 984 (1985)...................................................................................16

*Fishman v. Paolucci,*
    628 Fed. Appx. 797, 800-801 (2d Cir. 2015)......................................................20

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110, 118 (2d Cir. 2009)........................................................................19

*Gerkin v. Werner,*
    106 Misc.2d 643, 644 (N.Y. Sup. Ct. 1980)...................................................16-17

*Jill Stuart (Asia) LLC v. Sanei Int'l Co.,*
    548 Fed. Appx. 20, 22 (2d Cir. 2013)..................................................................18

*Roach v. Morse,*
    440 F.3d 53, 56 (2d Cir. 2006).............................................................................15

*Rodriguez ex rel. Rodriguez v. DeBuono,*
    175 F.3d 227, 235, n.9 (2d Cir. 1999)..................................................................15

*State v. Seventh Regiment Fund, Inc.,*
    98 N.Y.2d 249, 260 (2002)...................................................................................16

*Strouchler v. Shah,*
    891 F. Supp. 2d 504, 522 (S.D.N.Y. 2012).....................................................19, 22

*Sullivan v. M.A.C. Design Corp.,*
    2015 U.S. Dist. LEXIS 124600 (E.D.N.Y. Apr. 27, 2015)..................................16

*United States v. New York State Div. of the Lottery,*
    2007 U.S. Dist. LEXIS 98828, 9-10 (S.D.N.Y. Mar. 13, 2007)(Jones, J.)...........15

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7, 20 (2008)...........................................................................................15

Page

**Statutes and Rules**

New York Edu. Law § 6810 ...................................................................................5

New York Edu. Law § 6530 ............................................................. 11, n.10, 18

New York Pub. Hlth. Law § 18 ........................................................... 16, 18

NYCRR Title 10 § 80.................................................................................5


Rule 65(d), Fed. R. Civ. P. .................................................................. 4, 14

45 CFR § 164.304 ............................................................................ 10, 10, n. 9

45 CFR § 164.306 ............................................................................ 24, n.24

45 CFR § 164.306(a)(1) ...................................................................... 10

45 CFR 164.502............................................................................... 24, n.24

45 CFR 164.504(e) ...............................................................................8, n.8

45 CFR 164.504(e)(5) ..........................................................................9, n.8

## I.      INTRODUCTION

Plaintiffs, Dr. Jennifer Fung-Schwartz, DPM, ("Dr. Fung-Schwartz" or the "Doctor") individually and/or on behalf of her patients ("Patients"), and Jennifer Fung-Schwartz DPM LLC ("the Practice") submit this Memorandum in Support of Plaintiffs' Motion for a Preliminary and Permanent Injunction.   Plaintiffs seek an Order preventing Defendants, Cerner Corporation ("Cerner Corp.") and Cerner Healthcare Solutions, Inc. ("Cerner Solutions," and collectively "Cerner") from denying Plaintiffs access to their medical records.

There are over 6,500 patients under the care of Dr. Fung-Schwartz and the Practice whose medical records are currently stored in Cerner's EMR system.   On October 13, 2016, Cerner deliberately engaged in an illegal and dangerous act of self-help by activating a "kill switch" embedded in their software in order to cut off Dr. Fung-Schwartz's and the Practice's access to those thousands of Patients' medical records.   This had the immediate effect of denying medical care to Patients.   Cerner knew this and made a deliberate choice to take this action knowing Patients could not be treated while Cerner denied access.   Moreover, because Cerner had the Doctor's medical records and schedule, Cerner knew exactly how many Patients' records they were ransoming and even which Patients had appointments scheduled.   As Cerner knew, after Cerner activated the kill switch, Dr. Fung-Schwartz could not write prescriptions because New York State law requires electronically prescriptions and she was registered in the New York State system through the Cerner EMR.

Also, Dr. Fung-Schwartz was unable to consult Patients' records – as required by basic standard of care – to see if treatments were contraindicated by, for example, potential allergic reactions or drug interactions.   Nor could she could view test results

which had been entered into Patient records on the system.  The Practice could not even re-schedule Patients' appointments.

Cerner not only knew this denial of Patient care would necessarily result from its malicious actions; but Cerner was also, in fact, counting on it:  Cerner deliberately held Patients' health hostage over a fee dispute.[1]  Exactly as hackers use "ransom ware" to extract money from care providers, Cerner used its kill switch on Patients' medical records as part of a scheme to extract fees from Plaintiffs.  And as with ransom ware, Cerner did this with utter disregard for the rights and well-being of innocent Patients.

Cerner deliberately put the health of innocent Patients at risk knowing that Cerner's acts were forbidden by both the Health Insurance Portability and Accountability Act ("HIPAA") and the related Federal regulations promulgated by the Department of Health and Human Services ("HHS").  In fact, two weeks before Cerner activated the kill switch, HHS had issued an advisory that Cerner's precise actions were illegal.[2]  Yet knowing all this – and knowing they could have simply sued over the fee dispute – Cerner still chose to engage in dangerous and illegal self-help.  In addition to breaking the law, Cerner knowingly and deliberately violated its own HIPAA-required agreement with the Practice which incorporates the language of the HHS regulations.[3]

---

[1]     This is particularly dangerous because Dr. Fung-Schwartz regularly performs surgeries and has patients come to her office for follow-up appointments.

[2]     More than a year earlier, in April 2015, HHS's Office of the National Coordinator for Health Information Technology (ONC) submitted its Report to Congress concerning Health Information Blocking.   The Report's Scenario #3, "Kill Switch," analyzed the scenario in which a vendor activated a kill switch embedded in its software after a billing dispute.  As a result, "clinicians are unable to access basic clinical information necessary for patient care (e.g., diagnoses, medications, and test results)."  The report concludes, "**Analysis:** On these facts, Vendor has engaged in information blocking."

[3]     Under HIPAA, Cerner and any business partner who received protected patient information were required to agree in writing to (1) maintain the Practice's access to the

Because of the danger to Patients and because Cerner's actions evidenced utter disregard for the law and agreements they had signed, Dr. Fung-Schwartz was forced to immediately file the parent action in order to restore her ability to provide medical care to her Patients.  Plaintiffs' counsel was able to obtain a representation from Cerner's counsel that Dr. Fung-Schwartz's service would be restored.  Yet, five days after those representations, the service still had not been fully restored and Dr. Fung-Schwartz remained unable to prescribe medication electronically as required by New York State law.  Plaintiffs therefore sought a TRO from this Court.

Even while Cerner agreed to fully restore the EMR services, unwinding Cerner's illegal act of self-help proved complicated and time-consuming, with the Patients' treatment compromised during the entire outage.  Cerner explained to the Court that the systems were complex and that features which had still not been restored were from "a separate third-party application."  Cerner again had an issue with a third-party application which lead to another interruption in January 2017.  (16 Civ. 8019, Doc. 8). Even after Cerner agreed in Court to restore access to the EMR system, Cerner continued to insist they were entitled to cut off service to the Patients' medical records in the future.

There is an ongoing pattern here of Cerner's insistence on their ability to use their "kill switch" and deprive Plaintiffs of access to their own medical records, records which Cerner acknowledges they do not own.  From the very outset, Cerner has insisted on its self-proclaimed right to flout Federal law, New York law and the HIPAA-

---

protected patient health information, (2) **refrain from using the information for any unauthorized purpose** and (3) return the information at the end of the contract, or if return is not feasible, (4) extend the protections of the contract – *viz.* maintaining the Practice's access to the information.

required contract.  Clearly, without the intervention of the Court, all the Patients have to rely upon is the goodwill of a company which has already demonstrated an utter disregard for Patients' well-being.

Under controlling Second Circuit law, a lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address.  In some circumstances, even the mere the threat of patients losing access to medical care constitutes irreparable harm.  Under New York and Second Circuit law, Dr. Fung-Schwartz has standing to assert the Patients' rights and claims.

The facts are undisputed:  Cerner never owned the medical records.  Cerner's action was never legal or permitted.  At all times Cerner's action was in violation of HIPAA, HHS regulations and Cerner's own contract terms.

Accordingly, with respect to the injunctive relief, Plaintiffs are likely to succeed on at least three of the claims from the Amended Complaint:  Conversion, Tortious Interference with Business Relations and Tortious Interference with Contract.  There is no question that the balance of the hardships weighs decidedly in Plaintiffs' favor.  Moreover, there is a definite and paramount public interest in ensuring that Patients' health and care be protected and doctors and patients have full access to records they need for medical treatment any time they need it.  There is a public interest in the treatment of the more than 6,500 Patients being able to receive uninterrupted medical care.  As the difficulties in restoring service and the second outage in January 2017 demonstrate, there are third-party components to the system which need to be covered by the injunction.  Plaintiff cannot even know the identity of all these parties.  Only the protections of Rule 65(d) – requiring Cerner serve the injunction on anyone acting in concert to deliver the EMS services – will put these parties on notice of the seriousness

of the situation.  The injunction will change default behavior of third-parties by ensuring they act independently to satisfy their obligation to the Court.

What happened in this case is clear:  Cerner Corporation and its subsidiary, Cerner Healthcare Solutions – representing nearly $5 billion of annual revenue – had an alternative means to resolve a collection dispute which would not put innocent Patients' healthcare at risk.  They could have filed a lawsuit.  The callousness of Cerner's calculation here cannot be overstated.  Cerner weighed the well-being of over 6,500 Patients against their claim for $20,000 and chose the money.

## II.   BACKGROUND

### A.   THE PARTIES AND THEIR RELATIONSHIP

Dr. Fung-Schwartz started using Cerner's electronic medical records (EMR) system in 2006.  (Amended Complaint Ex. 1; Doc. 18-1).  Since then, Cerner moved the records to an online system that the Doctor logs into to use.  Accordingly, the electronic records are no longer stored on a computer in her office, but are stored remotely on a server controlled by Cerner.  There are now over 6,500 patients under the care of Dr. Fung-Schwartz whose medical records are in the EMR system.  (Givans Dec. ¶ 2).  Cerner never told Dr. Fung-Schwartz that it had embedded a kill switch in the software.

In March 2016, New York State's I-Stop law (The Internet System for Tracking Over-Prescribing Act) required doctors to (1) write prescriptions electronically, (2) check a state registry before prescribing certain drugs and (3) consult and annotate patient records when prescribing certain drugs.  NY Education Law Article 137 § 6810; Title 10 NYCRR Part 80 Rules and Regulations on Controlled Substances.  New York State implemented these measures to further its policy of protecting patients from addiction and stemming the opiate epidemic.  As New York's Attorney General stated:

> New York's historic I-STOP law has transformed the way
> our state is fighting the scourge of opiate addiction. Paper
> prescriptions had become a form of criminal currency that
> could be traded even more easily than the drugs themselves.
> That's why, when I authored the I-STOP law, one of my
> main goals was to reduce the value of stolen or forged paper
> prescriptions. The first major phase – the secure online
> database to prevent doctor-shopping and improve physician
> knowledge – has already been widely hailed as a success
> since its inception in late 2013. By moving to a system of e-
> prescribing we can curb the incidence of these criminal acts
> and also reduce errors resulting from misinterpretation of
> handwriting on good faith prescriptions.

Statement by A.G. Schneiderman on the Full Implementation of I-Stop.[4]  The Practice

had Cerner add the electronic prescription feature to the EMR system to meet New

York's e-prescription registration requirements. (Fung-Schwartz Dec. ¶ 15).

Dr. Fung-Schwartz or her staff logs into the EMR system to, *inter alia,* (1) enter

notes about treatment and the patient's response to treatment, (2) enter, view and

update a patient's medical history, for example, allergic reactions to a drug or changes

in a chronic condition such as diabetes, (3) upload test results from labs and X-rays to

the patient files, (4) write prescriptions (including, when prescribing a controlled

substance, checking a registry and noting in the patient's EMR the results in accordance

with New York I-Stop law), (5) make and change appointments and manage the

Practice's calendar, (6) access patient demographic and insurance information and (7)

keep track of billing, including patient and insurance payments.  (Fung-Schwartz Dec.

¶¶ 15-19; Givans Dec. ¶ 2).[5]

---

[4]     https://ag.ny.gov/press-release/statement-ag-schneiderman-full-implemention-i-stop

[5]     On their first visit, Patients fill out paperwork which includes an authorization for Dr. Fung-Schwartz to bill insurance directly as a provider on behalf of the Patient. (Givans Dec. ¶ 3).

In December 2014, the Practice began using Cerner to do its medical billing (also called "RCM" for revenue cycle management).  Cerner repeatedly failed to timely and properly submit insurance and Medicare claims, which led to a billing dispute about Cerner's services and fees.[6]  The billing dispute was not about the EMR service.

### B.   CERNER BLATENTLY IGNORED ITS OBLIGATIONS CONCERNING PROTECTED PATIENT HEALTH INFORMATION WHEN IT HELD PATIENTS' HELATHCARE HOSTAGE

On May 11, 2016 Jay Wright, a Sales Executive from Cerner Corp. e-mailed Dr. Fung-Schwartz a quote of approximately $650/month for the EMR service.  (Shieldkret Dec. Ex. 1).  Nevertheless, Cerner apparently continued to bill $1750/month after June 1, 2016.  On July 15, 2016, Cerner sent a demand letter for approximately $20,000 it alleged the Practice owed for the RCM service, including charges for the past 30 days – the period after the end date Melissa Jones had agreed to.  (Shieldkret Dec. Ex. 2).  Just two months later, Cerner Corp.'s outside counsel, Nathan Neuman, Esq. sent a demand for over $101,000.  (Shieldkret Dec. Ex. 3).

Dr. Fung-Schwartz hired counsel, Joe Paterno, III, Esq., to negotiate with Cerner Corp.  Mr. Paterno asked Cerner to **return** the Patient files that comprise the EMR by providing her with an archive which she could read and print:

> Cerner shall archive and allow access to all of Dr.'s patient files and records, such that the entire physical and electronic patient files may be read and printed by Dr. at a

---

[6]   It appears Cerner failed to submit and collect at least $220,000 in insurance and Medicare billing.  (Amended Complaint, Doc. 18 ¶ 77).  By February 2016, Cerner agreed that the Practice could terminate the use of Cerner's RCM.  In April 2016, Melissa Jones, Sr. Client Financial Specialist Cerner Corporation, e-mailed Dr. Fung-Schwartz to ascertain a final date.  After finding another company, Dr. Fung-Schwartz told Cerner she would stop using Cerner RCM by June 1, 2016 but she wanted to continue to use the EMR software and she had mailed a $6000 payment to Cerner.  (Fung-Schwartz Dec. Ex. 1).

commercially reasonable fee, which fee shall be
expeditiously disclosed by Cerner to Dr. in advance;

(Shieldkret Dec. Ex. 4, p. 2).  Cerner refused to return the Patients' protected health

information. Instead, Mr. Neuman wrote to Mr. Paterno on October 10, 2016:

> **Cerner has just recently terminated the contract** … and all
> services with Dr. Fung-Schwartz **including EMR**.
> Assuming we can come to terms, **a new EMR contract will
> need to be signed between the parties and then Cerner
> maybe able to respond to your client's list of demands**
> contained on page 2 of your letter.

Shieldkret Dec. Ex. 5 (emphasis added).  Cerner did not have the legal right to refuse to

return the Patient records; they never belonged to Cerner.  In fact, Cerner refused to

even consider returning them unless Dr. Fung-Schwartz first agreed to "come to terms"

and then also entered into a new EMR contract and then "**maybe**" Cerner would

consider returning Patient records.[7]

### C.  CERNER HAD NO LEGAL RIGHT TO HOLD PATIENTS' HEALTHCARE HOSTAGE

Cerner could not deny Plaintiffs access to their medical records under the

controlling law and the contract required under HIPAA with The Practice.  To comply

with HIPAA and HHS regulations, the Practice and Cerner entered into a Business

Associate Contract[8] which governed the use of the protected patient health information

---

[7]     On January 27, 2017, litigation counsel again asked Cerner's litigation counsel to transfer the Patient EMR files.  Shieldkret Dec. Ex. 6.  Cerner never responded.

[8]     Under HIPAA, two categories of persons who come into contact with protected patient health information are Covered Entities ("CE"s) and Business Associates ("BA"s).  Covered Entities include Dr. Fung-Schwartz and the Practice (as well as hospitals, labs and others who provide services to patients).  Business Associates include Cerner and others who provide support services to Covered Entities.

HIPAA requires (1) Covered Entities to have Business Associate Agreements ("BAAs") with service providers which incorporate and comply with the HIPAA regulations concerning protected patient health information (45 CFR 164.504(e)) and (2)

and was incorporated into the original 2006 contract.  Citing, HHS regulations, the

Business Associate Contract ("BAC") strictly prohibits Cerner from using Patients'

medical records for any purpose not authorized by the Practice:

> **3.   Limits On Use And Disclosure Established By Terms Of Contract.**
> Cerner hereby agrees that it may not use or disclose the information
> provided or made available by Covered Entity for any purpose other
> than as expressly permitted or required by this Contract, the software
> agreement with Cerner, or by the HHS Privacy Regulations.  (ref. 45
> C.F.R. 164.504(e)(2)(i)).

(Doc. 18-1, Ex. 1, p. 8).  The BAC also requires Cerner to surrender the information back

to the Practice and then destroy any copies (*Id.*, p. 9) so the Practice always maintains

control over who has access to protected patient health information:

> **15.   Return or Destruction of Information.**
> At termination of this Contract, Cerner hereby agrees to return or
> destroy all Information received from, or created and received by
> Cerner on behalf of Covered Entity.  If return or destruction of the
> Information is not feasible, Cerner agrees to extend the protections of
> this Contract for as long as necessary to protect the Information and to
> limit any further use or disclosure.  If Cerner elects to destroy the
> Information, it shall certify to Covered Entity that the Information has
> been destroyed.  (ref. 45 C.F.R. 164.504(e)(2)(ii)(I)).

Not only was Cerner a party to this HIPAA-required Contract, but Cerner also

drafted the language of this Contract specifically to comply with the HIPAA

regulations.  Moreover, it is inconceivable that Cerner – whose core business is

regulated under HIPAA and the BACs with its customers – did not know about the

---

Business Associates to have BAAs down the line with any subcontractors who come
into contact with patient health information.  45 CFR 164.504(e)(5).

Accordingly, Cerner Corporation must have signed a Business Associate
Agreement in this matter – whether as the Business Associate (as Cerner Corp.'s
attorney Mr. Neuman represented) or as a subcontractor of another Cerner entity – and
that agreement must have prohibited Cerner Corporation from ransoming or cutting off
access to the protected patient health information.  In this case the agreement Cerner
wrote and attached to the 2006 contract between Cerner and the Practice was called
"Business Associate Contract" ("BAC").  (Doc. 18-1, pp. 8-10).

numerous Federal regulations which prohibited self-help and required them to make

the EMR available to all the Plaintiffs.  For example, 45 CFR § 164.306(a)(1) states:

> § 164.306 Security standards: General rules.
> (a)General requirements. Covered entities and business
> associates must do the following:
>> (1) Ensure the confidentiality, integrity, and
>> **availability of all electronic protected health**
>> **information the covered entity or business associate**
>> **creates, receives, maintains, or transmits**.

(emphasis added).  Definitions are found in 45 CFR § 164.304.[9]

In fact, in April 2015, HHS's Office of the National Coordinator for Health

Information Technology (ONC) submitted a Report to Congress concerning Health

Information Blocking which concluded that the use of a kill switch that prevented

clinicians from accessing basic clinical information necessary for patient care (e.g.,

diagnoses, medications, and test results) was improper information blocking.  On

September 28, 2016, HHS's Office of Civil Rights issued an opinion (FAQ 2074) which

specifically stated that Cerner's exact actions were prohibited:

> **May a business associate of a HIPAA covered entity block or**
> **terminate access by the covered entity to the protected health**
> **information (PHI) maintained by the business associate for or on**
> **behalf of the covered entity?**
>
> **Answer:**
> **No.**
>
> First, a business associate may not use PHI in a manner or to
> accomplish a purpose or result that would violate the HIPAA
> Privacy Rule. See 45 CFR § 164.502(a)(3). Generally, if a business
> associate blocks access to the PHI it maintains on behalf of a
> covered entity, including terminating access privileges of the

---

[9]      Access means the ability or the means necessary **to read, write, modify, or**
**communicate data/information or otherwise use any system resource**
            …
        Availability means the property that data or information is **accessible and**
**useable upon demand by an authorized person.** 45 CFR § 164.304. (emphasis added).

covered entity, the business associate has engaged in an act that is an impermissible use under the Privacy Rule. **For example, a business associate blocking access by a covered entity to PHI (such as where an Electronic Health Record (EHR) developer activates a "kill switch" embedded in its software that renders the data inaccessible to its provider client) to resolve a payment dispute with the covered entity is an impermissible use of PHI.** Similarly, in the event of termination of the agreement by either party, a business associate must return PHI as provided for by the business associate agreement. If a business associate fails to do so, it has impermissibly used PHI.

Second, a business associate is required by the HIPAA Security Rule to ensure the confidentiality, integrity, and availability of all electronic PHI (ePHI) that it creates, receives, maintains, or transmits on behalf of a covered entity. See 45 CFR § 164.306(a)(1). **Maintaining the availability of the ePHI means ensuring the PHI is accessible and usable upon demand by the covered entity, whether the PHI is maintained in an EHR, cloud, data backup system, database, or other system.** 45 CFR § 164.304. This also includes, in cases where the business associate agreement specifies that PHI is to be returned at termination of the agreement, returning the PHI to the covered entity in a format that is reasonable in light of the agreement to preserve its accessibility and usability. **A business associate that terminates access privileges of a covered entity, or otherwise denies a covered entity's access to the ePHI it holds on behalf of the covered entity, is violating the Security Rule.**

(emphasis added).[10]

---

[10] New York State also requires that patients' medical records be maintained for at least six years from the patient's last visit.  New York State Education § 6530 Definitions of Professional Misconduct

§ 6530. Definitions of professional misconduct.

Each of the following is professional misconduct...
32. Failing to maintain a record for each patient which accurately reflects the evaluation and treatment of the patient.... Unless otherwise provided by law, all patient records must be retained for at least six years. Obstetrical records and records of minor patients must be retained for at least six years, and until one year after the minor patient reaches the age of eighteen years;

### D.   CERNER ACTIVATES THE KILL SWITCH

As the Business Associate holding the protected health information in all of Dr. Fung-Schwartz electronic medical records, Cerner knew there were more than 6,500 Patients who were already affected by Cerner's refusal to return the medical records. The Report to Congress and the FAQ from HHS could not be more pertinent or clear. Nevertheless, on October 13, 2016 at approximately 11 a.m. – in the middle of a workday with Patients at the Practice – Cerner deliberately and maliciously activated the kill switch and cut off Dr. Fung-Schwartz's access to the Patient medical records. (Fung-Schwartz Dec. ¶ 12).

Cerner knew that denying access to the medical records would necessarily affect Patients' treatment.  Cerner knew, for example, the number of patients who had appointments that day.  Cerner also knew that under New York law, Dr. Fung-Schwartz could not write prescriptions without access to both the medical records and the New York registry for controlled substances.  Cerner not only knew all this, Cerner was counting on it, attempting to hold the healthcare of innocent Patients hostage[11] in an unpermitted attempt at self-help in collection of a disputed billing amount.

Clearly, Cerner Corporation and its subsidiary, Cerner Healthcare Solutions, – representing nearly $5 billion of annual revenue according to Cerner Corp's 2016 10K

---

[11]      It is worth noting the evanescence of the line between what Cerner did and the extortion exacted from hospitals by ransom ware hackers.  Both use the well-being of patients as leverage.  Both demand exorbitant sums.  Cerner Corporation's attorney, Nathan Neuman, Esq., demanded $101.794 from Dr. Fung-Schwartz to settle Cerner's claim noting, ominously, that Cerner Corporation had already "terminated" the contract.  That amount is far in excess of the amount identified by Cerner as being at issue – $19,998 – in a letter just two months prior.  Both attempt to hide the identity of the responsible party from liability.  In this action, Cerner Corp. has repeatedly attempted to argue it is not a party to the contract – the exact contrary of what Mr. Neuman represented in his attempt to obtain over $101,000 from Dr. Fung-Schwartz.

filing – had an alternative means for resolving this collection dispute which would not put innocent Patients' healthcare at risk. Cerner weighed the well-being of over 6,500 Patients against their claim for $20,000 and chose the money.

### E.   CERNER'S PROBLEMS RESTORING ACCESS

It was only after Plaintiffs filed the parent action and obtained a TRO hearing on October 18, 2016 in this Court that full access was finally restored.  A previous agreement with Cerner's counsel did not accomplish restoration.  As Cerner's counsel explained to the Court, "My understanding was that there might have been an issue that when they terminate an account there are several flags that exist, I guess, and we thought we had – consistent with what I had talked about on Friday, we thought we had clarified all of that and corrected it."  (10/18/2016 Hearing Tr. 6:24 - 7:3).

Restoring service involved third party contractors and applications. Accordingly, Cerner's agreement alone was not sufficient to fully restore service; there was a 4-day delay (when no prescriptions could be written, and other services were sporadic).  So, for example, Cerner's counsel explained that scheduling "which is in and of itself another application. These are fairly complex systems with a lot of pieces," (*Id.* 7:9–11) had issues and worked sporadically and that the e-prescription function: "It is again a separate third-party application."  (*Id.* 8:9–10).

Apparently, the cooperation of third parties is necessary for full service to function.[12]   That issue was underscored when there was another service outage in

---

[12]     In an email, Cerner's counsel notes:  "I have had a chance to receive a follow-up from the client.  The prescription issue your client identified to us this morning appears to concern a third-party application.  Our client is reaching out to the third-party to make sure there is no barrier to your client's access." (Shieldkret Dec. Ex. 7). Under HIPAA and its regulations, subcontractors should have been bound by Cerner to the Business Associate Contract  *See* note 8, *supra*.

January concerning the function that verifies patient insurance coverage; that also involved a third-party application.  Cerner never explained why service was interrupted.

The involvement of numerous third-parties – parties who are unknown to Plaintiffs and whom Plaintiffs do not know how to contact directly – underscores the need for the protections of Rule 65(d).  The very complexity of the systems presents another reason injunctive relief is necessary.  Plaintiffs cannot even know who is responsible for the different portions of the EMS system.  Requiring Cerner to serve the third-parties with an Order under Rule 65(d) prevents outages two ways:  (1) it makes the third-parties aware of the duty to keep the medical records available and (2) it gives the third-parties an incentive to follow the Court's order, even if Cerner decides it want to activate the kill switch.  In short, binding third-parties under Rule 65 is an effective way to change the default behavior of the actors – to keeping the records accessible.

In fact, despite the clear legal mandate to keep the records accessible to Plaintiffs and despite the difficulty Cerner had restoring access, Cerner still maintains that it has a right to cut off access.  When the parties discussed extending the terms of the TRO – as the Court had suggested would be appropriate (10/18/16 Hearing Tr. 10:25 –11:3), Cerner made any such agreement contingent on Cerner being able to cut-off service at some arbitrary date in the future (first December 29, 2016 and then January 29, 2017). (Shieldkret Dec. ¶ 9).

Cerner's insistence that Dr. Fung-Schwartz agree to a cut-off date, without any provision for continuity of Patient care, was plainly unreasonable and unacceptable to the Plaintiffs.  Moreover, Cerner has never acknowledged that it cannot cut off service – under HIPAA and the BAC – until such provisions are made.

14

## III. ARGUMENT

### A.  THE LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir. 2006) (internal quotation marks and citation omitted).  "Although a showing of 'irreparable harm' is required for the imposition of any injunctive relief, preliminary or permanent, the 'imminent' aspect of the harm is not crucial to granting a permanent injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235, n.9 (2d Cir. 1999) (per curiam) (internal citation omitted).

### B.  LIKELIHOOD OF SUCCESS

The plaintiffs in this action have asserted at least three causes of action which support entry of an injunction:  1) conversion (Amended Complaint Counts 1, 9); 2) tortious interference with contract (Amended Complaint Count 12); and 3) tortious interference with business relations (Amended Complaint Count 13).  In this case, Cerner's intentional denial of access to medical records necessary for medical care is so egregious and so clearly illegal that there is a substantial likelihood of success on the merits on these claims.

#### 1.  Conversion

*United States v. New York State Div. of the Lottery*, 2007 U.S. Dist. LEXIS 98828, 9-10 (S.D.N.Y. Mar. 13, 2007)(Jones, J.) sets forth the elements of conversion in New York:

> Under New York law, to establish a conversion action, a plaintiff must show legal ownership of, or a superior possessory right in, the disputed property, and "that the defendant exercised [unauthorized] dominion over that property, . . . to the exclusion of the plaintiff's rights." *Middle East Banking Co. v. State Street Bank Intern.*, 821 F.2d 897, 906 (2d Cir. 1987) (quoting *Meese v. Miller*, 79 A.D.2d 237, 242, 436 N.Y.S.2d 496 (4th Dep't 1981)).

> \*                  \*                  \*

> To prevail in a suit for conversion, the plaintiff must prove that his ownership or possessory interest in the disputed property was superior to that of the defendant, and that the defendant interfered with the plaintiff's ownership interest in such property. *United States v. State of New York*, No. Civ. 80 1113E, 1987 U.S. Dist. LEXIS 14745, 1987 WL 9392, at \*2 (W.D.N.Y. Apr. 11, 1987).

A demand for the return of the property is not required if demand would be futile because the circumstances show that the defendant knows it has no right to the goods. *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260 (2002); *Sullivan v. M.A.C. Design Corp.*, 2015 U.S. Dist. LEXIS 124600 (E.D.N.Y. Apr. 27, 2015).

Cerner's illegal denial of access to Plaintiffs' medical records constituted a conversion of those records. Cerner has never had any ownership interest in the medical records. Dr. Fung-Schwartz owns them. "The law in New York State is clear 'that records taken by a doctor in the examination and treatment of a patient become property belonging to the doctor.' (*Matter of Culbertson*, 57 Misc 2d 391, 392-393.)" *In re Estate of Finkle*, 90 Misc. 2d 550, 552 (N.Y. Sur. Ct. 1977); *Albany Medical College v. McShane*, 66 N.Y.2d 982, 984 (1985).[13] Patients have a statutory right to access and copy their medical records. N.Y. Pub Health Law § 18. Courts have found that patients therefore have a property right in the records. *See, e.g., Gerkin v. Werner*, 106 Misc. 2d 643, 644 (N.Y. Sup.

16

Ct. 1980)("A patient, however, has a property right sufficient to afford such patient the right of reasonable access to his own medical records…").

Cerner exercised dominion over Plaintiff's property when it activated the kill switch to prevent Plaintiffs from accessing their medical records. Cerner knew it had no right to deny Plaintiffs access to their medical records according to agreements the Defendants had made, according Federal Regulations and also according to HHS's Report to Congress and the guidance issued by HHS's Office of Civil Rights in FAQ 2074, which specifically addressed this very issue. Denying Plaintiffs access to their medical records was obviously to the exclusion of the Plaintiffs' rights – including the statutory right New York patients have to their medical records.  Indeed, Cerner's intention was to deny medical treatment to Patients and gamble on Patients' health.

A demand was not required.  Nevertheless, Dr. Fung-Schwartz's counsel had asked for the data to be returned (Shieldkret Dec. Ex. 4, p. 2) – which Cerner refused even to discuss – prior to Cerner activating the kill switch.  (*Id*. Ex. 5).  There is no other conclusion than Cerner's acts constituted a conversion.  On this claim, Plaintiff is entitled to judgment and a permanent injunction to prevent any subsequent illegal acts by Cerner.

## 2.   Tortious Interference With Business Relations

"To prevail on a claim for tortious interference with business relations – also known as tortious interference with prospective economic advantage, *see Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)  – under New York law, a plaintiff must show that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful

---

[13]     In disputes where a doctor leaves a practice, New York has found that the practice owns the records, but the doctor is entitled to copy records on behalf of patients

purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Id.*" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, (2d Cir. 2015). Here, both Dr. Fung-Schwartz and the Practice had business relations with Patients.

Cerner's denial of access to the medical records clearly interfered with those relations. Patients came in for appointments and Dr. Fung-Schwartz could not access their test results or medical histories, write prescriptions for them or even schedule future appointments. (Fung-Schwartz Dec. ¶¶ 15-18). It is obvious such interruptions in service at a minimum cause annoyance, frustration and anxiety for patients. Cerner's self-help was prohibited by agreements they signed, was prohibited by HIPAA and associated regulation and was specifically identified as impermissible in HHS's Report to Congress and FAQ 2074. Cerner intended to harm the relationship between Dr. Fung-Schwartz and the Practice and her patients – a wrongful purpose – and it did. Having patients view a doctor as unreliable, as the source of annoyance, frustration or anxiety, interferes with the relationship of care and trust a doctor seeks to foster with patients.

### 3.  Tortious Interference With Contract

"In order to state a claim for tortious interference, "the plaintiff must show the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 8 N.Y.3d 422, 426, 867 N.E.2d 381, 835 N.Y.S.2d 530 (2007)." *Jill Stuart (Asia) LLC v. Sanei Int'l Co.*, 548 Fed. Appx. 20, 22 (2d Cir. 2013).

Dr. Fung-Schwartz and the Practice had contractual agreements with patients. Primary among these contracts was the agreement for Dr. Fung-Schwartz and the practice to provide medical care to the patients in exchange for a fee. For example, on their first

---

who have chosen to continue treatment with the doctor.

visit, Patients sign agreements that allow Dr. Fung-Schwartz to bill their insurers for their appointments and treatments.  (Givans Dec. ¶ 3).  Naturally, Cerner knew of these contracts.  It was Cerner's intent to use a threat to these arrangements between Dr. Fung-Schwartz and the Practice and the Patients as the leverage to obtain Cerner's desired, though illegal, ends.  Dr. Fung-Schwartz was unable provide the medical care as scheduled and agreed to by the Patients because of Cerner's illegal denial of service.

### C.  IRREPARABLE HARM

A showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  To satisfy the irreparable harm requirement, a plaintiff must demonstrate that absent a preliminary injunction it will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. *Id.*

Cases in this district have noted that even the mere threat of loss of medical care can constitute irreparable harm.  "[T]here is Second Circuit and out-of-circuit appellate law holding that the mere threat of a loss of medical care, even if never realized, constitutes irreparable harm." *Strouchler v. Shah*, 891 F. Supp. 2d 504, 522 (S.D.N.Y. 2012).  According to the Second Circuit in a case that related to denial of Medicaid benefits – not the actual direct denial of medical care itself as happened here – lack of medical services is exactly the sort of irreparable harm that a preliminary injunction was designed to address:

> The district court did not abuse its discretion in finding irreparable harm. The district court concluded that "the wrongful denial of Medicaid benefits . . . is the type of non-monetary, imminent harm that is properly characterized as irreparable." App. at 438. Indeed, if the state wrongfully

> terminates Medicaid benefits because a beneficiary fails to appear, "his situation becomes immediately desperate." *Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970); *see also Blum v. Caldwell*, 446 U.S. 1311, 1314, 100 S. Ct. 1635, 64 L. Ed. 2d 225 (1980) (Marshall, J.) (order denying stay of mandate) ("[T]he very survival of these individuals and those class members . . . is threatened by a denial of medical assistance benefits . . . ."). A lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address.

(emphasis added)  *Fishman v. Paolucci*, 628 Fed. Appx. 797, 800-801 (2d Cir. 2015).

In this case, Cerner has already activated the kill switch once.  Cerner repeatedly refused to agree to allow Plaintiffs future access to their records.  To the contrary, Cerner insisted on an arbitrary cut-off date.

It is also troubling that Cerner Corp. – contrary to the representations of its own outside counsel (Shieldkret Dec. Ex. 3) – has repeatedly insisted that it is improperly named as a party to this action with no basis whatsoever.  (Doc. 21, p. 3).  There is evidence to support a finding that Cerner Corp. is actually the entity that controls the kill switch.[14]

In the face of overwhelming legal authority to the contrary,[15] Cerner refuses to acknowledge that it has legal duties to continue to provide Plaintiffs access to their medical records.

---

[14]     When Dr. Fung-Schwartz logs into her system, the splash screen shows the system is Cerner Millennium® and has a copyright notice for Cerner Corporation. (Fung-Schwartz Supp. Dec. ¶ 1 and attached exhibit). Cerner built Denial of Access into its Millennium® product.  (Cerner Corporation Health Insurance Portability and Accountability Act of 1996 (HIPAA):  Positioning of Support for EDI, Privacy and Security Requirements by Solution Updated for Key Provisions of the American Recovery and Reinvestment Act of 2009 (ARRA HITECH) March 27, 2010 available at https://www.cerner.com/uploadedFiles/HIPAA%20Solution%20Positioning%20-%202008.doc).

[15]     The existence of the embedded kill switch itself is a dangerous loaded gun in Cerner's EMR system.  The consequences are extremely serious and by the time

The involvement of numerous third-parties – parties whose identities and roles are unknown to Plaintiffs – underscores the need for the protections of Rule 65(d). Cerner attributed its inability to quickly and fully restore service in October, as well as the unexplained outage in January, to third-parties.  This makes clear that Plaintiffs require the protection of an order that binds not only Defendants' officers, agents, servants, employees, and attorneys, but also others who are in active concert or participation with Defendants.[16]

The very complexity of the systems' presents another reason injunctive relief is necessary.  As Cerner's counsel advised the Court, "These are fairly complex systems with a lot of pieces."  (October 18, 2016 Hearing Tr. p. 7, l. 9-11)   Acting after a cut-off or interruption is acting too late.  The proposed remedy here would avoid the problem, by setting default behavior and assisting the third-parties to understand their obligations to the Court, not just Cerner.  This is particularly important should Cerner attempt to activate the kill switch again.  Plaintiffs have already experienced the problems arising from Cerner's attempt to fix things piecemeal after the harm already occurred.

### D.   THE BALANCE OF THE HARDSHIPS DECIDEDLY FAVORS ISSUING A PRELIMINARY INJUNCTION

Patients' interest in halting the improper denial of access to medical records is significant.  On the other hand, as the Federal and State laws and regulations make clear, as well as the HHS Report to Congress and FAQ 2074, Cerner has no legitimate interest in denying access and treatment or engaging in such a dangerous form of self-

---

Plaintiffs find out that Cerner has activated the switch, Patients will already be in danger.

[16]    This does not present any hardship to Cerner – Cerner is required by the Federal regulations to have had those third parties sign "Business Associates Agreements"

help.  Cerner runs a massive EMR system and maintaining Plaintiff's records has only slight marginal cost to Cerner.

Cerner's failure to recognize the effect on Patients[17] was apparent in Cerner's counsel's statements at the TRO hearing and is ongoing:  "It is when it becomes a temporary restraining order that I think we've gone beyond the pale, because there is no immediate irreparable injury that is going to result here."  (October 18, 2016 Tr. 12:19-22).  Cerner's counsel's claim is plainly contrary to the law in this circuit "the mere threat of a loss of medical care, even if never realized, constitutes irreparable harm."  *Stretcher v. Shah*, 891 F. Supp. 2d 504, 522 (S.D.N.Y. 2012) (emphasis added).[18]  It also reflects Cerner's indifferent attitude toward the obvious risks to the well-being of innocent Patients.[19]

Given the history, Dr. Fung-Schwartz's over 6,500 Patients[20,21] need the protection of the Court to assure that their healthcare will not be compromised.  The treatment and

---

("BAAs") and the injunction would bind those entities to continuing to do what the BAAs already require. *See* note 5, *supra*.

[17]     It was this sort of unreasonable insistence that made it impossible to reach an agreement with Cerner. Cerner simply refuses to accept what the courts, HHS and the Plaintiffs all understand:  Denial of a doctors' access to medical records constitutes irreparable harm even if a patient did not suffer particular injury because of it.

Moreover, the situation for patients in New York is particularly urgent, because of New York's I-Stop law requiring electronic prescriptions, checking a registry and specific annotating the medical records for certain prescriptions.

[18]     (citing, *inter alia*, *LaForest v. Former Clean Air Holding Co.*, 376 F. 3d 48, 55 (2d. Cir. 2004) and *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d. Cir. 1979), see also, *Fishman v. Daines*, 2017 U.S. Dist LEXIS 46764 (E.D.N.Y. March 29, 2017).

[19]     It was, after all, only out of sheer luck that patients did not end up with compromised treatment because of Cerner's action.  It took 5 days to restore Dr. Fung-Schwartz's ability to write a prescription for pain medication for a post-surgical patient. (Fung-Schwartz Supp. Dec. ¶ 3).

[20]     In its renewed pre-motion letter for partial dismissal under Rule 12, Cerner asserts that the patients, as non-signatories to any of the contracts with Cerner, are not

well-being of Patients should not be subject to Cerner's whims and Patients should not be forced to rely solely on the good will of Defendants that have not only proved themselves unreliable but have been deliberately bad actors.  Patients should have the best assurance possible of continued access to care.  An injunction is the best way to provide such assurance.

### E.   THE PUBLIC INTEREST DECIDEDLY FAVORS ISSUING A PRELIMINARY INJUNCTION

As made clear in the extent and number of the New York state regulations relating to the issues here, there is a tremendous public interest in the protection of patients' access to medical records and the broader protection of patients' health. Because New York recognizes that the purpose of medical records is to support patients' health, New York has specific requirements for doctors to create and preserve medical records.[22]  New York's I-Stop prescription law is based on an understanding of the importance of the availability of medical records to patients' treatment and cross-checking those records against a state registry.  New York State's I-Stop legislation was specifically designed to promote the public interest in the reduction of abuse of prescription medication.[23]

---

owed any duty by Cerner and do not have any recourse for Cerner's denying them their property right in their medical records.

[21]    The original Complaint only named Dr. Fung-Schwartz as Plaintiff.  The Practice has been added in the Amended Complaint and Dr. Fung-Schwartz is suing on behalf of her Patients as well.

[22]    *See, e.g.*, New York Education Law § 6530; New York Public Health Law § 18.

[23]    *See, e.g.*, NY Department of Health Rules And Regulations On Controlled Substances PRESCRIBING AND DISPENSING CONTROLLED SUBSTANCES, Title: Sections 80.62 Use of controlled substances in treatment and 80.63 – Prescribing.

The federal government has expressed its own independent public interest in keeping medical records accessible to doctors and patients.   HIPAA and federal regulations strongly favor maintaining the accessibility of Patients' medical records.[24]

The public interest may also be served by health care providers understanding the situation facing their patients when they sign up for service with Cerner.  It is very difficult to extract a practice from an existing medical records system.  Cerner exploited that difficulty by refusing to discuss returning the records pre-suit (Shieldkret Dec. Ex. 5) and ignoring correspondence which sought the answers to specific technical questions.  (Shieldkret Dec. Ex. 6).  It is also difficult for healthcare providers to make a fully informed choice about electronic medical records companies without knowing that the patients' treatment, and thus health, may be put at risk because of the policies of the electronic medical records service provider.

### F.   THE SCOPE OF THE INJUNCTION

The scope of the relief requested here is the minimum necessary to assure the goal of maintaining the Plaintiffs' ability to provide patient and obtain medical care. The requested relief conforms to the requirements of the applicable New York State and Federal regulations – requirements that Cerner and its agents and third parties acting in concert with Cerner are already required to follow.  Moreover, the relief sought is not mandatory – Cerner, its agents and third-parties acting in concert with Cerner will be required to continue to provide the same access and services they have been

---

[24]     *See, e.g.,* 45 CFR §§164.306, 164.502

providing.[25]  Plaintiffs request that Cerner be directed to give notice to its agents and others acting in concert with them.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary and Permanent Injunction should be granted in the form submitted herewith.

Respectfully submitted,

Dated: July 6, 2017

Elizabeth Shieldkret (ES 0625)
67-20 Exeter Street
Forest Hills, NY 11375

(718) 997-0290
es@eshieldkret.com

Attorney for Plaintiffs,
Jennifer Fung-Schwartz, D.P.M. individually
and/or on behalf of patients, and
Jennifer Fung-Schwartz, D.P.M., L.L.C.

---

[25]     Because Cerner had agreed to the relief as part of the BAC, there is no additional burden on Cerner and no need for a bond.

25