UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JENNIFER FUNG-SCHWARTZ, D.P.M., individually and/or on behalf of patients, and JENNIFER FUNG-SCHWARTZ, D.P.M., L.L.C., | 17 Civ. 233 (VSB) |
| Plaintiff, | ECF Case |
| v. | Hearing: August 4, 2017 11:00 a.m. |
| CERNER CORPORATION and CERNER HEALTHCARE SOLUTIONS, INC., | |
| Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION**

# Table of Contents

Page

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............................. 1

II. PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM ...................... 4

III. CONCLUSION ........................................................................................ 10

## Table of Authorities

Page

### Cases

*Chevron, U.S.A., Inc. v. NRDC, Inc..*,
467 U.S. 837, 843-44 (1984)........................................................................3

*Fishman v. Paolucci*,
628 Fed. Appx. 797, 800-801 (2d Cir. 2015). .........................................................8

*Linden Care, LLC v. Express Scripts, Inc.*,
No. 1:15-cv-1335, 2015 WL 12734164 (N.D. N.Y. Dec. 7, 2015)........... 8, 8 n. 13

*State v. Seventh Regiment Fund, Inc.*,
98 N.Y.2d 249, 260 (2002)............................................................................4

*Sullivan v. M.A.C. Design Corp.*,
2015 U.S. Dist. LEXIS 124600 (E.D.N.Y. Apr. 27, 2015)....................................4

*Trilogy Health Care v. Medco Health Solutions, Inc.*,
No. 13-550, 2013 WL 4832708 (D. N.J. September 10, 2013). ...............8-9, n. 13

### Statutes and Rules

New York Pub. Hlth. Law § 18 .............................................................3, n. 8

P.L. 114-255 (21st Century Cures Act) ..................................................5, n. 9

45 CFR § 164.304......................................................................................2, 3

45 CFR § 164.306(a)(1)...............................................................................2

45 CFR § 164.502(a)(3)...............................................................................2

45 CFR § 164.526.....................................................................................3, n. 8

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

On June 10, 2015, Cerner Corporation's former CEO, Neal L. Patterson, testified before Congress,[1] stating "Cerner's perspective:"

> We believe that every individual has a right to access their complete health record, regardless of where it's located or what system contains the data. **It is immoral for any organization to block the flow of information that could help individuals – and their providers – make better-informed decisions about their care.**

(emphasis added). It is therefore surprising to read in Defendants Cerner Corporation's and Cerner Healthcare Solution's (collectively "Cerner") brief that "Plaintiffs have not alleged any wrongful purpose or any dishonest, unfair, or improper means used by Defendants that could support any of the newly-created tortious interference claims." (Doc. 34, p. 18[2]). Thus Defendants had one position before Congress – that blocking access, as in their use of the kill switch on October 13, 2016 was immoral and violated a right to access – and a diametrically opposed position before this Court, stating: "Cerner Solutions was **entitled (and is still entitled)** to terminate service under the Contract."[3] *Id*. (emphasis added).

"Terminate service," is Cerner's euphemism for blocking access to patients' complete health records. As detailed in Plaintiffs' moving papers (Doc. 24, p. 6, n. 2; pp.

---

1 Available at https://www.help.senate.gov/imo/media/doc/Patterson2.pdf.

2 "Doc. 34" refers to Cerner's Memorandum Of Law In Opposition To Plaintiffs' Motion For Preliminary Injunction. As used herein, "Doc __" refers to docket entries and "p. __" refers to the page number in the Court's header for the document.

3 The Amended Complaint details numerous instances where Cerner made material misrepresentations to induce reliance and then took the opposite position. Likewise, on this motion, Cerner argues to the Court that it is unfair to expect it to provide uninterrupted EMR service. Doc. 34, p. 20. In their marketing materials, however, Cerner Corporation boasts that the industry standard for Application Service Providers of EMR is "**99 percent uptime guarantee during regular business hours** (depends on supplier)." Cerner goes on to say that according to an outside study, "Cerner is one of the best vendors when it comes to system uptime/availability." https://www.cerner.com/uploadedFiles/ASPModel.pdf. (emphasis added).

12-15), under HIPAA, HHS regulations and Cerner's own contract terms, Cerner has never been "entitled" to block access to patient records. Cerner's violation of numerous laws supports tortious interference claims. Cerner acted maliciously when it illegally and deliberately hampered Dr. Fung-Schwartz's ability to provide medical care to Patients and compromised the doctor-patient relationship by activating the kill switch in its EMR software. Cerner, however, continues to assert that what it did was proper and that Cerner will do it again.

In its Opposition, Cerner plays fast and loose with the meaning of "access" under the law, using "read only access,"[4] "read-and-write access,"[5] "full access"[6] and "complete access"[7] at different times. In FAQ 2074 (quoted in full in Doc. 24, pp. 14-15), HHS explains that blocking access to medical records as part of a fee dispute is a violation of the HIPAA Privacy Rule, 45 CFR § 164.502(a)(3), because blocking access is not an authorized use of protected patient information. HHS has established the definition of access:

> Access means the ability or the means necessary to read, **write, modify,** or communicate data/information **or otherwise use any system resource**.

45 C.F.R. § 164.304. (emphasis added). This rule makes practical sense because a doctor needs to be able to use all those functions when treating a patient. Only with the modification capability, for example, can a doctor add critical treatment and patient information. HHS also finds that blocking access violates the HIPAA Security Rule, 45 CFR § 164.306(a)(1), which requires Cerner to maintain the "availability" of the medical

---

4 See, e.g., Doc 34, pp. 1, 5, 11.

5 *See, e.g.*, Doc 34, pp. 5, 12 as "read and write access."

6 *See, e.g.*, Doc 34, pp. 6, 7, 8.

7 *See, e.g.*, Doc. 34, p. 6.

records. Under 45 C.F.R. § 164.304, "Availability means the property that data or information is accessible and useable upon demand by an authorized person." The Court must defer to HHS's regulations. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 843-44 (1984).[8]

Therefore, when Cerner wrote, "However, Dr. Fung-Schwartz possessed 'read only' access to clinical patient information when she made the decision to file Lawsuit I" (Doc. 34, p. 5), Cerner conceded that Defendants broke the law and blocked access – the ability to read, write, modify or communicate data-information – required under HIPAA and the HHS regulations. Moreover, at the TRO hearing, Cerner admitted that Cerner locked Dr. Fung-Schwartz out of the system resource for writing prescriptions. (10/18/16 Hearing Tr. 7:23 – 8:4) (full transcript annexed hereto).

Cerner repeatedly tells the Court the falsehood that Dr. Fung-Schwartz "has always had access to her patient's clinical patient information." (Doc. 34, p. 18. *See also*, p. 4 "Cerner Solutions has *always* provided Dr. Fung-Schwartz with the right to access clinical patient information (whether in a read-only fashion or otherwise)," p. 5, "However, Dr. Fung-Schwartz possessed "read only" access to clinical patient information," pp. 17-18, "Dr. Fung-Schwartz has always had access (whether in 'read-only' or 'read-and-write' format) to the clinical patient information").

In fact, the evidence – uncontroverted by any Cerner witness – shows that when Cerner engaged in impermissible self-help and activated the kill switch, Dr. Fung-Schwartz could not log into the Cerner EMR (Doc. 25, ¶¶ 12, 18) and neither she nor her

---

8 Both New York Public Health Law § 18 and HIPAA regulations, 45 C.F.R. § 164.526 require the ability for patients to add statements to their medical records and New York requires the statement be integrated into the record. These regulations demonstrate one reasons why read-only access is insufficient to protect patients' rights.

assistant could view even basic patient information, such as patients' phone numbers, or any patient chart information. (*Id.*; Doc. 27 ¶ 4).

Under New York law, Dr. Fung-Schwartz owns her medical records and Patients possess a property interest in the records as well. (Doc. 24, pp. 19-21). Cerner admits that it prevented Dr. Fung-Schwartz from accessing her medical records when it activated the kill switch in its EMR software. Cerner admits it had no property interest in the medical records. Cerner's interference with Plaintiffs' superior property rights was a conversion. Cerner's insistence that Plaintiff never made a demand for the return of the records is misplaced. As a matter of law such a demand was not necessary because Cerner knew it was acting illegally and had no right to withhold the medical records. *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260 (2002); *Sullivan v. M.A.C. Design Corp.*, 2015 U.S. Dist. LEXIS 124600 (E.D.N.Y. Apr. 27, 2015). As a factual matter, Dr. Fung-Schwartz, through counsel, had already asked for the medical records to be returned (Doc. 28, p. 13) and Cerner had refused (*Id.*, p. 15).

The facts are uncontested. Defendants admit they interfered with Plaintiffs' property rights in Plaintiffs' medical records. Defendants admit they were subject to the HIPAA and the HHS regulations. Defendants admit that they intentionally activated the kill switch, even after HHS issued a FAQ which advised in detail that their exact behavior was contrary to law.

Accordingly, Plaintiffs are likely to succeed on their claims for conversion, tortious interference with business relations and tortious interference with contract.

## II. PLAINTIFFS HAVE DEMONSTRATED IRREPARABLE HARM

As Defendants make clear in their opposition, Cerner has refused and continues to refuse to agree to maintain the *status quo* during the pendency of the lawsuit. (Doc.

34, p. 18, insisting "Cerner Solutions was entitled (and is still entitled) to terminate service under the Contract."). In spite of the clear requirements of HIPAA and the HHS regulations and the needs of the Patients, Cerner continues to assert that it can unilaterally cut off access to the EMR (Doc. 34, p. 8) under the guise of reserving its rights under the Contract.

In their Opposition, Defendants start out by denying that any harm is imminent but, a few pages later, they reveal their demand that they are bound and determined to cut off Dr. Fung-Schwartz's access prior to a final resolution on the merits:

> Regardless of whether the Court determines a preliminary injunction is appropriate, Defendants request the Court require Dr. Fung-Schwartz to submit a notice to this Court within 30 days identifying a third-party who will begin providing EMR software and support to Dr. Fung-Schwartz or file a notice within 30 days stating that she intends to transition to paper records.

(Doc. 34, p. 21). In other words, Cerner expresses its intention to cut off Plaintiffs' access to Patients' medical records with absolute certainty before a resolution on the merits of the case. Moreover, in the first sentence, Cerner makes it clear that it is immaterial to Defendants what the Court determines the harm to Patients will be from shutting off access. "Regardless" of any such finding, Cerner is determined to shut off access before any finding on liability is made. They do not care, for example that such a rapid transition is not feasible[9] or whether it is detrimental to patient care. For Cerner, satisfying its spite wins out over patient care. Defendants have weighed patient safety against the $746/month of services they claim they are due – which are clearly compensable damages – and are insisting on cutting off the services. Put another way,

---

[9] In fact, they know it is not feasible. As Mr. Patterson's testimony to Congress highlights, Cerner has long been aware of problems transferring data among EMR systems. Part of the 21st Century Cures Act, P.L. 114-255, passed in December 2016 is directed toward increasing interoperability through HHS-promulgated standards for EMR vendors to meet.

Defendants are demanding – again regardless of what the Court finds on harm or likelihood of success – a change in the *status quo*, or what really is mandatory injunctive relief in their favor all without ever having alleged any underlying claim, let alone a claim they are likely to succeed on and which would not be compensable by money damages. This baseless demand underscores Defendants' determination to cut off service before any decision on liability.[10]

Cerner writes:

> Plaintiffs further hypothesize that Defendants intend to fully disable Dr. Fung- Schwartz's EMR system without notice and without giving her an opportunity to access or read her clinical patient information. Plaintiffs' conjecture should be insufficient to secure a preliminary injunction.

(Doc 34, p. 11). This is further evidence of Defendants' actual intent to shut off Dr. Fung Schwartz's access. Cerner is not arguing that it will not disable the EMR system. They are making the distinction that they would not do so "without notice and without giving her an opportunity to access or read her clinical patient information," but they are not saying – as they make clear in their demand and elsewhere throughout their opposition – that they will not cut off service. And, in fact, their intent is clearly the opposite. Cerner apparently believes that if they provide notice and allow her to merely "read" the patient records that they should be able to then activate their kill switch. What Cerner ignores is whether that is sufficient to protect Patients and allow for uninterrupted care.

---

[10] In addition to demanding mandatory relief, Defendants request the Court "require Dr. Fung-Schwartz or her practice to pay all outstanding accounts receivable and on-going monthly fees of approximately $746 per month as her invoices come due during the pendency of the preliminary injunction." (Doc. 20-21). This amounts to final monetary relief before a determination of any liability. Cerner cites no authority to support its demand.

It is disturbing that Cerner's arguments are disconnected from the reality of patient care. As just one example, Cerner writes (Doc. 34, p. 13):

> Similarly, if the so-called class of patients Dr. Fung-Schwartz represents claims they received sub-standard podiatry care because Dr. Fung-Schwartz could not access their previous clinical patient information and because she for some reason did not see fit to take a new medical history from them, they would have an adequate remedy at law against Dr. Fung-Schwartz for her apparent malpractice.

It is shocking and astonishing that Cerner – who is in the business of providing services to healthcare providers – argues that bodily injury or wrongful death that results from their blocking access to patient protected health information is fully compensable by money and do not qualify as actual, irreparable harm. This distorted view of the reality of patient harm, combined with, *inter alia*, their willingness to flout the law and their clear desire to terminate the service before a resolution on the merits reflects a problematic recklessness toward maintaining patient care.[11]

In the Cerner's scenario, quoted above, Cerner's suggestion – to have the patient complete a full medical history the next time the patient came to her office (Doc. 34, p. 12) – cannot possibly re-create the information that is stored in the EMR system, which includes years of notes, lab results, prescriptions, drawings and other patient clinical, financial and personal information.

As Dr. Fung-Schwartz explains in her Declaration, she has ten-years worth of patient files, including her notes, in the system which she cannot possibly re-create. (Doc. 25, ¶ 20). For example, lab results are entered into the EMR and older test results will not be available from the lab. (*Id.*). A doctor cannot practice without access to the

---

11 And, of course, Cerner deliberately engaged in impermissible self-help and cut off service in October 2016.

medical record, including clinical notes, test results, knowledge of prior treatments and the patient's response to those treatments.

There is no doubt that when Cerner cut off access to the EMR before, Patients were denied medical care.[12] Dr. Fung-Schwartz could not write prescriptions, view test results or read, write or modify the patients' medical records. (Doc. 25, ¶¶ 14-20). Nor is there doubt that Cerner wants to cut off the EMR before a final determination on the merits of the case. Given the extreme nature of the harm and Cerner's stated indifference to both patient suffering and its obligations under the law, a finding of irreparable harm is warranted. "A lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address." *Fishman v. Paolucci*, 628 Fed. Appx. 797, 800-801 (2d Cir. N.Y. Oct. 15, 2015).

Plaintiffs moved for equitable relief based on Cerner's malicious behavior which constituted tortious interference with business relations, tortious interference with contract and conversion. The cases Cerner cites concerning the availability of equitable relief in contract disputes are, therefore, inapposite. For example, in *Linden Care, LLC v. Express Scripts, Inc.* No. 1:15-cv-1335, 2015 WL 12734164 (N.D. N.Y. Dec. 7, 2015), the plaintiff did not make the requisite showing of wrongful or improper purpose on a tortious interference claim. Nor did *Linden* involve regulations that explicitly prohibited the actions the defendant took or planned to take.[13] The harm was not the

---

[12] It is only a matter of luck that a serious incident did not arise.

[13] *Linden* makes clear that the contract damages Cerner seeks do not justify any change to the *status quo*. Cerner can be fully compensated by contract damages later. Unlike *Linden*, this case involves a claim that Cerner overcharged Dr. Fung-Schwartz and the Practice, so Cerner owes them money. (Doc. 18, p. 26, ¶ 4). Accordingly, there is a fact dispute about whether Cerner can even claim lack of payment for EMR services or terminate the contract. On its face, the contract runs through September 2019. This is unlike the facts in *Linden* and the other case cited by Defendants, *Trilogy Health Care v.*

same because the pharmacy was just the retailer of the drugs that doctors had prescribes for their patients. Here, there is a fundamental difference between the doctor-patient relationship and a retail pharmacy. In fact, one of the solutions in the case was to have patients consult with their doctors to work out a new method of filling their prescriptions.

Defendants' June 29, 2017 letter to the Court (Doc. 21, p. 3) make it clear that Cerner wants to be able to cut off the service as soon as the Rule 12 motion is decided. Defendants ask the Court to strike the injunctive relief, including the protection that Defendants preserve the medical records and return them to Plaintiffs:[14]

> Finally, Defendants will move the Court to strike portions of Plaintiffs' Prayer for Relief, specifically paragraphs (1)-(3) and (8)-(11). Defendants seek to strike paragraphs (1) through (3) because Plaintiff has [sic Plaintiffs have] demanded injunctive relief against Defendants without either pleading a claim for an injunction or establishing that an injunction is necessary or exigent. Defendants seek to strike paragraphs (8) through (11) because Plaintiffs have prayed for remedies that would not be available in a breach of contract action.

This constitutes Cerner's second attempt to remove injunctive relief from the case after Defendants' May 31, 2017 partial Rule 12 Motion (Doc. 17). Plaintiff believed the issue was resolved when Dr. Fung-Schwartz amended the complaint. (Doc. 18). Cerner, however, has systematically challenged any legal basis for maintaining the *status quo*. Plaintiffs also learned there were serious logistical barriers to transferring to a new EMR

---

*Medco Health Solutions, Inc.*, No. 13-550, 2013 WL 4832708 (D. N.J. September 10, 2013), where the most the plaintiffs could achieve with an injunction was 2 or 3 months of service under the contract.

[14] The injunctive relief sought would (1) enjoin Defendants from deleting, destroying, altering, amending or otherwise changing any of Dr. Fung-Schwartz's electronic medical records; (2) enjoin Defendants from withholding electronic medical records from Dr. Fung-Schwartz; and (3) require Defendants to make the records available and assist with transition to a new vendor.

system. (*See*, *supra*, n. 9). Accordingly, Plaintiffs served the preliminary injunction motion.

Cerner's June 29, 2017 letter to the Court also seeks to have the claims against Cerner Corporation dismissed. (Doc. 21, p. 3). As Plaintiffs' explained in their June 22, 2017 letter to the Court (Doc. 20), this argument is frivolous: it is not possible for Cerner to prevail under the Rule 12 standard on this argument. Moreover, as set forth in the moving papers, there is evidence (Doc. 24, p. 24, n, 14; Doc. 26, ¶ 1, Ex. 1) – uncontroverted by Defendants – that it is actually Cerner Corp. who controls the kill switch in the EMR software. Under these circumstances, it is troubling that Defendants are attempting to put the entity that controls the kill switch beyond the jurisdiction of the Court.

**III. CONCLUSION**

In his Congressional testimony, Cerner's CEO told the story of his wife's frustration with the lack of interoperability of electronic health records systems:

> Because there is not widespread interoperability, Jeanne carries printed copies of her records around in shopping bags. Each record she carries represents a phone call, a wait in a line at a records desk, a fax or a photocopy. The burden of assembling those records is what she calls the "train wreck."

Cerner's proposed solution for Dr. Fung-Schwartz and her patients (Doc. 34, p. 12) – going back to using paper records and somehow re-creating ten years worth of medical history, notes, lab results, images, prescriptions and more – is a train wreck which strews more than 6,500 innocent patients onto the tracks.

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction should be granted.

Dated: August 1, 2017 /s Elizabeth Shieldkret

Elizabeth Shieldkret (ES 0625)
67-20 Exeter Street
Forest Hills, NY 11375

(718) 997-0290
es@eshieldkret.com

Attorney for Plaintiffs,
Jennifer Fung-Schwartz, D.P.M. individually and/or on behalf of patients, and
Jennifer Fung-Schwartz, D.P.M., L.L.C.

CERTIFICATE OF SERVICE

I, Elizabeth Shieldkret, hereby certify that a true and correct copy of the foregoing Plaintiff's Reply Memorandum Of Law In Support Of Motion For Preliminary Injunction is being electronically filed with the court on August 2, 2017 and is, therefore, being served on Defendant's counsel of record by the court's CM/ECF system.

s/ Elizabeth Shieldkret
Elizabeth Shieldkret (ES 0625)