gaidschc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JENNIFER FUNG-SCHWARTZ, MD,

4                    Plaintiff,              New York, N.Y.

5              v.                            16 Civ. 8019(VSB)

6    CERNER CORPORATION and CERNER
     HEALTHCARE SOLUTIONS, INC.,
7
                    Defendants.
8
     ------------------------------x
9
                                            October 18, 2016
10                                          4:04 p.m.

11   Before:

12                   HON. VERNON S. BRODERICK,

13                                          District Judge

14                          APPEARANCES

15   ELIZABETH SHIELDKRET
          Attorney for Plaintiff
16
     SHOOK, HARDY & BACON LLP
17        Attorneys for Defendants
     BY:  PATRICK FANNING (via speakerphone)
18

19

20

21

22

23

24

25

gaidschc

1          (case called)

2          THE CLERK:  Counsel, please state your name for the

3    record.

4          MS. SHIELDKRET:  Elizabeth Shieldkret for plaintiff.

5          THE CLERK:  Mr. Fanning.

6          (Pause)

7          THE COURT:  Hello.

8          THE CLERK:  Mr. Fanning.

9          MR. FANNING:  Yes.

10         THE CLERK:  Hi.  We're in the courtroom, and the Judge

11   is taking the bench.

12         THE COURT:  If you could just identify yourself,

13   Mr. Shieldkret for the record.  I'm sorry.  Sorry.

14   Mr. Fanning.

15         MR. FANNING:  Yes.  My name is Pat Fanning.  I am an

16   outside counsel for Cerner Corporation in Kansas City,

17   Missouri, and I'm with the law firm of Shook, Hardy & Bacon.

18         THE COURT:  Ms. Shieldkret, you may be seated.

19         MS. SHIELDKRET:  Thank you, your Honor.

20         THE COURT:  OK.  So we're here in my courtroom,

21   Mr. Fanning.  We have a court reporter here, so I ask that you

22   do speak up.  I think we can hear you pretty well so I don't

23   think that should be an issue.

24         I understand, am I correct, Mr. Fanning, that you've

25   received the papers that I have, is that correct?

gaidschc

1          MR. FANNING:  I've received a declaration from

2     plaintiff and a declaration and a supplemental declaration from

3     plaintiff's counsel as well as a draft order to show cause.

4          THE COURT:  OK.  And there is a supplemental

5     declaration from the plaintiff also.  I don't know whether you

6     have received that.

7          MR. FANNING:  I'm sorry, your Honor.  I have received

8     that as well.

9          THE COURT:  OK.  Ms. Shieldkret, I think that's all --

10    well, and the complaint, obviously; you have a copy of the

11    complaint, Mr. Fanning?

12         MR. FANNING:  Yes, your Honor.

13         THE COURT:  OK.  And the exhibits that are attached

14    both to the complaint -- well, exhibits -- there are exhibits

15    to the complaint and exhibits to, I think, counsel's

16    declaration.  Did you get copies of those?

17         MR. FANNING:  I received certain exhibits.  I'm not

18    certain at this stage what is attached to what but I think so.

19         THE COURT:  OK.  All right.

20         Ms. Shieldkret, you look very familiar and I'm trying

21    to --

22         MS. SHIELDKRET:  Your Honor, we know each other from

23    Calvin College.

24         THE COURT:  That's what I thought.  Wow!

25         So Ms. Shieldkret and I were undergraduates together

gaidschc

```
1    in Calvin College.  All right.  And I thought that was the case
2    but I wasn't quite sure.  You know, I don't think that -- I
3    mean, obviously, Ms. Shieldkret, I don't think we have been in
4    touch since then.  Were you a freshman when I was a freshman
5    counselor?
6              MS. SHIELDKRET:  Yes, your Honor.  That is the case.
7    But you worked at Weil, Gotshal with my husband Marshall Sklar.
8              THE COURT:  OK.  But I think at the time were we both
9    associates, I think?
10             MS. SHIELDKRET:  You and Marshall?
11             THE COURT:  Yes.
12             MS. SHIELDKRET:  Yes.
13             THE COURT:  OK.
14             MS. SHIELDKRET:  I don't remember seeing you at that
15   time.
16             THE COURT:  OK.  All right.
17             So, Mr. Fanning, I don't think that creates any
18   issues, but I wanted to make sure that I get that out on the
19   record.  OK?
20             MR. FANNING:  Thank you, your Honor.
21             THE COURT:  OK.  So I've read through the papers.  I
22   must say I haven't -- you know, it's just been one pass
23   through.  But let me hear from -- where do things stand now?
24   Because it seemed like there had been an agreement.
25             Yes, Ms. Shieldkret
```

gaidschc

1          MS. SHIELDKRET:  Yes, your Honor.  To avoid having to

2     come in on it for a TRO on Thursday, on Friday counsel reached

3     an agreement that all of Dr. Fung-Schwartz's capabilities for

4     her running her office through this electronic medical records

5     system would be restored and she would pay -- the service had

6     cost $700 a month, and she would pay for ten days of service

7     and the -- you know, we were told that everything had been

8     restored on Friday.  That was not the case.  And in particular

9     what we're concerned about is New York State mandates that

10    prescriptions be done electronically through one of these

11    software packages, and she does not have access to her

12    prescription writing capabilities at this time.

13          THE COURT:  OK.  Let me hear from -- as I understand

14    it, let me -- you may be seated.  You don't necessarily need

15    to -- it is up to you whether you stand when you address me.

16          But as I understand it there was some functionality

17    that was restored on Saturday, but then when the doctor

18    attempted to utilize the system in a certain way on Sunday, was

19    unable to, and on Monday was also unable to, and I know that

20    there was an exchange of -- well, there was an email sent to --

21    I think sent to Mr. Fanning.

22          Mr. Fanning, let me hear from you with regard to this.

23    Can you shed any light on what happened on Saturday and what's

24    happening now?

25          MR. FANNING:  Yes, your Honor.  And just as a real

gaidschc

1    quick clarification, I'm not sure an email was sent to our

2    client indicating that a temporary restraining order was going

3    to be sought until Friday morning.  I have to go back and look

4    at my emails.

5              THE COURT:  OK.

6              MR. FANNING:  So Friday afternoon, as Ms. Shieldkret

7    represented, we reached an agreement that we would obviously

8    restore full access to her client for ten days and then in that

9    time hopefully we could try and see about alternative ways to

10   work this out.  I received notice on -- well, I received an

11   email and a voicemail on my office line I would say Sunday

12   afternoon probably about 4 o'clock Eastern Time that I don't

13   remember specifically what was in the notice, but based upon

14   what was in the declaration, that Ms. -- or that

15   Dr. Fung-Schwartz had had difficulty editing her medical

16   records or adding notes to her medical records on Sunday.  And

17   based upon the declaration, it is at least my understanding

18   that she did not have a problem opening or viewing the medical

19   records on Saturday.  So I responded via email to

20   Ms. Shieldkret on Sunday evening, or Sunday apparently late,

21   actually, indicating that I would make sure to look into this

22   the first thing in the morning with the client.

23             We had a meeting with the client fairly early in the

24   morning yesterday.  My understanding was that there might have

25   been an issue that when they terminate an account there are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

gaidschc

1   several flags that exist, I guess, and we thought we had --

2   consistent with what I had talked about on Friday, we thought

3   we had clarified all of that and corrected it.  The client went

4   back into the system.  My understanding was they corrected that

5   issue that the doctor was having with respect to being able to

6   edit or view -- well, I guess you could always view but being

7   able to edit medical records.

8          Then there was an issue that Ms. Shieldkret identified

9   early yesterday morning about the scheduling module, which is

10  in and of itself another application.  These are fairly complex

11  systems with a lot of pieces.  So we addressed that as well.

12  It is my understanding that her client was back up and

13  operating as of yesterday morning.

14         I had a conversation with Ms. Shieldkret at 4 o'clock

15  Eastern yesterday.  Asked how things had gone.  I wanted to

16  make sure that her client had full access to the system.  And I

17  received -- you know, after she and I talked, I gave her my

18  cell phone number.  I didn't hear anything last night.

19         Went to bed.  Got back to work this morning at 9 a.m.,

20  or about 8:45.  Sent an email to Ms. Shieldkret pro-actively

21  saying, hey, I haven't heard anything, is there anything -- you

22  know, how is your client's situation going.  I did not hear

23  anything.  And then I want to say at maybe 11 a.m. Eastern Time

24  I received an email with an amended declaration, or

25  supplemental declaration, indicating that her client had

gaidschc

1    attempted to log into the e-prescription service for

2    prescribing narcotics, consistent with New York law, and was

3    unable to do that last night.  And apparently there was a flag

4    that was on her account concerning this collections issue.

5            Now, as soon as I heard that, I made sure I got in

6    touch with the client.  It was my understanding that the client

7    had actually cleared up that red flag earlier in the morning

8    because someone, you know, got into the office basically and

9    said, no, that should have been cleared up as well.  It is

10   again a separate third-party application.

11           So even though we tried to clear up all red flags, to

12   make a complicated situation fairly straightforward, hopefully,

13   there is a PIN or a token, similar to a secure ID type token,

14   that for some reason had not been reactivated.  So they fixed

15   that this morning from what I understood and did it fairly

16   promptly.  I had gotten confirmation from my client that they,

17   at least as far as they know, everything is a go over there and

18   there should not be anything that is hindering

19   Dr. Fung-Schwartz's ability to do anything with her EMR

20   solution or her e-prescription module or anything else.

21           So I communicated that to Ms. Shieldkret.  We made the

22   offer this morning, and certainly it is an offer maybe I should

23   have made yesterday, but we made an offer this morning to

24   provide a technical person who could interface with Dr.

25   Fung-Schwartz when she has time at her convenience and just sit

1   down and make sure that there is nothing else that is tripping

2   up the system at this point.

3         We certainly worked in very good faith to try to

4   cooperate and try to assist Dr. Fung-Schwartz in accessing her

5   medical records, and at this point I am aware of nothing else

6   that needs to be resolved and I, therefore, don't see any

7   immediate or irreparable harm that is threatened.  But I also

8   need to add the doctor's help to make sure that we know that

9   everything has been addressed to her satisfaction.

10        THE COURT:  OK.  Let me hear from Ms. Shieldkret.

11        Have you been able to speak with your client I guess

12  this afternoon?

13        MS. SHIELDKRET:  Right.  The last email that -- I

14  didn't see it, my office read it to me -- that I received from

15  him, from Mr. Fanning, was that there was a third-party issue

16  and he was working on it.  So, no, I have not had my client --

17  been able to talk to my client to go in and login and try to

18  write the prescription.

19        But even the story that he told you, that on Friday we

20  had an agreement, everything -- she had the system for years.

21  Everything was just supposed to work like it did before.  They

22  didn't turn on -- they didn't turn back on one of the users.

23  So her staff came in Monday morning and couldn't access things.

24  She had trouble accessing it over the weekend, and then we had

25  this prescription problem.  So the reason we're asking for an

gaidschc

1    order is because by the time we know there is a problem, it's

2    too late.  They need to -- if he's saying you have to come to

3    me and tell me there is a problem, this is their system.  They

4    need to make sure that everything's working right.  That's what

5    the agreement was supposed to do.

6           I asked him will he do the agreement on consent so

7    that we can just have it so ordered, but he is not giving you

8    any reason why we shouldn't have an order today so that we

9    don't have these problems in the future and his client isn't

10   reacting to issues that we bring up but proactively goes out

11   and looks for all of those flags and makes sure that things are

12   working.  We have patients calling into the office that need

13   treatment.  It can't be that she is on the phone with a patient

14   or a patient is coming in and she discovers there is a problem.

15          THE COURT:  I guess, Mr. Fanning -- and I'll hear from

16   you -- but my suggestion was going to be, quite frankly -- you

17   know, it sounds like the parties have an agreement and so that

18   when Ms. Shieldkret mentioned a consent order, I was thinking a

19   stipulation, in other words, where the parties would enter into

20   a stipulation.  I don't have to get into the issue, quite

21   frankly, of irreparable harm and what the current status is,

22   but it sounds like there was an agreement on paper.  And

23   whether it's merely taking the email exchange -- I think there

24   were two -- and putting that into a document that I would so

25   order, and obviously you may want -- if you want it for ten

gaidschc

1     days, that's fine; if you want to extend it, that's fine

2     also -- to allow the parties to -- (a) to allow, I guess so

3     that there is -- you know, so that the doctor -- you know,

4     look, things do happen and I understand that, but obviously the

5     doctor it sounds like is concerned that she is not going to be

6     able to operate her practice and would like the ability not to

7     have to come back into court if that's the case.

8              So let me ask this, Mr. Fanning.  Would you be

9     amenable to entering into some form of stipulation, or

10    something like that, in connection with -- and, again, because

11    I know that there were certain things that you had agreed to.

12    You know, there was an item 3 that is part of the TRO, which I

13    was going to get into, but I think if we can work out the

14    basics which the parties had agreed to already.  And, you know,

15    the third issue I think, at least my view, was an issue for

16    discovery.  And by "third" I mean that the identifying

17    individuals who may have made a decision to cut off access to

18    the doctor.  It sounds like there may not have necessarily been

19    an affirmative decision, but, again, I am not weighing in on

20    the facts at this stage.

21             But let me hear from you, Mr. Fanning, concerning just

22    simply, you know, speaking with Ms. Shieldkret and entering

23    into a stipulation that you would have here, and then you could

24    go on, you know, whether you want a referral to a magistrate

25    judge -- and I'll leave that up to you -- or whether you will

gaidschc

1   just try and iron out a settlement with regard to the fees

2   that -- the disputed fees, I should say.

3            Mr. Fanning.

4            MR. FANNING:  Your Honor, I did not object to a

5   stipulation consistent with the terms of what we talked about

6   on Friday.  Where it gets tricky from my perspective is when

7   you turn it into a temporary restraining order, just given the

8   nature and the circumstances.  While they have identified two

9   instances where apparently these modules were not turned back

10  on, and without pointing fingers or casting blame, the furthest

11  thing at this point could be that we're -- I'm butchering the

12  language, but essentially we are working very diligently to try

13  to cooperate and to try to work collaboratively with the

14  doctor, so there has never been an intent.  Sunday night and

15  Monday night, outside of business hours, when two issues arose,

16  we addressed them expediently the next day during business

17  hours.

18           So I guess I'm not saying it very artfully, but, yes,

19  I'm fine with a stipulation.  It is when it becomes a temporary

20  restraining order that I think we've gone beyond the pale,

21  because there is no immediate irreparable injury that is going

22  to result here.  We just have an agreement, and if for some

23  reason we violate that agreement, then I guess there could be,

24  you know, some type of measure taken, but no one is trying to

25  place this doctor in any harm's way.  And the real challenge is

gaidschc

1    that that is what a TRO is for, when the parties aren't working

2    collaboratively towards that.

3          THE COURT:  I think a stipulation would give both

4    parties what they sort of need.  In other words, it will give

5    your client, you know, satisfaction, or not, that it is not

6    going to be just running into court and hopefully -- and you

7    may want to put in there the additional provision relating to

8    providing someone to assist the doctor in sort of ironing out

9    any technical -- in other words, a specific person, or

10   something like that.  But I think you should, you know, try and

11   get that stipulation to me by tomorrow.  If not -- and I'll so

12   order that.

13          I do -- what it does avoid is the need for me to make

14   various findings.  Look, I think the parties -- it sounds to

15   me, Mr. Fanning, that your client understands the potentially

16   serious nature of the doctor not having access to these

17   records.  As I read the agreement itself, I mean, it doesn't --

18   and I'm not saying that -- I'm absolutely not saying that I'm

19   making a finding with regard to this, but it doesn't

20   necessarily indicate, at least my reading of them, this what

21   would be this sort of self-help; in other words, as opposed to

22   filing a lawsuit, you know, shutting down access.

23          And, again, I have not reviewed the agreement in that

24   much detail.  But as I see the agreement, the dollar amount

25   involved, even at a maximum for both sides, is, although a

gaidschc

1    significant amount -- I'm not -- you know, don't want to

2    minimize the dispute, but could be eaten up fairly quickly if

3    you get into litigation.  So I understand the reason for the

4    parties entering into the agreement.

5           So if -- I don't know, Ms. Shieldkret, what your

6    schedule is like and, Mr. Fanning, whether you will be able

7    to -- I mean, it seems like it is a fairly easy thing, but

8    whether or not you will be able to put together a stipulation

9    and get it to me so that we will have it on the docket so that

10   both parties know.  And, quite frankly, that way, Mr. Fanning,

11   also you are not left explaining to your client.  You could

12   basically just show them the stipulation and say, look, this is

13   what we've agreed to do and it's now effectively, although not

14   a TRO, effectively the Court has so ordered it.  So it is

15   something that Ms. Shieldkret could use to come back and say,

16   you know, there is something that's not being abided by.

17          So let me ask this, Mr. Fanning.  Will you have time

18   between I guess once we are done here and tomorrow such that we

19   could get the stipulation on file tomorrow?

20          MR. FANNING:  Yes.

21          THE COURT:  OK.

22          MR. FANNING:  Would it just be -- since it is not a

23   temporary restraining order, it would just be a stipulated

24   order?

25          THE COURT:  Correct.  So it would be in the form of a

gaidschc

1    stipulation, and then you would have -- at the bottom you could

2    either include it or I will just write in a so-ordered

3    paragraph.  So not unlike what would be submitted if it was a

4    protective order or something like that, or a stipulation.  You

5    know, I often sign stipulations of dismissal; I also sign off

6    on those.  But here so it would be a format of stipulation

7    signed by counsel -- I'm assuming signed by counsel, you know,

8    on behalf of their clients, and then I would so order that once

9    the parties submit it.

10            MR. FANNING:  And I don't mean to be hypertechnical,

11   but are you OK with me signing it knowing that I have not been

12   pro hac'ed into this case yet?

13            THE COURT:  I apologize.  My staff had informed me of

14   that, and this stage for purposes of both this appearance and

15   taking care of the stipulation, you know, I will allow --

16   basically deem you admitted pro hac.

17            But are you going to -- well, hopefully the parties

18   will be able to resolve this, but I don't know whether you are

19   admitted in this district.  Was your client getting local

20   counsel?  What was the plan?

21            MR. FANNING:  Well, we have attorneys in our office

22   who are admitted in the Southern District of New York.  They

23   just aren't familiar with this client.  So I would probably

24   affiliate with them and seek to be admitted pro hac vice when

25   the time comes.  Hopefully, again, we won't need it, but if

gaidschc

1    that happens that's how I would seek to do it.

2             THE COURT:  OK.  You may, though, need to -- or

3    someone from your firm may need to file a notice of appearance

4    just so that you can -- you know, you probably have access

5    through Pacer to see what happens, but for purposes of getting

6    ECF notifications and for the purpose of filing things, I think

7    someone will need to file a notice of appearance.

8             MR. FANNING:  OK.  We will work on our end to make

9    that happen.  I have been following it very diligently on Pacer

10   since Friday afternoon, but I will do that so that we have

11   someone getting a notice.  And then, you know, once we get past

12   the stipulation tomorrow, if it proceeds towards an answer,

13   then at that point you would see us enter a formal appearance

14   and I would seek to be admitted pro hac.

15            THE COURT:  OK.  And, Ms. Shieldkret, do you have

16   time?

17            MS. SHIELDKRET:  Yes, your Honor.  Timing is not an

18   issue but it's the content is an issue.  The agreement that we

19   reached was that Cerner was going to turn everything back on

20   just the way it was before they turned it off.  And now what he

21   seems to be saying is it requires a level of cooperation and

22   time from Dr. Fung-Schwartz to get this all working, and that

23   was not the deal.  They represented to us that they were going

24   to flick the switch back and everything would be the way it

25   was.  So I don't know if we can have the same stipulation.

gaidschc

 1   What he just said to the Court is not what we agreed to.

 2           THE COURT:  And I'm not sure exactly, but part of it

 3   is the details of it.  But what I thought I heard -- again, I'm

 4   not -- was that there were these flags that -- in other words,

 5   there may be certain functionality that his client -- and I'm

 6   not, you know -- and, again, I'm sort of speaking off the top

 7   of my head -- that his client may not be aware that your client

 8   doesn't have, in other words, with the regard to it.  I guess

 9   what you're saying is --

10           MS. SHIELDKRET:  I'm sorry.

11           THE COURT:  No.  That is OK.

12           What you're saying is that the agreement was that all

13   those flags should have been removed, there shouldn't have been

14   a problem with regard to access.  And I think what may have

15   happened is -- well, I don't know what may have happened.  So

16   I'll leave it to counsel to work on what the language is with

17   regard to that and also to get sort of, you know, in realtime

18   what the current sort of status is.  You know, I don't think

19   there is a disagreement about what the objective -- end

20   objective is for both parties.  So I think the issue is

21   language.

22           And I hope, Mr. Fanning, that your client realizes

23   that they have to -- and I'm not -- again, that this requires a

24   significant amount of attention at this time just simply

25   because it didn't work out as had been negotiated and there

gaidschc

1    were problems.  And, again, I'm not saying that this was

2    anything that was intentional, but it perhaps could have been

3    avoided if parties had thought through exactly -- and by

4    "parties" I'm not referring to counsel, because, you know,

5    counsel wouldn't necessarily know all the ins and outs of the

6    technology, but hopefully the parties will be able to reach an

7    agreement on the language.

8            If you can't, you should just call my chambers and

9    we'll get on the phone tomorrow, and you just need to have

10   basically disputed language.  In other words, the language, Ms.

11   Shieldkret, that you might be proposing, that there is an

12   objection from Mr. Fanning, or vice versa, and I'll resolve

13   that dispute to the extent the parties, you know, want me to do

14   that.

15           Does that make sense, Ms. Shieldkret?

16           MS. SHIELDKRET:  Yes, your Honor.  Thank you.

17           THE COURT:  All right.  Mr. Fanning?

18           MR. FANNING:  Yes, your Honor.

19           THE COURT:  OK.  So I'll plan on -- hopefully I won't

20   hear from you other than receiving the stipulation tomorrow and

21   we'll get that on the docket.

22           And just let me know -- it sounds like the parties

23   have been -- the dialogue is open, but if you think it might be

24   useful, and I haven't looked at the docket, to have a

25   magistrate judge involved to facilitate settlement, just let me

gaidschc

1  know and I will do the referral and you can reach out to the

2  magistrate judge and schedule a settlement conference.

3          MR. FANNING:  Judge Moses has been appointed on the

4  case --

5          THE COURT:  OK.

6          MR. FANNING:  -- already.

7          THE COURT:  All right.  So just let me know and Judge

8  Moses, you know, just figure out when you could fit into her

9  schedule.

10          MR. FANNING:  OK.

11          THE COURT:  All right.  Anything else, Ms. Shieldkret?

12          MS. SHIELDKRET:  No, your Honor.  Thank you for your

13  time.

14          THE COURT:  All right.  Thank you.

15          Mr. Fanning?

16          MR. FANNING:  Thank you very much, your Honor.  I have

17  nothing else.

18          THE COURT:  OK.  Thank you very much.  And hopefully

19  although it was a pleasure dealing with both of you, hopefully

20  we won't have to deal under these circumstances again.

21          All right.  Thank you very much.

22          MR. FANNING:  Have a good evening.  Thank you, your

23  Honor.

24          THE COURT:  All right.  We will stand adjourned.

25                                    -  -  -