H841func

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JENNIFER FUNG-SCHWARTZ, MD,

4                    Plaintiff,

5            v.                              17 Civ. 233 (VSB)

6    CERNER CORPORATION, CERNER
     HEALTHCARE SOLUTIONS, INC.,
7
                     Defendants.             Conference
8    ------------------------------x

9                                            New York, N.Y.
                                             August 4, 2017
10                                           11:06 a.m.

11   Before:

12                     HON. VERNON S. BRODERICK,

13                                            District Judge

14                             APPEARANCES

15   ELIZABETH SHIELDKRET, ESQ.
          Attorney for Plaintiff
16
     SHOOK, HARDY & BACON LLP
17        Attorneys for Defendants
     BY:  PATRICK N. FANNING, ESQ.
18

19

20

21

22

23

24

25

H841func

1            (Case called)

2            THE COURT:  Okay.  Would the parties please identify

3       themselves for the record.

4            MS. SHIELDKRET:  Elizabeth Shieldkret for plaintiff

5       Dr. Jennifer Fung-Schwartz, and with me at counsel table is

6       Dr. Fung-Schwartz.

7            THE COURT:  Okay.  All right.  Good morning.

8            And for the defendants.

9            MR. FANNING:  Good morning, your Honor.  Pat Fanning

10      on behalf of the defendants.

11           THE COURT:  Okay.  Good morning.

12           All right.  Let me review for the parties the

13      documents I have in connection with today's conference.  I have

14      an October 19, 2016 email from Ms. Shieldkret writing to a

15      possible stipulation in 16 CV 8019; Mr. Fanning's June 29th

16      letter of this year regarding defendant's motion to dismiss; I

17      have Ms. Shieldkret's July 6 response letter; and I have the

18      parties' briefing with regard to the temporary restraining

19      order and PI, which are Docket 23 through 35.  Are there any

20      other materials I should have in connection with today's

21      conference?  Oh, and I guess there is a -- I don't know if I

22      have it in front of me, but there was another complaint that

23      was filed.  I'm not sure if I have it here now.

24           But is there anything else I should have?

25      Ms. Shieldkret?

H841func

1             MS. SHIELDKRET:  Your Honor, there is a June 22, 2017

2    letter from me to the Court, and I just want to check the --

3             THE COURT:  I'm sorry.  That's a June 22nd?

4             MS. SHIELDKRET:  22nd.  It was before we filed -- it

5    may be Docket No. 22.  I'm just checking that.  And that

6    relates to their motion to dismiss as well.

7             THE COURT:  Okay.

8             MR. FANNING:  Your Honor, the amended complaint would

9    be relevant to the June 29th letter, if you have it with you.

10            THE COURT:  Okay.  We'll get started.  I'm without my

11   deputy clerk so we don't have access to the printer here, but

12   I'll have one of my staff print out those documents and bring

13   them up to me, but I think we should get started.

14            MS. SHIELDKRET:  Your Honor, I brought copies of the

15   June 22nd letter and I found that.

16            THE COURT:  Okay.  All right.

17            MS. SHIELDKRET:  If I may hand them up?

18            THE COURT:  Yes.

19            MS. SHIELDKRET:  I've got two copies for you and one

20   for my opposing counsel.

21            THE COURT:  Okay.  All right.

22            MR. FANNING:  Thank you.

23            THE COURT:  So let me ask, with regard to the case

24   that was more recently filed, why was that case filed?  It

25   seems like the claims appear to be essentially, other than I

H841func

1    guess the class claims, essentially identical to the first

2    complaint, which is a 16 CV 8019.  I guess the second case is

3    17 CV 233.  So why was the second case filed?

4            MS. SHIELDKRET:  Yes, your Honor.  So I wrote the

5    Court a letter on January 11, 2017, in the 8019 case to advise

6    the Court we hadn't served a complaint.  We wanted a little bit

7    of time to figure out what the technical situation was and what

8    we really needed and -- but we at that time were actually

9    having an outage with the service and so we felt it was prudent

10   to keep a case active so that all of that would be resolved.

11   And I wrote a letter to the Court telling them we had refiled

12   just out of an abundance of caution to not have a gap in the

13   case and that we would, you know, continue to file in whichever

14   case the Court thought was appropriate.  But in the meantime,

15   we had an active case with the same complaint, and soon after

16   that, the second outage issue was resolved.  But we did file

17   the second complaint, so it was really just to make sure that

18   the case wasn't dismissed for lack of service.

19           THE COURT:  Okay.  All right.  So I didn't quite

20   understand that it was a -- in other words, the first complaint

21   was never served.  And I had mistakenly assumed that it had

22   been.  But, okay.  So in essence it was to preserve -- okay.

23   All right.  I understand.

24           So let me ask the defense:  With regard to the first

25   complaint, I take it your client hadn't been served, is that --

H841func

1          MR. FANNING:  That's correct, your Honor.  You may

2     recall that the first complaint was filed and counsel for the

3     plaintiff had sent it to Cerner and then advised Cerner that

4     she wanted a TRO about a discontinuation in certain services.

5          THE COURT:  Yes.

6          MR. FANNING:  And so we had a phone call with the

7     Court, and at that point we resolved whatever issue existed.

8          THE COURT:  Yes.

9          MR. FANNING:  I thought it went away.  I think we

10     fully expected to get served with a complaint but never got

11     served.

12          THE COURT:  Okay.

13          MR. FANNING:  And then the issue that was referenced

14     in January was a third-party application interruption, not

15     something where Cerner had advised to disconnect or do anything

16     with the solution.  So that issue was quickly rectified, but

17     then that second complaint was filed for some reason rather

18     than simply seeking more time to serve.  I know the rules have

19     changed, but you could still do that.

20          THE COURT:  Yes.  Okay.  So we need to I guess deal

21     with which complaint is going to be the operative complaint.

22     So I take it the second complaint, am I correct there are some

23     class claims in there?  In other words, there's a reference to

24     a class of patients, basically.  But there is no class

25     representative, I take it, in the second complaint.

H841func

1          MS. SHIELDKRET:  Correct, your Honor.  So in the

2     second case, we subsequently filed an amended complaint, and

3     what that has is Dr. Fung-Schwartz as the sort of

4     representative because of the special doctor/patient

5     relationship, that there's sort of two categories of claims,

6     where we believe she can also step into the footing of the

7     patient.  One is because of reimbursements which get signed

8     over to her for the medical care, and the other is for the

9     privacy issues about the medical records and the interruption

10    in service.

11         THE COURT:  Okay.  Well, I mean, just in thinking

12    about it, I think while there may be some similar type of

13    issues that relate to patient and the doctor, but there are

14    also I think significant things that are different that come to

15    mind.  So for example, the fact is that -- and I'm not sure

16    concerning the ownership of the files, you know, who has more

17    of a claim, in other words, the patient, who can go see another

18    physician and ask for their records to be transferred, or the

19    physician.

20         So secondly, there is an issue that the patients

21    aren't involved in this sort of -- and I know there may be a

22    disagreement on how to characterize it -- payment disputes.

23    And so with regard to the doctor's ability to be a

24    representative of them, I think that in terms of a class

25    action, it doesn't seem to me that she would be a class

H841func

1     representative in that regard.

2             MS. SHIELDKRET:  Your Honor, I want to make sure that

3     you understand, there are two different payment kind of

4     disputes here.  The one that we filed a preliminary injunction

5     about is for the health records, and that's a dispute between

6     Dr. Fung-Schwartz and Cerner.  What's implicated there is the

7     patients' access rights and privacy rights, which are the same

8     rights that Dr. Fung-Schwartz has to the records.  There's a

9     separate part of the case which is not part of this motion,

10    which has to do with Cerner provided another service, which is

11    really the thing that there was a dispute about.  They were

12    sending bills to patients.  Patients had assigned things, for

13    example, like their Medicare payments to Dr. Fung-Schwartz.

14    Cerner was not billing Medicare properly so those claims were

15    getting rejected, and then they were telling the patients, you

16    owe the money.  She doesn't want to go and collect that money

17    from the patients.  The patients have already assigned their

18    right to the money to her.  And that's why, rather than make us

19    go through an extra step of having to have the patients go back

20    to Cerner and say, you're the one that messed up my Medicare

21    claim, she already has that assignment from the patients and

22    she should be able to say, I deserve this money and I would

23    have gotten it from Medicare but for your processing the claim

24    improperly.

25            THE COURT:  But isn't that a different claim than --

H841func

1   in other words, if there is an assignment, is the assignment

2   indicated in the amended complaint?

3           MS. SHIELDKRET:  Yes.

4           THE COURT:  Because it's different than, I think, a

5   class action.  And was the assignment attached to the amended

6   complaint?

7           MS. SHIELDKRET:  I don't believe it was attached to

8   the amended complaint.  It was described in the amended

9   complaint.  And right, and so it's not a class action.  It's

10  basically a third-party representative saying, we have the same

11  insurance.  We're aligned.  And that is something that courts

12  have recognized doctors can do.

13          THE COURT:  But it's not necessary -- well, I'm not

14  sure, because I haven't seen the assignment, but as I

15  understand it, it would be, you know, the patients who had this

16  right, they have transferred that right to the doctor through

17  the assignment.  And again, I don't know what, because in part

18  the devil is in the details here as to what the assignment

19  actually says and what the doctor has received and what the

20  patient has retained or given up.  You know, if it's merely

21  signing over a right to payment, I guess I don't know.  But I

22  guess in terms of what complaint should be the operative

23  complaint, since the first complaint was not served and the

24  second complaint was, it seems to me that, well, I think the

25  second complaint should be the operative complaint that we

H841func

operate off of, but let me hear from the defense with regard to

that.  Because I know there was a motion to dismiss that had

been filed with regard to the first complaint.  Am I correct?

          MR. FANNING:  Your Honor, this is where it gets

confusing.  The first complaint filed in the 2016 lawsuit was

identical to the five-count second complaint filed in the 2017

lawsuit.  We moved to dismiss the identical complaint, so the

2017 lawsuit, five-count compliant.  In response, we were met

with an 18-count amended complaint in the second lawsuit that

added patients.  And I don't mean to be difficult here, but

there is a conversion claim, which I think is the basis for

this preliminary injunction motion.  Count One of the second

amended complaint brings the conversion claim, from what I can

tell, on behalf of the patients, so it's not subject to a

contractual assignment.  It is a suggestion that the patients

are in here in court pursuing a conversion claim and they're

using the doctor to do it.  That's part of the challenge with

the second amended complaint, as well as the motion that we're

talking about.

          THE COURT:  Okay.  All right.  Well, let me ask this,

Ms. Shieldkret.  Is that an accurate description of the

conversion claim?

          MS. SHIELDKRET:  Yes, your Honor.

          THE COURT:  Okay.  And what is the actual nature of

the conversion?  And have there been complaints by the patients

H841func

1    about this?

2            MS. SHIELDKRET:  No, your Honor.  It's when they

3    turned off the system and she couldn't get access to medical

4    records at all that compromised not just Dr. Fung-Schwartz's

5    rights but the patients' rights as well, and because their

6    rights are intertwined, they have a right to access and she has

7    to keep the files, the medical records available for them, we

8    believe that she can stand in for the patients and bring the

9    claim on both parts, because there are patients' rights here

10   that are implicated, whether that's completely turning off the

11   system or even the dispute we have now about what's going to

12   happen with the system.

13           THE COURT:  Although as I understand it, there was a

14   break in service that occurred in 2016, there was another

15   shorter break in service that I understand, Mr. Fanning, was

16   not related, was some other technical issue that was fairly

17   quickly resolved.  So in terms of where things stand, and there

18   have been no patient complaints, there is no assertion that the

19   patients requested some record that, in other words, they were

20   going to another physician, they were unable to get those

21   records.  So the issue with regard to a TRO, it seems to me the

22   conduct or the issue would be stale here.

23           In addition, I don't see, as I understand it, where

24   the irreparable harm is, in other words, you know, going

25   forward.

H841func

1          So with regard to the pending TRO and the application,

2    because the activities at issue were from 2015 and because I

3    know there was a refiling of the TRO and because I don't see

4    that there's irreparable harm here, in other words, harm that

5    couldn't be taken care of through damages, I'm going to deny

6    the TRO at this stage.

7          So I guess the question I have is:  There is, as I

8    understand it, a motion to dismiss the most recent complaint?

9    Am I correct, Mr. Fanning?

10          MR. FANNING:  There is a premotion letter that we

11    submitted to the Court with respect to the most recent

12    complaint.

13          THE COURT:  Okay.

14          MS. SHIELDKRET:  Your Honor, if I may.

15          THE COURT:  Yes.

16          MS. SHIELDKRET:  The issue with the preliminary

17    injunction, it relates to them bringing this motion to dismiss.

18    What they're trying to do is to get the equitable relief

19    removed from the case, and what that does is it says -- now we

20    have a status quo where she has access to the records.  They're

21    trying to change the status quo so they can deny her access to

22    the records.  And the same thing with getting Cerner Corp. out,

23    which is part of their motion.  That's what's changed.  That's

24    what's changed since May, when they started doing this, and

25    we're concerned now, when she goes back to the office now, is

H841func

1    the service going to be on?  Because if we leave here without

2    some sort of resolution about what rights she has to records,

3    then I believe they're going to take that as they can turn it

4    off.  That's what they want to do, and they confirmed that in

5    their opposition to the preliminary injunction motion.  So the

6    question is, you know, what are they willing to do before the

7    resolution of this action?  Because when they turn the records

8    off, that's it.  I mean, there is irreparable harm because it's

9    going to deny medical care to patients.

10            THE COURT:  But am I correct, Mr. Fanning, that your

11    client is willing to transfer these records to another server?

12            MR. FANNING:  Absolutely, and always has been, your

13    Honor.  That's never been an issue.

14            THE COURT:  So why isn't that a solution?  In other

15    words, why can't these records be transferred to another

16    provider?

17            MS. SHIELDKRET:  So there are a couple reasons, and

18    she has tried.  She's gone to other medical offices and looked

19    at different systems and she's also started using a different

20    provider.  There are, in addition to training and user issues,

21    it's not a one-to-one correspondence of where records will go,

22    and so it's not an easy process.

23            Also, because she started using electronic medical

24    records before it was really mandated, she's got a lot more

25    records in the system than, you know, people who had started

H841func

1    using it more recently.  To do a transfer, she's got a complex

2    transfer to do.  And she's an individual practitioner, so she's

3    got fewer resources.  She doesn't have an IT person.  So when

4    they say they're willing to do the transfer, they're willing to

5    release the records, but that doesn't mean it's going to safely

6    get into a new system.  And that's what our issue is for the

7    patients going forward.

8          But even if that were not a technical challenge, which

9    is the problem that she has, she wants to be able to continue

10   to use the system right now because she doesn't have a clear

11   path that everything will get from System 1 to System 2.  It's

12   not a situation -- I mean, there's a dispute about this

13   contract.  She had a contract for the services to 2019.  So if

14   she prevails at the end, you're placing all the burden on her

15   to make a switch to a new system when she may prevail at the

16   end on the contract and had the right all along to do this

17   through 2019, and that just seems like, on the balance of the

18   hardships, why can't we just stay with the status quo, have her

19   use the system.  All they're saying is they want money for it,

20   and that can be satisfied either with security now or with

21   payment at the end of the lawsuit.

22         THE COURT:  Well, I guess, I mean, I still don't see

23   where the TRO comes in.  And we had talked about a stipulation

24   to maintain the status quo.  And as I understand it, the system

25   really hasn't been turned off, so to speak.  So, I mean, the

H841func

```
1     issue may be, Ms. Shieldkret, that, you know, if the motion to
2     dismiss is granted, you know, then there's no case.  In other
3     words, I don't know, and I'm not prejudging anything, but as I
4     understand it, am I correct that there are fees that are owed
5     to the defendants?
6          MS. SHIELDKRET:  No.  That's the dispute.  She paid
7     them for services she didn't receive, and so she's overpaid,
8     and that's what the issue is.
9          THE COURT:  All right.
10         MS. SHIELDKRET:  They say she owes them money, and we
11    say no, they actually need to reimburse her.
12         THE COURT:  All right.  But at core, isn't this just a
13    breach of contract case?
14         MS. SHIELDKRET:  No, your Honor, because they owed
15    other duties outside of the contract, and that's what those
16    HIPAA regulations are all about.  No matter what they did, what
17    the contract says, turning off the service was a violation --
18         THE COURT:  But, again, that was a one-time issue.
19    That was resolved.  There may be some damages that are
20    associated with that.  I don't know.  And the services haven't
21    been turned off again.  So the issue becomes, this case I think
22    needs to get resolved, and I'm trying to get it there.  What's
23    the end game here?  I mean, because in the end -- and I haven't
24    looked at the contract, but I would imagine it has an out for
25    both parties in some way.  Whether that's a transition to a new
```

H841func

1    provider or whether there is a notification period that the

2    doctor could serve if she was going to terminate their services

3    in advance of the 2019 end date, I don't know.  But, you know,

4    in response to my question, what I heard you to be saying is

5    that it would be difficult to transition to another system.  So

6    if what you're saying is that the doctor wants to remain with

7    this service and the issue is about things that she paid for

8    that she didn't receive -- and I'm not sure what that is.  Is

9    that in the nature of the time that the system was shut off or

10   was that additional things that she wasn't able to receive

11   during the pendency of the contract so far?

12           MS. SHIELDKRET:  So the real dispute here, other than

13   turning off the medical records system that day, she was happy

14   using the medical records system, but the real dispute here is

15   about the billing system, and what happened was, they failed to

16   collect over $200,000 worth of billing for her, and that's why

17   we're saying, if she has to go back and collect that from the

18   patients, the patients then just have to go back to Cerner and

19   say:  You caused this.  You know what, you had a duty to comply

20   with the Medicare billing requirement and you didn't do this.

21   And so it just gets back to Cerner, which is why we're saying,

22   you know, this money is owed to her and, you know, under the

23   contract, they didn't perform the services.  But beyond that,

24   they didn't do the thing that they owed everybody in this case,

25   which was to properly process these claims.

H841func

1          THE COURT:  Okay.  But again, that's a breach of

2     contract.  That's still a breach of contract claim.  So I guess

3     what I'm saying is, I still don't see the issue for a TRO, so

4     I'm going to maintain my ruling with regard to that, with

5     regard to the system and keeping it on during the pendency of

6     this case, and I'll make the direction, Mr. Fanning, that your

7     client shouldn't use the kill switch, whatever that is.  If

8     there is such a thing.  I thought that there had been agreement

9     between the parties back some time ago about that issue and

10    that there was going to be some form of stipulation.  And we

11    can proceed with the current complaint.

12         Mr. Fanning, we can talk about the motion to dismiss

13    and scheduling that and proceed from there.  Does that make

14    sense, Mr. Fanning?

15         MR. FANNING:  Your Honor, that would be fine.  The

16    real challenge -- nobody's taken away anything, but we're not

17    getting paid.  And keep in mind, there are two -- we keep

18    talking about the property interest in being able to read

19    medical records, which is what the current verbiage is for

20    medical records was never taken away.  The other property

21    interest that's out there is our license that she refuses to

22    pay for, and the dispute that she has with regard to billing

23    services is completely separate and apart from her continued

24    use over the last at least 18 months of the EMR without paying

25    for it.  And so nobody's going to activate a kill switch, but

H841func

1    we just want out of this relationship, and if the parties have

2    a breach of contract that we're each going to do battle over,

3    that makes sense, I guess, if we have to do that, but we don't

4    want to continue to be entangled in this relationship for

5    however long it takes to get this case resolved, when she's not

6    paying.  So we have a challenge there.

7          Now the other issue with respect to the motion to

8    dismiss, we would like to address, because there are a bunch of

9    counts in there now.  One request we would make, is there any

10   way we could, at least for purposes of a motion to dismiss,

11   disregard these cases, these various counts that are brought on

12   behalf of the patients?  Because there is no patient plaintiff

13   in this case right now.

14         THE COURT:  And again, I think as I indicated, and it

15   may be just the way it's phrased, but there are no patients

16   here, and therefore, I'm not sure if the conversion claim is

17   brought on behalf of the patients.  Why don't we do this.

18   Well, let me put it this way, Mr. Fanning.  You can move to

19   dismiss whichever count you deem appropriate, and so if it's

20   not with regard to all of the counts, that's fine.  Other than

21   the assignment issue, other than that, where there may be some

22   sort of a shift and the patient may have turned over their

23   right to pursue certain claims to the doctor, and that may be

24   the case, I don't know, you know, the conversion itself, to the

25   extent that it relates to medical records, it doesn't sound as

H841func

| | |
|---|---|
| 1 | if any patients have either complained or been implicated here, |
| 2 | so I'm not sure that a claim on their behalf necessarily -- |
| 3 | obviously, I think it has been alleged that the doctor has an |
| 4 | interest in those records.  So I guess, Mr. Fanning, you can |
| 5 | move to dismiss whichever count you deem appropriate.  To the |
| 6 | extent what you're saying is, you're going to move to dismiss |
| 7 | some of them, I'll hold in abeyance the necessity of answering |
| 8 | with regard to that until we can clear up exactly what remains. |
| 9 | And I guess because there is this issue, are there going to be |
| 10 | counterclaims here and/or another lawsuit with regard to the |
| 11 | monies that your client claimed that they're owed? |
| 12 | MR. FANNING:  Yes, your Honor.  There will be a breach |
| 13 | of contract on the claim, very straightforward.  It's just the |
| 14 | amount she hasn't paid for the contract that she's involved |
| 15 | with. |
| 16 | THE COURT:  Okay.  All right. |
| 17 | Yes, Ms. Shieldkret. |
| 18 | MS. SHIELDKRET:  Your Honor, there are two things I'd |
| 19 | like to address.  The first is, we're not averse to paying |
| 20 | during the pendency of the action to keep the service active, |
| 21 | but counsel has not been able to reach an agreement on that |
| 22 | because defense had a bunch of conditions that we just couldn't |
| 23 | agree to.  And they haven't been sending her bills.  So the |
| 24 | amount that we've been getting, you know, the amount they put |
| 25 | in the papers this time was different from what we thought it |

H841func

1    was.  But there's some number.  If none of them are

2    unreasonable, we're willing to pay them during the pendency of

3    the suit to keep the service available.

4            But the second thing -- and they keep doing this, and

5    it's upsetting to my client -- is, they keep saying she had

6    read only access when they hit the kill switch, and that's just

7    not true.  You've got two declarations from the doctor and from

8    her assistant that said she had no access at all.  They had

9    nothing.  And in response to our papers, they didn't put in

10   anything that said they did have access.  So I just don't want

11   to continue this fiction that they keep saying they had read

12   only access to the Court, because what they're offering now is

13   read only access when they get her off the system, and that's

14   one of the things that we're concerned about is, I'm not sure

15   that they know when they're looking at the system what she's

16   seeing in her office, but when they hit the kill switch, she

17   didn't have any access at all.  She could not log in.

18           THE COURT:  Okay.  But as I understand it, since that

19   time she's been able to log in and get the information.

20           Look, I understand, and again, I don't recall whether

21   I've gotten an affidavit from the defendants about what sort of

22   access there was.  It may be that there's representations from

23   counsel on that.  But obviously that's something that counsel

24   doesn't have personal knowledge of, so it's not an issue right

25   now that's necessarily before me as a factual matter.

H841func

1         But with regard to the payment, Mr. Fanning,

2    Ms. Shieldkret mentioned there were certain conditions about

3    payment and the like.  As I've indicated, the system should

4    remain on.  But I guess the question is, if there is a certain

5    amount of money that your client believes that it's owed and

6    there are invoices and things like that, if there were

7    conditions that you were setting, what I think I hear

8    Ms. Shieldkret saying is that you can put that money in escrow,

9    I guess, so that your client can have some assurance that it is

10   monies that are there, and it may also deal with, at least in

11   part, in part, the counterclaim that you intend to bring, and

12   the amount of damages that might be accruing, basically,

13   because of the nonpayment.  So I don't know whether that's the

14   solution that the parties can agree to, but again, I don't want

15   to get involved.  I don't know what the conditions may or may

16   not have been.  But in that way, at least you know the money is

17   there and can decide on what the terms of the escrow would be.

18   I would leave it to the parties to figure that out.  And I

19   understand it may be that your client may be concerned that

20   accepting payment means you're acquiescing to the contract and

21   therefore are going to be, you know, needing to provide the

22   services in 2019 or something like that.  So I don't know what

23   the issues are, but I think a way to deal with this or at least

24   stem the amount of damages that might be related to the

25   counterclaims which you've indicated you may file would be to

H841func

1   place the monies in escrow.  So I will suggest the parties

2   discuss that as you're working through the motion to dismiss

3   papers.

4           And just to get back to the other point, so with

5   regard to what access the doctor had or didn't have, I'm not

6   making any factual findings on that.  So you've preserved the

7   record in terms of that, so I think that that issue is dealt

8   with.  But on the issue of the escrow account, I'll leave it to

9   the parties to talk about that and see if you can work that

10  out.  Does that make sense, Ms. Shieldkret?

11          MS. SHIELDKRET:  Thank you, your Honor.  Yes.  With

12  respect to the EMR service, not the full amount that they're

13  claiming is due, but with respect to the EMR service, we're

14  certainly willing to work it out with them.

15          THE COURT:  Okay.  I don't know exactly what you mean.

16  In other words, there are certain fees your client would be

17  willing to pay and put in escrow and others that you still

18  dispute.

19          MS. SHIELDKRET:  Yes.

20          THE COURT:  So that's fine.  Look, if you can work it

21  out, I think any amount of money that's put aside I think

22  lessens the amount that might be, you know, in a counterclaim.

23  And obviously you can decide, whatever the bells and whistles

24  are, well, whatever the parties want to work out.  And if it

25  doesn't work out, as I said, at least during the pendency of

H841func

1    the motion to dismiss, the system should remain on.  Hopefully

2    you'll be able to resolve it either through payment without the

3    payment being any admission, and without having any effect on

4    the motion to dismiss and the desire of the defendants to

5    terminate the contract or the like.

6              So let me ask this:  How much time would you like to

7    file your motion to dismiss, Mr. Fanning?

8              MR. FANNING:  Your Honor, would 14 days be okay?

9              THE COURT:  That's fine.  So 14 days from today.

10             MR. FANNING:  August 18th?

11             THE COURT:  Okay.  How much time for your opposition?

12             MS. SHIELDKRET:  Your Honor, I'd like an extra week

13   because the Labor Day holiday falls in there.

14             THE COURT:  Okay.  That's fine.  So three weeks from

15   the 18th?

16             MS. SHIELDKRET:  Yes, your Honor.

17             THE COURT:  Okay.

18             THE LAW CLERK:  That's September 8th.

19             THE COURT:  September 8th?

20             Mr. Fanning, a week on reply, is that --

21             MR. FANNING:  Yes, your Honor.

22             THE COURT:  Okay.  So the 15th.  All right.  15th

23   on reply.

24             All right.  Once I see the papers, I'll determine

25   whether or not I think oral argument is necessary.  And as I

H841func

1    mentioned, during the pendency of the motion, even if you don't

2    move against all counts, we'll hold the answer in abeyance in

3    light of the motion to dismiss.

4            Are there any other issues that I need to deal with

5    today?  Ms. Shieldkret?

6            MS. SHIELDKRET:  No.  That's all, your Honor.  Thank

7    you.

8            THE COURT:  Okay.  Mr. Fanning?

9            MR. FANNING:  I probably need to correct one thing on

10   the record.

11           THE COURT:  Oh, yes.  Go ahead.  Yes.

12           MR. FANNING:  I mentioned that counterclaim on breach

13   of contract and then Ms. Shieldkret mentioned that

14   Dr. Fung-Schwartz has not been getting billed since I think

15   October, and that might have something to do with the

16   termination of the contract, so just for purposes of the

17   record, it's possible the counterclaim would be quantum meruit

18   if necessary on services since October of 2016, or whenever she

19   stopped getting billed.  So I just want to make sure that

20   that's clear, that I'm not --

21           THE COURT:  I think I understand.  Basically the

22   invoicing may have stopped because your client's position is

23   that they're terminating the contract.

24           MR. FANNING:  So if we're not in a contractual phase,

25   either now or going forward or going back to '16, I don't want

H841func

1   to forfeit the right to perhaps pursue an equitable claim for

2   quantum meruit.

3           THE COURT:  I understand.

4           MR. FANNING:  Thank you, your Honor.

5           THE COURT:  But in the meantime, I would like the

6   parties to discuss the issue of whatever the amount is for

7   whatever services, putting it in escrow and see if you can work

8   that out.  Okay.

9           All right?  If there's nothing else, we'll stand

10  adjourned.  Thank you very much.

11          MS. SHIELDKRET:  Thank you, your Honor.

12          MR. FANNING:  Thank you, your Honor.

13          (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25