UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER FUNG-SCHWARTZ, D.P.M., and
JENNIFER FUNG-SCHWARTZ, D.P.M., L.L.C.,

                              Plaintiff,

        v.

CERNER CORPORATION and CERNER
HEALTHCARE SOLUTIONS, INC.,

                              Defendants.

Second Amended
Complaint
and Jury Demand

17 Civ. 233 (VSB)

### The Parties, Jurisdiction and Venue

1.      Plaintiff, Jennifer Fung-Schwartz ("Dr. Fung-Schwartz") is a medical doctor with a principal place of business at 50 West 97th Street, Suite 1A, New York, NY 10025.

2.      Plaintiff, Jennifer Fung-Schwartz, D.P.M., L.L.C. ("the Practice") is a New York Professional Service Limited Liability Company with a principal place of business at 50 West 97th Street, Suite 1A, New York, NY 10025.

3.      Dr. Fung-Schwartz's patients ("Patients") sign a form which states, "I authorize that all payments for financial benefits for professional services rendered be made to Dr. Jennifer Fung-Schwartz, DPM."

4.      Upon information and belief, Defendant Cerner Corporation ("Cerner Corp.") is a Delaware corporation with a principal place of business at 2800 Rockcreek Parkway, Kansas City, Missouri, 64117.  Upon information and belief

Cerner Corp. is registered with the New York State Department of State to do business in New York State.

5.    Upon information and belief, Defendant Cerner Healthcare Solutions, Inc. ("Cerner Solutions") is a Delaware corporation with a principal place of business at 2800 Rockcreek Parkway, Kansas City, Missouri, 64117.  Upon information and belief Cerner Healthcare Solutions, Inc. is not registered with the New York State Department of State to do business in New York State.

6.    Upon information and belief, Cerner Corp. directs the day-to-day activities of Cerner Solutions and also provides services to Cerner Solutions clients, including but not limited to acting as the contract manager for Cerner Solutions, providing customer service and support for Cerner Solutions' customers and providing eBilling to Cerner Solutions' customers.

7.    The 2014 contract between the Practice and Cerner Healthcare Solutions, Inc. directed the Practice to fax the contract to Cerner Corporation.  The contract also advised the Practice "To gain access to eBill, contact the Cerner Client Care Contact Center at 866-221-8877 or e-mail ClientCareCenter@cemer.com."

8.    Upon information and belief, cerner.com is owned by Cerner Corp.

9.    Upon information and belief, 866-221-8877 is registered to Cerner Corp.

10.    Dr. Fung-Schwartz believed the Practice was doing business with Cerner Corp.

11.    According to Cerner Corp.'s 10K SEC filing for the fiscal years ending December 31, 2016 and December 31, 2015, "Cerner solutions are offered on the unified Cerner Millennium® architecture."  To use electronic prescription services, Dr. Fung-Schwartz accesses a webpage with the Cerner Millennium® name and the

statement, "© 2011 Cerner Corporation.  All right reserved.  Access and use of this solutions system (including components thereof) require, and are governed by, license(s) from Cerner Corporation…."

12.    Monthly metric reports generated for the Practice were titled, "Jennifer Fung-Schwartz DPM LLC," and stated on the front page "© Cerner Corporation. All rights reserved.  This document contains confidential and/or proprietary information belonging to Cerner Corporation and/or its related affiliates…"

13.    As used herein "Cerner" refers to Defendants collectively.

14.    Jurisdiction is conferred by 28 U.S.C. § 1332.

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## Background

16.    Dr. Jennifer Fung-Schwartz is a medical doctor, board certified in podiatry, with a practice located at 50 West 97th Street in Manhattan.  The Practice is the entity which runs Dr. Schwartz's private office practice.

17.    In March 2006, the Practice contracted with Cerner Corp., dba Cerner Physician Practice, Inc. to provide Electronic Medical Records (EMR) services to Plaintiff.  Exhibit 1 is a copy of that contract.

18.    In 2006 the EMR software and the EMR data resided on a computer in the Practice's office.

19.    At some point between 2006 and 2016, the desktop EMR software was replaced by an online version.  Dr. Fung-Schwartz and the Practice could access the records, but the data was stored remotely.

20.    Prior to 2014, medical billing (also called "RCM" for revenue cycle management) for the Practice was handled by two separate entities depending

on the type of billing: (1) an outside vendor was engaged to handle Medicare billing; and (2) all other billing was handled by Practice personnel.

21.  During that time, Dr. Fung-Schwartz used tools within the Cerner EMR to generate bills.

22.  RCM is almost all conducted electronically. Insurers will accept paper forms, but it is the exception and it slows down payment of the claims.

23.  Dr. Fung-Schwartz and the Practice also used tools within the EMR to manage all the financial information for the office.

24.  In 2014, a serious illness affecting a Practice employee made it unfeasible for the Practice to continue to handle the billing. The personnel issue did not necessitate changing the outside vendor for the Medicare billing.

25.  Dr. Fung-Schwartz discussed her options with Cerner personnel to move non-Medicare medical billing to Cerner. She had discussions with one or more Cerner sales representatives who prepared a proposal and sales orders.

26.  Exhibits 2 is the September 2, 2014 Cerner Sales Order prepared by Rick Goodman for signature by Kim Hlobik. Upon information and belief, Rick Goodman was Senior Manager, Ambulatory Sales for Cerner Corp. from January 2010 to September 2015. Upon information and belief, Kim Hlobik has been an employee of Cerner Corp. since August 2000.

27.  Exhibit 3 is the November 19, 2014 Cerner Sales Order prepared by Mark Banville and Cerner Ambulatory Business Office Services Proposal. Upon information and belief, Mark Banville has been a Sales Executive for Cerner Corp. Since March 2010.

28. The proposal represented Cerner's services include, "Well trained and experienced revenue cycle and billing professionals."

29. Cerner said it delivers performance up to industry standards:

> We align ourselves to the Healthcare Financial Management Association (HFMA) and Medical Group Management Association (MGMA) standards for measuring and improving billing and collection performance. Cerner Ambulatory Services also adheres to the OIG third party medical billing guidelines to provide you a high level of compliance with applicable laws and regulations.

30. Cerner assured Dr. Fung-Schwartz it would "Review, scrub and process claims (primary, secondary, tertiary) daily. Cerner stated:

> Prior to processing Client's claims, Cerner will review – for completeness – claim details, including patient demographic information, procedure and diagnosis coding, and other details on the claim. Cerner will use a combination of human review and automated claim scrubbing to maximize clean claim percentage. After the claim has been scrubbed, Cerner will submit the claim to the appropriate payer through a clearinghouse. Cerner will also submit secondary and tertiary claims as necessary.

31. As part of "Patient Responsibility Management," Cerner would "Generate and mail patient statements in the Client's name and according to a standard statement cycle."

32. Cerner represented "Cerner's Consumer Care team manages calls for all Cerner Revenue Cycle Ambulatory Services Clients. Patient statements include a toll-free number that can be used to speak directly to a member of our team regarding any questions on their account."

33.    For Accounts Receivable ("A/R"), Cerner claimed that "Cerner will assume the primary responsibility and will first attempt to research and correct all denied or rejected claims."

34.    Under this Scope of Services and Responsibilities, Cerner represented that only Dr. Fung-Schwartz could "Approve bad debt write-offs/adjustments." Cerner assured Dr. Fung-Schwartz that, "To ensure A/R metrics are accurate and meaningful, Client will approve writing off or turning over to a collection agency, uncollectible patient balances.  Cerner will seek Client's approval to write off balances where the patient has received three statements and no response of potential payment by the patient."

35.    Prior to contracting with Plaintiff, Cerner sales personnel represented that Cerner was capable of handling her billing and timely obtaining reimbursement for her services from private insurers and government insurance programs, such as Medicare.

36.    They further represented that the new billing would work well with the existing Cerner EMR tools Dr. Fung-Schwartz was already using to do her billing.  This was a factor in her choice of Cerner over the process of starting with a different company.

37.    Cerner represented that the Practice would be billed at a rate of 9.21% of "total net revenue" with a monthly minimum of $1750 and that price would include the EMR as well as the RCM.  The price was set based on the Practice's previous levels of billings.  Cerner represented to Dr. Fung-Schwartz that if she maintained her then-current level of billing the new Cerner contract would not cost more than her previous combined costs for RCM and EMR services.  Yet

even as Cerner made this representation, Cerner knew that it was false because Cerner could not maintain the current level of billing because it was unable to properly submit claims to insurers and Medicare.

## Medicare Billing

38. Cerner personnel persuaded Dr. Fung-Schwartz that she should move all her billing – including the Medicare billing – to Cerner by representing, *inter alia*, that (1) Cerner was capable of meeting the requirements for Medicare billing, (2) Cerner would be no more expensive than her then-current vendor and (3) having only one vendor would simplify billing and support.

39. Accordingly, in 2014, the Practice contracted with Cerner Solutions for Cerner Solutions and Cerner Corp. to provide billing services by submitting a signed sales order to Cerner Corp.

40. Upon information and belief, at the time Cerner was making representations to Dr. Fung-Schwartz to induce her to sign the RCM sales order, Cerner knew it had problems with its system for processing claims and obtaining reimbursement from insurers, particularly for Medicare claims, that it had no plan to fix the problems and that it would not be able to provide her with the high level of compliance that it promised before she chose Cerner as her RCM provider.

41. As early as June 2013 at least one doctor had problems with Cerner's RCM for submitting Medicare claims and complained to Cerner.

42. The Practice began submitting its claims through Cerner RCM in or about December 2014.

43.    Soon after starting with Cerner RCM, the Practice's revenues fell off dramatically.  Dr. Fung-Schwartz noticed a marked decline in revenue even though her workload and billing remained consistent.  A large proportion of the decline was for claims submitted to Medicare.

44.    Exhibit 4 is a redacted version of two paper claims Cerner submitted to Medicare, close-ups of the addresses and a notice indicating why the claims were rejected.  (Dr. Fung-Schwartz wrote, "spoke to Samantha about this" on one of the forms.)  The forms have the following defects:

   a.    The computer-generated name and address of the insurer is wrong.
   b.    The computer-generated insured's ID number (redacted on the exhibit) is wrong.
   c.    The incorrect information is whited-out on the form.
   d.    A different address and ID number (redacted) are handwritten onto the forms.

45.    Upon information and belief, Cerner was attempting to submit paper claims because Cerner had a problem with its computer system and could not submit the form electronically.

46.    Upon information and belief, the computer-generated information on the form is wrong because the Cerner system did not have the ability to consistently prepare proper claims.

47.    Upon information and belief, Cerner improperly attempted to correct the forms by handwriting onto them because Cerner knew it could not fix the problems in its computer system and generate either (1) an electronic claim or (2) a properly printed form.

48.    Exhibit 4, p. 5 shows that Medicare rejected the claim for using white-out.

49.     Either Cerner did not know the requirements for submitting paper claims to Medicare or it knew the claims would be rejected for having white-out on them and deliberately submitted the improper claims.

50.     Upon information and belief, Cerner's improper submission of Medicare claims affected patients of other practices as well.

51.     If a Medicare recipient has secondary insurance, Medicare automatically submits the claim to the secondary insurer.  Submitting a claim to a secondary insurer will result in a duplicate claim that gets rejected.  Nevertheless, Cerner repeatedly submitted claims to secondary insurers of Medicare insureds.

52.     As a result of Cerner's improper actions, Dr. Fung-Schwartz repeatedly received letters from a secondary insurer, Emblem Health, telling her that duplicate claims had been submitted by her and "we can initiate a fraud investigation if we see a pattern of duplicate billing."

## Relationship to Patients and Insurers

53.     Dr. Fung-Schwartz and the Practice participate as providers in various insurance plans and Medicare through contracts with the insurers.

54.     Insured patients authorize the insurers to pay their benefits directly to the provider.  So, it is Dr. Fung-Schwartz or the Practice who submits the claim to obtain the insured patient's benefits.

**Late Billing and Accounts Receivable**

55.    Cerner caused the Practice to lose money because Cerner submitted claims late and/or wrote off charges without consulting Dr. Fung-Schwartz. Exhibit 5 is an example.

56.    The insurer was supposed to be billed for a surgical procedure on August 12, 2015 which cost $475.  The patient paid $20 as a co-pay.

57.    Cerner did not submit a claim to the insurer, Oxford, until January 18, 2016, more than 120 days after the procedure.  According to Cerner employee, Samantha Wright, the claim got "stuck in emr and was submitted late due to system issues."  Cerner submitted the claim twice, both times on paper.

58.    Under New York law, insurers do not have to pay medical bills if they are submitted more than 120 days after the services were provided.

59.    Oxford refused to pay the late claim.  Cerner claims it appealed.

60.    One inducement for the Practice to sign the Cerner RCM sales order was that Cerner represented it would "provide you a high level of compliance with applicable laws and regulations."

61.    New York law requires a late claim to be paid when it "was a result of an unusual occurrence and that he or she [the provider] has a pattern or practice of timely submitting claims."

62.    Upon information and belief, either (1) Cerner was not able to claim that the late submission was unusual and it had a pattern or practice of timely submitting claims on behalf of the Dr. Fung-Schwartz or, (2) Cerner did not make the proper argument under New York law.

63.    Oxford denied the appeal on the claim.

64.    One inducement to enter into the contract was that Cerner represented that it would not write off Accounts Receivable without approval from Dr. Fung-Schwartz.  Cerner did not consult Dr. Fung-Schwartz about the write-off or even disclose that it had submitted the claim late.  Instead on April 20, 2016 Cerner unilaterally wrote off $475 from the account.

65.    The amount that Cerner wrote off – $475 – was also incorrect.  The patient had paid the $20 co-pay, so the amount the insurer should have been billed for was $455.  The account was left with a -$20 balance.  When Cerner unilaterally wrote off the incorrect $475 amount, Cerner made it look like the money had been collected.  They may have charged 9.21% to the Practice.

66.    Upon information and belief, either Cerner's system does not flag accounts with a negative balance (so they can be reviewed and the overage returned to the proper party) or Cerner intentionally and deliberately concealed the flag so Dr. Fung-Schwartz would not know about the write-off.

67.    Upon information and belief, this is not an isolated incident and Cerner repeatedly hid botched claims from the Practice and Dr. Fung-Schwartz and wrote them off without the authorization which Cerner had promised to obtain from Dr. Fung-Schwartz.

68.    Upon information and belief, if a claim was not written off, then after the insurer rejects the claim, Cerner still sent statements in Dr. Fung-Schwartz's name to patients that make it look like they owe the money.  Upon information and belief, patients also received a document from their insurer stating that the claim was denied.

69.     One patient contacted the Practice because she knew she had insurance that was supposed to cover the claim and, upon information and belief, Cerner had sent her a statement which led her to believe Dr. Fung-Schwartz was attempting to collect the claim from the patient.

**Cerner Personnel, Reporting and The Practice's Termination of RCM Services**

70.     To induce Dr. Fung-Schwartz to enter accept the RCM sales order, Cerner represented that it had "Well trained and experienced revenue cycle and billing professionals."  Upon information and belief, at the time Cerner made that statement, it knew that it this statement was false and that it had no plan to provide well trained and experienced revenue cycle and billing professional to Dr. Fung-Schwartz.

71.     Cerner had received complaints from customers about the inadequacy of its employees.  The issue of high turnover, inexperienced and poorly trained Cerner personnel being assigned to clients is an issue in at least one litigation against Cerner.

72.     Despite Cerner's representation about its "Well trained and experienced revenue cycle and billing professionals" and the growing evidence Cerner already knew this statement was false and only made to induce a new customer to select Cerner over other vendors.  Upon information and belief Cerner had not plan to improve training, hire more experienced personnel or otherwise address its issue of inexperienced and poorly trained personnel so that it would live up to the promises it made to Dr. Fung-Schwartz to induce her to select Cerner.

73.    Instead, after Cerner's repeated problems with the RCM, Cerner represented to Dr. Fung-Schwartz that the employee Cerner had assigned to work on Dr. Fung-Schwartz's account, Samantha Wright (referenced in ¶ 57 and Exhibit 5), had been terminated for incompetence.

74.    Dr. Fung-Schwartz repeatedly contacted Cerner Solutions, Cerner customer support and her account representative, Melissa Jones, to attempt to resolve the problems.  Upon information and belief, Melissa Jones has been an employee of Cerner Corp. since August 2011.  For example, Dr. Fung-Schwartz had a conference call with Ms. Jones and other Cerner personnel in July 2015 after the Practice's revenue had plummeted.  Dr. Fung-Schwartz explained that there was no reason to stay with Cerner when the Practice already had a vendor who could properly submit claims to Medicare.  In order to induce Dr. Fung-Schwartz not to leave Cerner, Ms. Jones and Cerner falsely represented that they could fix their problems.

75.    Upon information and belief, despite Ms. Jones's representations, Cerner had no plan to improve the quality of its RCM submissions of Medicare claims and took no additional measures to address the issue.  Ms. Jones's false representations in July 2015 induced Dr. Fung-Schwartz to continue to submit claims via Cerner and directly resulted in the decrease in revenue to the Practice and Dr. Fung-Schwartz.

76.    Cerner was never able to consistently submit Medicare claims properly.

77.    Dr. Fung-Schwartz also periodically reviewed the monthly metrics reports with Ms. Jones and other Cerner personnel.  The reports showed increasing amounts of Accounts Receivable, meaning that Cerner was not

collecting insurance claims.  Dr. Fung-Schwartz repeatedly demanded that Cerner address the Accounts Receivable issue and collect the claims.  Cerner refused.

78.    Cerner's pre-contract proposal, which were material to Dr. Fung-Schwartz's decision to choose Cerner over other providers  promised "Analysis of operational and financial performance processes" and "Reports and tools to monitor and maximize financial performance."  (Exhibit 3, p. 2).  The actual reports and the monthly review with Cerner personnel were actually detrimental to the Practice's financial performance.

79.    For example, by providing monthly reports that showed Accounts Receivable but did not specify which receivables had already been rejected by insurers and Medicare, Cerner hid for months that they had actually failed to timely submit claims and that they were uncollectable from the insurers under New York law.  Cerner's monthly reports were designed to falsely show the claims as still collectable.

80.    Finally, on a conference call with Ms. Jones and Cerner personnel in February 2016, Cerner acknowledged that the Practice had the right to withdraw from the RCM sales order. Cerner again refused to collect the outstanding Accounts Receivable.

81.    Upon information and belief, Cerner caused the Practice and Dr. Fung-Schwartz to lose at least $220,000 of revenue.

82.    Dr. Fung-Schwartz had to borrow money to cover her expenses.

83.    In April 2016, Melissa Jones contacted Dr. Fung-Schwartz to set a termination date for the RCM services.  Dr. Fung-Schwartz informed her that the practice would cease using the RCM services on June 1, 2016.

84.    After leaving the billing arrangement with Cerner, Dr. Fung-Schwartz obtained another service provider for the Practice's billing.  With the new vendor, the Practice's revenues returned to the level they were before she contracted with Cerner.

### Cerner's Illegal Conversion of the Electronic Medical Records

85.    None of the Defendants owns the Electronic Medical Records.

86.    Under HIPAA, 42 U.S.C. § 1320d and/or related regulations, Cerner was required to continue to provide access to the EMR.

87.    By May 31, 2016 the Practice has stopped submitting claims with Cerner RCM.  The Practice and Dr. Fung-Schwartz continued to use the EMR software.

88.    In March 2016, New York State implemented a mandatory electronic prescription program.  Dr. Fung-Schwartz had Cerner add this feature to her EMR software.

89.    In April 2016, Dr. Fung-Schwartz made a $6000 payment to Cerner. The cost of the EMR software was approximately $700/month.

90.    In New York State, patients are entitled to examine and copy medical records even if there is a fee dispute.  HIPAA also requires patients have access to medical records.

91.    On September 23, 2016 at 3:51 p.m., Cerner Corp.'s outside counsel, Nathan Neuman, Esq., sent an e-mail to Plaintiff stating in relevant part:

> Dear Dr. Schwartz:
> **This email will confirm that this office represents Cerner Corp.** dba Cerner Physician Practice, Inc. (collectively hereafter "Cerner") regarding a debt obligation owed to it by Jennifer Fung-Schwartz, DPM [alleged to be over $100,000] per  Section 3.2 of the attached Cerner Physician Practice Software License, Hardware Purchase, [sic. and] Support Services Agreement (hereafter the "Agreement") with a services start date of March 24, 2006…

(emphasis added).

92.    Dr. Fung-Schwartz retained counsel, Joseph Paterno III, Esq., to respond to Mr. Neuman in reliance on Cerner Corp.'s representation that it was owed money.  Dr. Fung-Schwartz relied on Cerner Corp.'s representation because she knew she had a contract with Cerner and she repeatedly received materials, like the monthly reports described in ¶ 12 herein, which had Cerner Corp.'s name on them and the login screen for the EMR software had Cerner Corp.s' name on it.

93.    Dr. Fung-Schwartz's counsel talked with and wrote to Mr. Neuman. On October 10, 2016 Mr. Paterno wrote to Cerner Corp.'s counsel, Mr. Neuman, offering $10,000 to settle the dispute.  He also sought to have the patient information returned to the Practice and Dr. Fung-Schwartz as required by law:

> Cerner shall archive and allow access to all of Dr.'s patient files and records, such that the entire physical and electronic patient files may be read and printed by Dr. at a commercially reasonable fee, which fee shall be expeditiously disclosed by Cerner to Dr. in advance

94.    Mr. Neuman wrote back that day, affirming that his client, Cerner Corp. was a party to the contract and stating in part:

> **Cerner has just recently terminated the contract** … and all services with Dr. Fung-Schwartz including EMR

Page 16 of 26

(emphasis added).  Cerner Corp.'s counsel, Mr. Neuman, refused to address the issue of returning the patient medical records.

95.    Without prior notice, Cerner abruptly cut off access to Dr. Fung-Schwartz's Electronic Medical Records on October 13, 2016.

96.    Without access to the EMR, Dr. Fung-Schwartz could not treat patients or even view her patients' records.  The Practice could not see the calendar or basic patient contact information, so they could not call patient to cancel appointments.  The Practice could not schedule appointments, enter lab results into the system or verify insurance coverage.  Dr. Fung-Schwartz could not prescribe medications without access to the EMR.

97.    Neither Dr. Fung-Schwartz nor Practice employees could view any financial information for the Practice.

98.    Cerner is obligated to return the medical records to Dr. Fung-Schwartz and the Practice at the end of the contract period.

99.    One of the features of the medical records is that Dr. Fung Schwartz can create graphics by drawing on a foot to indicate a patient's condition, for example, where on the foot a patient has a lesion.  These graphics are linked to the patient's medical records and Dr. Fung-Schwartz can consult her prior drawings along with her notes.

100.    Cerner has repeatedly told Dr. Fung-Schwartz and this Court that Dr. Fung-Schwartz can migrate the contents of the medical records to another EMR system.  However, Cerner has only offered to export the text portion of the medical records.  Upon information and belief, Cerner does not have a method for exporting the drawings related to the patient's medical records.  Without the

drawings, the patient's medical record is incomplete and not fully accessible to Dr. Fung-Schwartz, the patient and the Practice.

101.    For ease of reference, Plaintiff identifies the Counts with the same numbers as the Amended Complaint (Doc. 18).  The counts omitted are preserved for appeal, the Counts which are amended have the same number and the new counts are added at the end.

### Count 4:  Fraud

102.    Plaintiffs restate and reallege paragraphs 1 through 101 as if fully set forth herein.

103.    Prior to entering the 2014 RCM contract, Defendants knowingly made the false statements to Dr. Fung-Schwartz described herein, including (1) representing to Dr. Fung-Schwartz that Defendants had the capability to properly process the claims and "provide you a high level of compliance with applicable laws and regulations" (2) representing her total cost for RCM and EMR services would not increase relative to her billing, (3) representing to Dr. Fung-Schwartz that her account would be handled by well-trained and experienced personnel.

104.    Dr. Fung-Schwartz and the Practice relied on Cerner's false representations when she signed and returned the sales order to Cerner Corp. and switched over her billing, including her Medicare billing from her prior vendor, to Cerner.

105.   As a result of Cerner's representations and Dr. Fung-Schwartz's reliance on them, Dr. Fung-Schwartz and the Practice were injured.

### Count 6:  Fraud By Cerner Corp.
### In Claiming It Was A Party to the Contract

106.   Plaintiffs restate and reallege paragraphs 1 through 105 as if fully set forth herein.

107.    Cerner Corp. falsely represented to Dr. Fung-Schwartz that it had contracted with her and that she owed Cerner Corp over $100,000.

108.   Cerner Corp. falsely represented to Dr. Fung-Schwartz that Cerner Corp. was the entity that terminated the agreement to provide services, including EMR services.

109.   Cerner Corp. knew that it was not the proper party to collect on the contract and that the contract was with the Practice, not Dr. Fung-Schwartz individually, and upon information and belief, Cerner Corp. intended to mislead Dr. Fung-Schwartz to obtain money from her.

110.   Dr. Fung-Schwartz relied on Cerner Corp.'s false representation because she knew she had a contract with Cerner, she regularly logged into the EMR software which had Cerner Corp.'s name on it and she received monthly reports with Cerner Corp's name on them .  That reliance included (1) retaining outside counsel to negotiate with Cerner Corp. on behalf of her and the Practice, (2) offering to settle Cerner Corp.'s claims for $10,000, (3) retaining litigation counsel to investigate Cerner Corp. and name it in the lawsuits.

111.    As a result of Cerner Corp.'s representations and Dr. Fung-Schwartz's reliance on them, Dr. Fung-Schwartz was injured and continues to be injured.

## Count 9:  Conversion

112.    Plaintiffs restate and reallege paragraphs 1 through 111 as if fully set forth herein.

113.    Defendants' do not have any property interest in Dr. Fung-Schwartz's electronic medical records (EMR) or patients' insurance claims.

114.    Defendants took patients' insurance claims and destroyed their value.

115.    Dr. Fung-Schwartz repeatedly asked Cerner to properly submit or re-submit patient claims.  Cerner failed to do so.

116.    Patients were injured by Defendants' actions.

117.    Dr. Fung-Schwartz requested the electronic medical records be turned over to her and even offered to pay Defendants any reasonable costs to archive the records so she could access them.  Cerner refused.

118.    Plaintiffs were injured by Cerner's actions.

## Count 11:  Tortious Interference with Business Relations

119.    Plaintiffs restate and reallege paragraphs 1 through 118 as if fully set forth herein.

120.    Defendants caused the insurers not to issue payment, for by example, knowingly submitting paper claims with white-out and claims with other deficiencies which Cerner knew would not be accepted by the insurers and by double-billing insurers, which exposed Dr. Fung-Schwartz to allegations of fraud.

121.    Defendants actions caused injury to Dr. Fung-Schwartz and the Practice.

## Count 13:  Tortious Interference with Business Relations

122.    Plaintiffs restate and reallege paragraphs 1 through 121 as if fully set forth herein.

123.    Defendants maliciously and illegally cut off Dr. Fung-Schwartz's access to the EMR, including the ability to prescribe medications.

124.    Defendants intentionally caused the insurers not to issue payment, for by example, knowingly submitting paper claims with white-out and claims with other deficiencies which Cerner knew would not be accepted by the insurers.

125.    Defendants intentionally caused Dr. Fung-Schwartz to cancel appointments and shut down her practice during the time she was denied access to the EMR.

126.    Defendants falsely told patients they owed Dr. Fung-Schwartz money.

127.    Defendants actions caused injury to Plaintiffs.

## Count 15:  Unfair Competition

128.    Plaintiffs restate and reallege paragraphs 1 through 127 as if fully set forth herein.

129.    Defendants (1) made false and misleading statements to insurers and patients under Dr. Fung-Schwartz's name and or signature, including (a) submitting duplicate claims to insurers under Dr. Fung-Schwartz's signature, (b) sending statements to Dr. Fung-Schwartz's patients which falsely stated or

implied that they owed money to Dr. Fung-Schwartz, (2) knowingly submitted claims that would be rejected and (3) secretly wrote off botched claims.

130.    Defendants acts, omissions and concealments were done intentionally for their commercial advantage because they were paid on a percentage of the Practice's billing.

131.    Defendants deprived Dr. Fung-Schwartz and the Practice of benefits and property rights belonging to them and harmed their professional reputation with patients and insurers.

## Count 16:  Misappropriation of Trade Secret

132.    Plaintiffs restate and reallege paragraphs 1 through 131 as if fully set forth herein.

133.    Defendants maliciously misappropriated and concealed from Dr. Fung-Schwartz and the Practice their (1) patient medical records and (2) trade secrets including the Practice's (a) financial information, (b) calendar and (c) customer lists when Defendants illegally cut off access to the EMR system.

134.    Defendants acts and concealments were done intentionally for their commercial advantage in an effort to ransom them for a $100,000 payment – far in excess of any amount they had ever previously claimed was due under the contract.

## Count 17:  Breach of Contract

135.    Plaintiffs restate and reallege paragraphs 1 through 134 as if fully set forth herein.

136.    As described herein, Defendants' breached the terms of the contract.

137.   The Practice performed under the contract.

138.   Defendants' material breach harmed the Practice.

## Count 18:  Negligence

139.   Plaintiffs restate and reallege paragraphs 1 through 138 as if fully set forth herein.

140.   Defendants owed Dr. Fung-Schwartz and the Practice a duty to comply with, *inter alia*, OIG third party medical billing guidelines, federal law and New York law to properly submit claims to insurers.

141.   Defendants owed Dr. Fung-Schwartz and the Practice a duty to comply with federal and New York law to keep patient medical records available to their physician.

142.   Cerner failed to timely submit Patient insurance claims properly.

143.   Cerner wrongfully withheld patient medical information from their treating physician.

144.   Dr. Fung-Schwartz and the Practice were injured by Defendants' action.

## Count 19:  Negligence

145.   Plaintiffs restate and reallege paragraphs 1 through 144 as if fully set forth herein.

146.   Defendants owe Dr. Fung-Schwartz and the Practice a duty to comply with federal and New York law to return complete patient medical records to their physician, including the drawings.

147.   Defendants are not able to provide the complete medical records, with the drawings, in breach of those duties.

148.   Dr. Fung-Schwartz and the Practice are injured by Defendant's acts and omissions.

## Count 20:  Fraud

149.   Plaintiffs restate and reallege paragraphs 1 through 148 as if fully set forth herein.

150.   Defendants owe Dr. Fung-Schwartz and the Practice a duty to comply with federal and New York law to return complete patient medical records to their physician, including the drawings.

151.   Defendants represented to Dr. Fung-Schwartz and the Practice that they would comply with those duties, before she signed the contract, while they have provided EMR services and during this litigation.

152.   Dr. Fung-Schwartz and the Practice relied on Defendant's representations when Dr. Fung-Schwartz contracted with Cerner for EMR services and each time she entered patient medical information into the EMR system.

153.   Defendants knew their representations were false because they never had a method for exporting the drawings, only the text portion of the records.

154.   As a result of Cerner's representations and Dr. Fung-Schwartz's reliance on them, Dr. Fung-Schwartz was injured and continues to be injured.

WHEREFORE Plaintiff demands judgment:

(1)    That Defendants, their agents, servants, employees, attorneys and those persons in active concert or participation with Defendants be preliminarily and permanently enjoined and restrained throughout the United States from deleting, destroying, altering, amending or otherwise changing any of Dr. Fung-Schwartz's electronic medical records;

(2)    That Defendants, their agents, servants, employees, attorneys and those persons in active concert or participation with Defendants be preliminarily and permanently enjoined and restrained throughout the United States from withholding electronic medical records from Dr. Fung-Schwartz;

(3)    That Defendants be required to make available the electronic medical records at issue and cooperate with Dr. Schwartz and any vendor she hires so that she can export, download, print and/or otherwise obtain her own electronic and hard copies of the records;

(4)    That Defendants reimburse Dr. Fung-Schwartz and the Practice for the fees paid for the billing services;

(5)    That Defendants reimburse Dr. Fung-Schwartz and the Practice for the costs of migrating EMR and RCM services to other products and vendors;

(6)    That Defendants pay Dr. Fung-Schwartz and the Practice $220,000 or such other amount proved which Defendants failed to submit or obtain from third parties;

(7)    That Defendants pay such other damages as are proved suffered by Plaintiffs as a result of Defendants' conduct;

(8)    That Defendants pay punitive damages;

(9)    That Defendants pay costs and attorney fees;

(10)    That Defendants pay pre-judgment interest;

(11)    That Plaintiffs be awarded such other and further relief as this Court may deem just and proper.

## Jury Demand

Plaintiff demands trial by jury.

Dated:  October 25, 2018          By:    /s/ Elizabeth Shieldkret
                                          Elizabeth Shieldkret (ES 0625)
                                          67-20 Exeter Street
                                          Forest Hills, NY 11375

                                          (718) 997-0290
                                          es@eshieldkret.com

                                          Attorney for Plaintiffs,
                                          Jennifer Fung-Schwartz, D.P.M.
                                          Jennifer Fung-Schwartz, D.P.M., L.L.C.