# Exhibit 1

# CERNER PHYSICIAN PRACTICE, INC.

## *SOFTWARE LICENSE, HARDWARE PURCHASE, SERVICES and SUPPORT AGREEMENT*

This agreement, including any schedules attached hereto ("Agreement") made this **24** day of **March**, 2006, ("Effective Date") by and between Cerner Physician Practice, Inc., a Delaware corporation ("CPP"), located at 2800 RockCreek Parkway, North Kansas City, Missouri 64117 and the Client identified below ("Client").

**Client:** Jennifer Fung
**Address:** 50 West 97th Street, Suite 1A, New York, NY 10025
**Telephone:** 212-678-2333 **Fax:** 212-678-9366

CPP and Client agree as follows:

## 1. GENERAL PROVISIONS.

**1.1. Agreement.** Subject to the terms and conditions of this Agreement and the payment of all fees including the applicable license fees, Client agrees to purchase and CPP agrees to convey to Client the Hardware, Software licenses, services and other items as may be listed on the schedules attached hereto at the pricing set forth herein. In the event the parties enter into a written order hereafter, such order(s), upon execution by both parties, is incorporated into this Agreement ("Subsequent Order") This Agreement and any schedules and attachments attached hereto constitutes the entire agreement between the parties and supersedes all prior or contemporaneous agreements, representations and proposals, written or oral, except for Client's obligations to pay support or other fees under existing contract(s), if any, between the parties.

**1.2. Binding Effect.** As of the Effective Date hereof, this Agreement will be binding upon and inure to the benefit of the parties, their legal representatives, permitted transferees, successors, and assigns as permitted by this Agreement. CPP shall have the right to assign this Agreement, and to contract with third parties to perform any or all of the services set forth herein. This Agreement, to the extent signed and delivered by means of a facsimile machine, will be treated in all manner and respects, and will have the same binding effect, as an original document. Client consents to receipt of information from CPP by e-mail and facsimile machine.

**1.3. Assignment.** This Agreement and any rights and obligations may not be sold, leased, assigned or otherwise transferred in whole or in part by Client without the prior written consent of CPP and upon such terms and conditions as CPP in its sole discretion may require.

**1.4. No Waiver.** No delay or failure in exercising any right under this Agreement and no partial or single exercise of such right will be deemed to constitute a waiver of such right or any other rights hereunder. No consent to a breach of any express or implied term of this Agreement will constitute consent to any prior or subsequent breach.

**1.5. Force Majeure.** Neither party will be liable for failure to perform any of its respective obligations under this Agreement or the schedules and subsequent orders, other than the payment of fees, if such failure is caused by an event outside its reasonable control, including an act of God, war, or natural disaster.

**1.6. Dispute.** The parties will make reasonable efforts through negotiation to settle any disputes arising out of or related to this Agreement. This Agreement shall be construed and interpreted in accordance with the laws of the State of Missouri and any dispute shall be resolved in a forum located in the State of Missouri.

**1.7 Miscellaneous.** This Agreement, and all modifications or amendments to this Agreement, will not be effective unless made in writing and signed by an authorized representative of each party. If any provision hereof is held to be invalid or unenforceable, the remaining provisions will remain in full force.

**1.8 Notice.** Any notice required or permitted to be given hereunder shall, except where specifically provided otherwise, be given in writing by personal delivery, certified mail, or overnight delivery to the address set forth herein for such party, (notices to CPP shall be sent to the attention of Chief Legal Officer) and the date upon which such notice is received shall be deemed to be the date of such notice, irrespective of the date appearing thereon.

**1.9 Verification.** CPP reserves the right to audit Client's use of the Software and services no more than once per year, after reasonable notice and during normal business hours, to verify compliance with the terms of this Agreement.

**1.10 Definitions.** As used in this Agreement and any Subsequent Orders, the following terms will have the meanings described below.

**Confidential Information** shall mean all information provided by one party to the other party or available to such party, which is not generally known to others, whether or not marked as confidential, provided by or learned about by a party in the course of the parties' dealings with one another, or their predecessors, including proprietary information, Documentation, information about CPP Software and Third Party Software, computer and software systems and programs, ideas, concepts, the

Terms and Conditions:

terms of this Agreement, patient data and any other information not generally known to others.

Notwithstanding the foregoing, Confidential Information does not include information that (i) is known to the receiving party at the time of disclosure to the receiving party as demonstrated by written or electronic records of the receiving party, (ii) is or becomes generally known through no wrongful act of the receiving party, (iii) has been rightfully received by a party from a third party authorized to make such disclosure without restriction, (iv) has been approved for release by written authorization of the disclosing party, or (v) is required by law or regulation to be disclosed, to the extent so disclosed after delivery of prior written notice to the other party.

**Delivery Date** is defined in Para. 13.1.

**Documentation** means the product manuals accompanying or associated with the Software and/or Hardware delivered or available to Client. However, Documentation (a) may describe (i) some functionality that is specified for configurations that Client does not have and (ii) modules or products not included, and therefore are not applicable, (b) may contain certain sections that, from time to time, may be out of date in a manner that will not have a material effect on Client or the value of the Software to Client, and (c) all Updates may not comply with the then current Documentation, however the Documentation will be updated by CPP for major Updates.

**Error** means a veritable and reproducible failure of the Supported Software to conform to the Documentation that accompanied it.

**Go Live Date** shall mean the date when live data can be processed through the CPP Software for commercial purposes and Client must not unreasonably delay processing such data.

**Hardware** means the hardware sold and identified in this Agreement.

**Hardware Error** is a reproducible and substantial failure of the Supported Hardware to conform to the Documentation that accompanied it or manufacturer's specifications.

**Hardware Support Fee** means the amount due from Client to CPP for Hardware Support Service as listed in this Agreement or in any notice sent by CPP

**Hardware Support Service** means the services described in Para. 15.2.

**Manufacturer's Warranty** means the warranty, if any, provided by the manufacturer of any Hardware.

**Renewal Term** is defined in Para. 4.1.

**Software** means the CPP Software and the Third Party Software. Software does not include the source code.

**Software Support Fee** means the amount due from Client to CPP for Software Support Service as listed in this Agreement or in any notice sent by CPP.

**Software Support Service** is defined in Para. 12.2.

**Subsequent Order** is defined in Para. 1.1.

**Support** means Software Support Service and Hardware Support Service.

**Supported Hardware** is defined in Para. 15.1.

**Supported Software** means any Software that Client obtains a license from or through CPP to use, is listed herein or in any Subsequent Order, and for which Client has agreed to pay a support fee to CPP.

**Term** is defined in Para. 4.1.

**Third Party Software** means software licensed, owned, or provided, by a third party, and/or licensed or delivered by or through CPP to Client under this Agreement or any Subsequent Order.

**Update** is defined in Para. 12.4.

**CPP Software** means the specific object code version or release of the CPP software program(s) that are licensed to Client herein, together with all Updates provided to Client by CPP in accordance with this Agreement and customization work, if any.

## 2. SOFTWARE LICENSE

**2.1. Software License.** Subject to the terms and conditions in this Agreement, CPP grants Client, and Client accepts, a non-exclusive, non-transferable perpetual license, subject to termination as described in paragraph 3.2, to use the number of copies of the CPP Software described herein and the Documentation in consideration of Client's payment of the applicable fees. Said license shall apply to

any Subsequent Orders accepted by CPP during the Term or any Renewal Term. Except as expressly set forth in this Agreement, CPP retains all right, title and interest in and to the CPP Software and any and all work produced by CPP including, without limitation, the Documentation, all inventions, creations, expressions, improvements, computer programs, source codes, specifications, operating instructions and all other documentation, whether patentable or unpatentable.

2.2.    **Limitations.** Client may not (i) use the Software except as permitted in this Agreement, (ii) make copies of it (except backup, testing, or archival copies), or relocate it; (iii) translate, modify, reverse engineer, decompile or disassemble the Software; (iv) export, rent, lease, assign, enter any timeshare or subscription service or make any transfer of the Software; (v) remove, obliterate, alter or obscure the copyright and trademark notices and serial number that appear on the Software or during its use, or (vi) exceed the number of copies or users as set forth in this Agreement. These limitations will survive termination of this Agreement for any reason and shall apply to any software that is the subject of, or part of, any prior agreement(s) between the parties and/or their predecessors. If Client provides third party billing services for medical providers ("Clients"), use of the CPP Software shall include the storage and processing of data for Clients and access to the data by Clients, all in the ordinary conduct of Client's billing services. Client agrees that the use of any software or hardware that reduces the number of users directly accessing or utilizing the Software (sometimes called "multiplexing" or "pooling" software or hardware) does not reduce the number of Software licenses required. The required number of Software licenses would equal the number of distinct inputs to the multiplexing or pooling software or hardware. Client is prohibited from using any software other than the CPP' modules or Query API module to access the Software or any data stored in the Software database for any purpose other than generating reports or statistics regarding system utilization, unless CPP has given its prior written consent to Client's use of such other software and Client has paid to CPP the license fees with respect to such access to the Software or data stored in the Software database in accordance with the CPP licensing policies applicable to the Software modules that provide access to the Software application modules and data stored in the Software database.

2.3.    **Third Party Software.** In the event Client licenses Third Party Software through CPP, CPP will transfer to Client only the rights CPP has in the Third Party Software delivered to Client. In no event shall Client obtain any title thereto. THIRD PARTY SOFTWARE IS TRANSFERRED TO CLIENT "AS IS". Client's right to use the Third Party Software, all warranties and updates regarding the Third Party Software, and all other terms and conditions of said license will be governed by this Agreement, and the separate agreements, if any, included with the Third Party Software and this Agreement and as may be accepted by CPP, on Client's behalf, at the time of installation. Client agrees to implement any necessary updates, modifications or additions to Third Party Software. During the term of this Agreement, if Client provides third party software to CPP, Client represents and warrants that Client is authorized to provide such third party software and that CPP is authorized to use such third party software for the purpose provided. Client will indemnify, defend and hold harmless CPP from and against any and all claims, liabilities, losses, damages, causes of action or injuries, together with costs and expenses, including reasonable attorney's fees, arising out of or resulting from Client's failure to comply with the foregoing provisions, representations and warranties.

3.    **FEES AND PAYMENTS**

3.1.    **Fees and Payments.** This Agreement specifies the amounts due CPP. Client will pay to CPP the fees, amounts and expenses due CPP as specified herein. Client is obligated to pay the Software Support Fee and the Hardware Support Fee for the entire Term. Client acknowledges that CPP is allowing the Client to pay said fees on a periodic basis as an accommodation to Client only. After the Term, Client agrees to pay the Software Support Fee and Hardware Support Fee for each Renewal Term. Payment periods for Support fees are subject to change upon prior written notice, at the discretion of CPP.

3.2.    **Failure to Pay.** Failure to make any payment due to CPP in accordance with this Agreement, including the Software Support Fee and/or the Hardware Support Fee, will result in forfeiture of Client's right to receive Software Support Service, Hardware Support Service and/or any other support or services. Failure to (i) comply with the limitations set forth in paragraph 2.2, or ii) pay all the license fees for the Software in accordance with this Agreement will result in termination of Client's Software license, termination of this Agreement and will obligate Client to return any and all Software and Documentation to CPP. In addition to the foregoing, CPP will charge a late fee on fees, amounts and expenses not paid to CPP as provided in this Agreement at the lesser of the maximum amount chargeable by law or one and one-half percent (1.5%) per month commencing fifteen (15) days after the date payment was due. In addition, Client agrees to pay all reasonable expenses incurred by CPP in enforcing any collection of fees or other rights under this Agreement including, but not limited to, all expenses of any legal proceeding related thereto including but not limited to attorney fees.

3.3.    **Payment Terms.** With regard to the Software license, any Hardware purchased, and certain services, a deposit, as set forth in this Agreement, is due upon execution of this Agreement. The balance is due on the Delivery Date. All payments are non-refundable, due in U.S. dollars and must be paid within thirty (30) days of receipt of the invoice.

3.4.    **Support Fee Adjustments.** CPP may adjust the Software Support Fee and/or the Hardware Support Fee at any time during the Term or any Renewal Term by delivering to Client written notice of the adjustment. Sixty (60) days prior to the end of the Term or the Renewal Term, either party may elect to cancel the Software Support Service and/or Hardware Support Service for the next Renewal Term only by providing written notice of such election to the other party.

3.5.    **Taxes.** The fees and expenses due to CPP as set forth in this Agreement are net amounts to be received by CPP, exclusive of all sales, use, withholding, excise, value added, and ad valorem taxes incurred by Client or imposed on CPP in the performance of this Agreement or otherwise due as a result of this Agreement. Client will be responsible for and will pay any and all such taxes and charges.

3.6.    **Expenses.** Unless specified otherwise, Client will reimburse CPP for all out-of-pocket expenses reasonably incurred in rendering services to Client. Expenses will include reasonable travel and transportation expenses, lodging and meals, and the cost of any shipping costs, communications charges, telephone calls (except Client support calls), and other related expenses.

4.    **TERM AND TERMINATION.**

4.1.    **Term.** This Agreement will commence on the Effective Date. Support will commence on the date specified in the schedules attached hereto or as set forth in a Subsequent Order and thirty-six (36) months thereafter ("Term"). Support will automatically renew for successive twelve (12) month periods ("Renewal Term") unless either party provides written notice to the other party of its intent not to renew at least sixty (60) days prior to the expiration of the then current term.

4.2.    **Termination for Cause.** In the event that either party materially defaults in the performance of any of its obligations under this Agreement and does not substantially cure such default, or commence a cure, within twenty (20) days after being given written notice specifying the default, the non-defaulting party may, by giving written notice to the defaulting party, terminate this Agreement as of a date specified in such notice of termination. The specified date shall be at least twenty (20) days after the notice of termination, except for termination for non-payment, which may be immediate after the 20-day cure period.

4.3.    **Effect of Termination.** Upon termination for any reason, other than a CPP Breach (defined as a material breach by CPP as determined by final arbitration or a court of competent jurisdiction), Client will pay CPP for all services performed by CPP up to the date of such termination and all other amounts Client owes to CPP under this Agreement including, but not limited to, the unpaid portion of the Software Support Fee and/or Hardware Support Fee for the balance of the Term or Renewal Term.

4.4.    **Survival.** Termination of this Agreement or Support will not terminate each party's obligations under the provisions of Paragraph 1 (General Provisions), Paragraph 2.2 (Limitations) Section 3 (Fees and Payments), Paragraph 4.3 (Effect of Termination), Paragraph 4.4 (Survival), Section 5 (Nondisclosure and Confidentiality), Paragraph 9.2 (Warranty Limitations), and Section 11 (Limitation of Liability), all of which survive termination and/or non-renewal.

5.    **NON DISCLOSURE AND CONFIDENTIALITY.** Each party may have access to Confidential Information of the other party. The recipient of such Confidential Information agrees to hold such information in strictest confidence and not to disclose, or cause to be disclosed, the information to any third party, other than an authorized agent or contractor of CPP, or utilize the Confidential Information for any purpose other than as expressly contemplated by this Agreement. Each party agrees to take all reasonable steps to ensure that Confidential Information is not disclosed or distributed by its employees or agents in breach of this Agreement. Each party agrees that due to the unique nature of Confidential Information there can be no adequate remedy at law for breach of this paragraph and that such breach would cause irreparable harm to the other; therefore the non breaching party shall be entitled to seek immediate injunctive relief, in addition to whatever remedies it may have at law or under this Agreement.

6.    **SITE ACCESS.** CPP will be permitted access to Client's premises, employees and system during Client's normal working hours, with reasonable prior notice to Client, as CPP deems necessary for the performance of CPP' obligations under this Agreement.

7.    **REMOTE ACCESS.** Client will provide CPP with remote access to the Software and Supported Hardware for purposes of performing support services. Client will provide and maintain at Client's expense the necessary telephone or data lines, modem, hardware and software specified by CPP. CPP will use reasonable efforts to comply with all security and safety precautions associated with CPP' remote access of the Software. CPP will not be responsible for any loss of any of Client's data, "downtime," loss or corruption of other software program files, or any other loss associated with the provision of dial-in or remote access services, whether arising in contract, tort, negligence, strict liability, products liability, or otherwise.

8.    **SOURCE CODE ESCROW.** Client shall have the right to become a beneficiary to an escrow agreement, subject to the terms and conditions of said escrow agreement. If obtained by Client, use of the source code shall be limited to

Client, for the sole purpose of providing support to Client, and the source code shall be considered part of Confidential Information. Upon written notification to CPP General Counsel and payment of the CPP then current initial escrow fee and annual escrow fees, CPP will add Client as a beneficiary. Client will be removed as a beneficiary upon the failure to pay any annual fee within thirty (30) days after payment was due.

## 9. WARRANTY

**9.1. Warranties.** CPP warrants that, during the ninety-day period following the Go Live Date, the CPP Software will substantially conform to the Documentation when used by the Client in a manner that is consistent with the Documentation. CPP does not warrant that the Software described herein will meet Client's requirements. Client's sole and exclusive remedy for a breach of the foregoing software warranty will be, at CPP' option, to repair or replace the non-conforming CPP Software or return any payments Client paid for the non-conforming CPP Software and terminate this Agreement. This software warranty will not apply and CPP will be neither obligated nor responsible to repair, replace, or grant a refund with respect to any CPP Software that does not conform to its Documentation as a result, in whole or in part, of one or more of the events indicated in Paragraph 12.5 (Limitations & Exclusions). This warranty is applicable only for new CPP Software licenses purchased pursuant to this Agreement or by Subsequent Order.

**9.2. Warranty Limitations.** OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT, CPP DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES TO CLIENT, WITH RESPECT TO THE SOFTWARE, THE DOCUMENTATION, THE HARDWARE, OR ANY SERVICES PROVIDED HEREUNDER OR OTHERWISE REGARDING THIS AGREEMENT. WITHOUT LIMITING THE FOREGOING, ANY IMPLIED WARRANTY OF MERCHANTABILITY, INFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED AND DISCLAIMED.

**10. Infringement Indemnification.** Provided Client is paying Software Support Fees, CPP will at its own expense defend any action brought against Client to the extent that it is based on a claim that the CPP Software when used as authorized by this Agreement infringes any patents, copyrights, or trade secrets enforceable in the U.S.; provided that Client notifies CPP immediately of any such claim; and provided that CPP will have the exclusive right to control the defense. If, as a result of such a claim, litigation or threat of litigation, Client is enjoined from using the CPP Software, CPP may at its sole option and expense procure for Client the right to continue to use the CPP Software, or at CPP' sole option and expense, may replace or modify the CPP Software so as to settle such claim, litigation or litigation threat. If such settlement or modification of the CPP Software is not reasonably practical, CPP may discontinue and terminate the license and this Agreement upon written notice to Client. This describes our entire liability with respect to infringement of any copyrights, patents or trade secrets by the CPP Software.

## 11. LIMITATION OF LIABILITY.

**11.1. Limitation of Remedy. In no event will CPP or any Third Party Software provider be liable for any special, indirect, incidental, speculative, punitive or consequential damages or loss of goodwill in any way relating to this Agreement or resulting from the use of or inability to use the products or the performance or non-performance of any services, including, without limitation damages for loss of profits, data or use incurred by Client or any third party, even if CPP has been notified of the possibility of such damages.**

**11.2. Maximum Liability.** IN NO EVENT WILL CPP'S LIABILITY AND ANY THIRD PARTY SOFTWARE PROVIDER'S LIABILITY FOR ANY COSTS, EXPENSES, OR DAMAGES TO CLIENT OR ANY THIRD PARTY, REGARDLESS OF THE FORM OF ACTION, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, PRODUCTS LIABILITY OR OTHERWISE, EVER EXCEED THE AMOUNT RECEIVED BY CPP FROM CLIENT FOR THE CPP SOFTWARE LICENSE.

**11.3 Allocation of Risk.** Client is a sophisticated purchaser and acknowledges and agrees that the allocation of risks in this Agreement are reflected in the amounts due from Client and other charges provided under this Agreement, that CPP is unable to test the Software and Hardware under all possible circumstances, that CPP cannot control the manner in which Client shall use the Software and Hardware, and that the allocation of risks under this Agreement are reasonable and appropriate under the circumstances.

## 12. SOFTWARE SUPPORT.

**12.1. Point of Contact and Support.** Client will appoint one of Client's adequately trained employees to clear all support requests and serve as the primary point of contact with CPP. Client will appoint a second qualified employee as a backup. Either employee will be responsible for contacting CPP for support services.

**12.2 Software Support Service.** During the Term and any Renewal Term, CPP will provide telephone support to Client's adequately trained personnel for the CPP Software, to report Errors in the Supported Software and to seek assistance with regard to such Errors, use reasonable efforts to correct any Error, and provide Updates ("Software Support Service"). Support does not include training of Client's personnel. Support will be available pursuant to schedules published periodically by CPP. The failure of Client to pay the Software Support Fee will allow CPP to invoke the remedies set forth in paragraphs 3.2 and 4.3 of this Agreement. In the

event Client elects not to renew Software Support Service, Client acknowledges that Client will not be entitled to any Updates; there are risks in using the CPP Software without Software Support Service; and CPP makes no representations or guarantees about the ability of Client to subsequently receive Software Support Service or as to the cost of such Software Support Service.

**12.3. Support for Third Party Software.** Software Support Service will not include support for any Third Party Software unless support for such software is indicated in this Agreement or in a Subsequent Order, and Client is paying an applicable Software Support Fee for said Third Party Software, and said Software Support Service will be rendered only to the extent necessary to operate CPP Software.

**12.4. Updates.** "Update" means a modification or enhancement to the Supported Software only that is generally provided by CPP or the Third Party Software provider to all Clients of the CPP Software as part of the CPP standard software support. Updates do not include new modules added to the existing CPP Software. CPP will provide all Updates to currently licensed CPP Software if and when made available to other Clients if Client is current on Client's Software Support Fee. All such Updates will be subject to the terms and conditions of this Agreement. Updates may require additional hardware and/or software to be purchased or licensed at Client's expense. If CPP notifies Client that the Update is mandatory for the continue provision of Software Support Services, Client agrees to install such Updates in a timely manner. Failure to install the Update will be a material default. CPP makes no warranties or representations regarding the frequency of Updates or the extent to which Updates are made available at all. Software customizations, if any will not be updated and CPP does not warrant compatibility of software customizations with any updated software.

**12.5 Migration to New CPP Software.** CPP shall allow Client to transfer its base CPP Software licenses, excluding Third Party Software, to a qualifying new technology CPP Software product if Client is current on paying all applicable Software Support Fees and all of Client's other payment obligations are satisfied in full. The price of the license transfer is included in the Software Support Fee. Client shall, at its own expense, obtain any Hardware and Third Party Software required to run the new CPP Software. If Client requires assistance from CPP to implement such new CPP Software, Client agrees to pay CPP for these additional services and other costs incurred by CPP.

**12.6. Limitations & Exclusions.** CPP will not be responsible for providing Software Support Service relating to the following: (a) problems that result from Client's improper use of any software or hardware; (b) problems caused by changes, alterations or revisions made by Client or on Client's behalf (other than by CPP); (c) problems caused by Client's data, network, operational or other environmental factors not within the direct control of CPP; (d) third party databases; (e) software customizations; (f) any use of the Software in violation of this Agreement; and (g) any problems or errors caused directly or indirectly by any hardware not supported by CPP and any hardware not in accordance with CPP specifications. Client will reimburse CPP for all reasonable expenses incurred and time spent in responding to any maintenance or support claims arising from the foregoing, repairing any of Client's alterations or revisions to the Software and correcting problems or other defects resulting from the occurrence of one or more of the events described in the items above. Such services will be invoiced to Client at CPP' then current time and material rates. In addition, Client is obligated to continuously back up its data, programs and files.

## 13. DELIVERY AND TRAINING.

**13.1. Delivery.** After execution of this Agreement CPP will arrange for a date to deliver the Software and Hardware to Client. The Delivery Date is the earlier of the date CPP or its designee tenders the CPP Software to the carrier for shipment or the date CPP electronically transfers the CPP Software to Client. In the event the Client already has access to the Software, the Delivery Date shall be the Effective Date.

**13.2. Installation services.** The terms in this section apply only to the extent these services are included in this Agreement or a Subsequent Order. Provided Client has complied with any specifications that CPP may provide to Client and the other terms of this Agreement, CPP will install the Software. CPP will contact Client to review Client's installation. CPP may assign a project coordinator who will serve as a single point of contact during this process. Client is obligated to pay the amount that has been billed for products and services delivered or provided to date regardless of the stage of Client's implementation.

**13.3. Other Software and Hardware.**

Client agrees and acknowledges that i) any custom programming or customization work on Client's existing hardware or software cannot and will not be brought forward or integrated with the Software or Hardware ("Non-Integration"), and ii) any of Client's software or hardware (new or existing), including printers, terminals and personal computers which do not meet the specifications set by CPP ("Foreign Equipment") may not function with the Software or Hardware. CPP will not be responsible for any damages or costs incurred by Client as a result of (a) Non-Integration, (b) any problems with, or caused by, Foreign Equipment or (c) any problems caused by Client's third party hardware consultants, salespersons or installers even if CPP receives a fee from Client to assist these third parties.

**13.4. Training.** CPP will provide Client a training session or sessions only if training is included in this Agreement, in order to train Client's employees in the

operation of the CPP Software. The fee for these services is listed in this Agreement. Client agrees to pay for scheduled training services at the rate set forth in this Agreement if not cancelled at least 30 days in advance of the training date. Additionally, in the case of on-site training cancellations, Client will reimburse CPP for the cost of any non-refundable airline tickets purchased in advance for the express purpose of training Client, regardless of the cancellation date. Any additional training beyond that listed herein will be quoted at then current rates and billed separately.

**13.5.       Installation and/or Conversion Fees.** The terms in this Section apply only to the extent these services are included in this Agreement or a Subsequent Order. Installation and/or conversion services are not included in the total amount owed unless specifically listed. Client shall be responsible for obtaining certain information and assistance from third parties doing business with Client, including, but not limited to, delivering live sample data on the transfer medium, format and file structure as, and when, designated by CPP in order for CPP to perform the work herein (e.g. data conversion and hospital interfaces).Client understands and agrees there are limits on what data CPP can convert and what Client must do before CPP can complete the conversion process. As every conversion is unique, what data can actually be converted as well as the cost and time required to complete this may vary widely. Conversion will usually require that Client's existing system be "down" for a period of time. Installation and conversion services not listed herein or in a Subsequent Order will be invoiced to Client at then current time and materials rates.

## 14.       HARDWARE PURCHASE TERMS AND CONDITIONS

**14.1       Hardware Purchase.** The terms in this Section apply only to the extent Hardware is included in this Agreement or a Subsequent Order. CPP agrees to sell to Client and Client agrees to purchase from CPP the Hardware identified in this Agreement or Subsequent Order. Hardware may be revised or discontinued by the manufacturer and replacement hardware may be delivered in its place, provided however, such replacement hardware meets or exceeds the material specifications of the Hardware listed. All Hardware will be delivered to Client's address set forth in this Agreement. Client will pay as the Hardware purchase price the applicable amount set forth in this Agreement or a Subsequent Order.

**14.2    Hardware Warranty.** In the event CPP acquires Hardware from CPP, CPP will transfer to Client any Manufacturer Warranty for the Hardware that CPP is permitted to transfer to Client. If the Manufacturer's Warranty is transferred to Client and the Hardware does not satisfy the foregoing warranty and Client provides CPP written notice of the nature of such defect during the warranty period, then CPP will repair or replace, or cause to be repaired or replaced the defective Hardware under the Manufacturer Warranty. This Hardware warranty will not apply and CPP will neither be obligated nor responsible to repair or replace any Hardware where the repair or replacement is necessitated by (i) one or more of the events indicated in Section 15.6 (Limitations and Exclusions) or (ii) failure to comply with the Manufacturer's Warranty. If CPP determines that the Hardware returned for warranty correction is not defective according to the terms herein, Client will be responsible for all costs of handling and transportation, if any, and CPP may, at CPP' discretion, charge Client the CPP then-current applicable service rate for review and assessment of the alleged defect.

**14.3.       Title and Risk of Loss.** Title will pass to Client when the Hardware is tendered to carrier for shipment and Client shall assume all risk of loss when the Hardware is tendered.

**14.4.       Security Interest.** CPP reserves a purchase money security interest in any Hardware provided by CPP to secure Client's payment obligations for such Hardware. Such security interest is retained until Client's payment obligations are satisfied in full for the Hardware. CPP may file this Agreement or financing statements pursuant to the Uniform Commercial Code or other applicable law to evidence or perfect CPP' security interest. Client agrees to execute any additional documents CPP deems necessary to perfect any such security interest. Upon payment in full of the total amount owed to CPP, CPP agrees to release such security interest.

## 15.       Hardware Support Terms and Conditions

**15.1.       General.** The terms in this Section apply only to the extent Hardware is included in this Agreement and Client has agreed to pay a Hardware Support Fee for such Hardware ("Supported Hardware").

**15.2.       Repair.** Provided Client pays the Hardware Support Fee in accordance with the terms of this Agreement, CPP agrees to use reasonable commercial efforts to repair a Hardware Error as reported to CPP by Client ("Hardware Support

Service"). Failure to pay the Hardware Support Fee shall allow CPP to invoke the remedies set forth in Paragraphs 3.2 and 4.3

**15.3.       On-Site Assistance for Hardware.** In the event a Hardware Error cannot be resolved using telephone support and remote access capabilities, then CPP agrees to send a repair technician (either a CPP employee or a third party agent) to the address where the Supported Hardware is located to attempt to resolve the Hardware Error. CPP will have full and free access to the Supported Hardware to provide Hardware Support Service thereon. CPP agrees that its repair technicians will install repaired or replaced hardware in substantially the same manner as the Supported Hardware was installed when such repair technician arrived on-site.

**15.4.       Depot Support Services – Shipping Costs.** In the event CPP or its designee provides depot support services and any Supported Hardware is shipped to CPP or its designee, Client will pay for the cost of shipment of any Supported Hardware to CPP or its designee, and CPP will pay for the cost of return shipment of any Supported Hardware to Client. Client will bear the risk of loss and be responsible for carrying any insurance of any Hardware during the shipment to CPP or its designee.

**15.5.       Replacement Parts.** Maintenance parts will be furnished on an exchange basis. Such parts may be new, equivalent to new or refurbished and will be in good working order and at least functionally equivalent to the part or item being replaced. Any malfunctioning part of the Supported Hardware that has been replaced will be the property of CPP and Client agrees to return such malfunctioning part to CPP. If Client fails to return any replaced malfunctioning part within five (5) days after delivery of the new maintenance part, then CPP may invoice and Client will pay for the maintenance part that was delivered to replace such malfunctioning part at the CPP then current sales price.

**15.6.       LIMITATIONS & EXCLUSIONS.** CPP will neither be responsible for nor obligated to provide Hardware Support Service for Supported Hardware in the event such repair is necessitated by the following: (a) faulty electrical systems external to the machines or accessories, attachments, or other devices not furnished by CPP; (b) accident, transportation, neglect or misuse; (c) failure to provide a suitable installation environment (including but not limited to failure of or failure to provide adequate or proper electrical power, air conditioning, humidity control, or protection from dust or dirt from the outside or within the building), or from use of supplies or materials not meeting machine specifications for such installation; (d) the improper use of the Supported Hardware; (e) Client relocating the Supported Hardware or adding or removing accessories, attachments, or other devices; (f) fire, lightning, aircraft, explosion, riot, civil commotion, vehicles, windstorm or hail, vandalism or malicious mischief, leakage or accidental discharge from sprinkler systems, damage to the room housing the Supported Hardware and or peripheral devices, smog, smoke, vapor or gas, rain or other weather elements, or water damage; (g) expendable items such as printer ribbons, print heads/bands, and tape cartridges; (h) Client's failure to perform regular maintenance in an adequate manner; or (i) such service which is necessitated by or the result of malfunctions or other problems of software or hardware other than Software or Hardware provided by CPP.

Client will reimburse CPP for all reasonable expenses incurred and time spent in responding to false maintenance or support claims, repairing any Client alterations or revisions to the Hardware and correcting defects resulting from the occurrence of the events described above. Such services will not be treated as Hardware Support Service, and will be invoiced to Client at the CPP then current time and material rates. After the Term, CPP in its discretion, may, upon thirty (30) days prior notice to Client, remove Hardware from Supported Hardware and adjust the Hardware Support Fee accordingly.

**16.**       **Non-Solicit.** During the Term or Renewal Term and for a period of one (1) year after termination, neither party shall solicit the employment of any employee of the other party with whom the other party had contact in connection with the relationship arising under this Agreement.

*End of Terms and Conditions; Balance of the page is intentionally blank. Signature lines on next page.*

THE FOLLOWING SCHEDULES ARE MADE A PART OF THIS AGREEMENT

Check if Included:        Description of Schedules

☒          Product List, Fees and Payment Terms (Schedule A)

☐          Electronic Data Interchange- "CPP EDI"

☐          General Addendum

☒          Business Associate Agreement

The Terms and Conditions, and the Schedule(s) (with attachments) attached hereto are made a part hereof. Client's signature below will indicate acknowledgment and acceptance of the contents of this Agreement including the Terms and Conditions, the Schedules and any other attachments hereto.

Client

*Jennifer Fry-Schwartz*
_Signature_

JENNIFER FUNG- SCHWARTZ
_Print Name_

DPM, LLC
_Corporate Title_

**Redacted**
_Corporate Tax ID Number_

3/25/06
_Date_

Cerner Physician Practice, Inc.

_Signature_

_Print Name_

_Title_

_Title_

_Date_



SCHEDULE A:
## Product List, Fees & Payment Terms

This sales order, upon execution by both parties, is hereby incorporated by reference into the Original Agreement between Cerner Physician Practice, Inc. or its predecessor and the Client and constitutes an amendment to that Agreement.
Original Agreement date: _____ Original Agreement number: _____

| Billing Information: | | Shipping Information: | |
|---|---|---|---|
| Client Number: | 02.20931 | | |
| Bill to Name: | Jennifer Fung | Ship to Client Name: | Jennifer Fung |
| Bill to Attention: | Dr. Fung | Ship to Attention: | |
| Bill to Address 1: | 50 West 97th Street | Ship to Address 1: | 50 West 97th Street |
| Bill to Address 2: | Suite 1A | Ship to Address 2: | Suite 1A |
| City, State, Zip: | New York, NY 10025 | City, State, Zip: | New York, NY 10025 |
| Client P.O.#: | | | |
| Authorized Purchaser: | | Additional Address: | |
| Client Phone #: | 212-678-2333 Fax: 212-678-9366 | | |
| Bill Support to: | | | |

### SECTION 1: PRODUCT LIST AND FEES

| QTY | SKU # | DESCRIPTION / COMMENTS | UNIT PRICE | TOTAL PRICE | ANNUAL SUPPORT |
|---|---|---|---|---|---|
| | THIRD PARTY SOFTWARE: | | | | |
| 1 | CHARTSTATION-6.0 | Intuition EMR Clinicians Base License | | | |
| 1 | CHARTSTATION-6.0 | Intuition EMR Nurse License(s) | $ 4,500.00 | $ 4,500.00 | $ 900.00 |
| 1 | CHART-DOCMGMT | Document Management | $ 600.00 | $ 600.00 | $ 120.00 |
| 1 | CHART-FRONTSHEET | Front Sheet | $ 400.00 | $ 400.00 | $ 80.00 |
| 1 | CHART-DESKTOP | Desktop | $ 400.00 | $ 400.00 | $ 80.00 |
| 1 | CHART-SYNCHRONIZE | Synchronization (Server/Host) | $ 500.00 | $ 500.00 | $ 100.00 |
| 1 | CHART-SYNCHRONIZE | Synchronization (Remote) | $ 600.00 | $ 600.00 | $ 120.00 |
| | | Total Third Party Software | $ 250.00 | $ 250.00 | $ 50.00 |
| | PROFESSIONAL SERVICES | | | | |
| 1 | SS-000-TRNGOS | 4 Eight (8) Hour Day(s) Intuition EMR Onsite Training @ Customer's Location | | $ 7,250.00 | $ 1,450.00 |
| | | Travel & Expenses will be billed as incurred. Training days are eight hours each. | $ 4,000.00 | $ 4,000.00 | |
| | | A $500 fee will apply for each nonconsecutive Intuition EMR training day. | | | |
| | | Total Installation and Training | | | |
| | | | | $ 4,000.00 | |

| Less Deposit Collected: | ☐ Credit Card (Attach credit card authorization form) | | |
|---|---|---|---|
| | | Subtotal | $ 11,250.00 | $ 1,450.00 |
| | ☐ Check | Freight | $ |
| Name _____ | Check # _____ | TOTAL | $ 11,250.00 |
| Exp: 02/26/06 | | Deposit Received | $ |
| | | Balance Due | $ 11,250.00 |

### SECTION 2: PAYMENT TERMS

Software / Hardware:
          50 % deposit due at execution of contract. Balance due upon the Delivery Date.

Support:
          Billed ☐ Monthly ☑ Quarterly  in advance, due and payable the 1st day of the term. Support services begin
          on    04/2006    . For upgrades, cancellation of the previous support services occurs simultaneously.

Services / EDI:
          EDI:    Amounts due and payable under net 30 day terms.
                  ☐ "per transaction": billed one month in arrears; or
                  ☑ "per provider": billed monthly in advance
                  All services are described in the Agreement.

Taxes:
          All prices listed in this Agreement are exclusive of all taxes including federal, state, local use, sales, property,
          withholding, excise, value added, ad valorem and similar taxes. Client agrees to pay any and all applicable
          taxes (except tax levied against Cerner Physician Practice Inc.'s income) to Cerner Physician Practice, Inc.
          if invoiced as such or to the proper taxing authority if not invoiced by Cerner Physician Practice, Inc..
          If Client is tax-exempt, Client shall provide an exemption certificate to Cerner Physician Practice, Inc.

### SECTION 3: SIGNATURES

The parties hereby cause this Sales Order to be executed by their duly authorized representatives effective as of the date below.

Jennifer Fung:

| | | CERNER PHYSICIAN PRACTICE, INC.: |
|---|---|---|
| Signature: | _Jennifer Fung Schwartz_ | Name: _____ |
| Print Name: | JENNIFER FUNG - SCHWARTZ | Print Name: _____ |
| Title: | DPM | Title: _____ |
| Date: | 3/25/06 | Date: _____ |

OFFICE USE ONLY

| SALES / SALES OPS: | | SALES / SALES OPS: | | |
|---|---|---|---|---|
| Product Line | PD02-Podiatry-Wisdom | Special Shipping | | ACCOUNTING: |
| Sales Rep (Name) | Floyd Alexander | Location: | | Shipped Date |
| New or Existing Client? | | | | Invoiced Date |
| Est. Ship Date | | ACCOUNTING: | | CPP PO # |
| Est. Install Date | | Bill to Client # | | Faxed Contract rec'd? Y / N Date |
| Est. Training Date | | Ship to Client # | | Signed Contract rec'd? Y / N Date |
| Est. Live Date | | SOFTRAX Order # | | Lease Agreement rec'd? Y / N Date |

# BUSINESS ASSOCIATE CONTRACT

**THIS BUSINESS ASSOCIATE CONTRACT** ("Contract") is entered into on this 24 day of March 2006, between Jennifer Fung ("Covered Entity") and Cerner Physician Practice, Inc. (successor in interest to VitalWorks, Inc.), a Delaware corporation ("Cerner").

**WHEREAS,** Covered Entity may make available to Cerner certain Information, in conjunction with services that are being provided by Cerner to Covered Entity, that is confidential and must be afforded special treatment and protection.

**WHEREAS,** Cerner will have access to and/or receive from Covered Entity certain Information that can be used or disclosed only in accordance with this Contract.

**NOW, THEREFORE,** Covered Entity and Cerner agree as follows:

1.  **Definitions.**

    a.  **"HHS Privacy Regulations"** shall mean the privacy regulations promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and published in the Code of Federal Regulations ("C.F.R.") at Title 45, Sections 160 and 164.
    b.  **"HHS Security Regulations"** shall mean the security regulations promulgated under HIPAA and published in the C.F.R. at Title 45, Sections 160, 162 and 164.
    c.  **"Information"** shall mean any "protected health information" provided and/or made available by Covered Entity to Cerner after the Effective Date, and has the same meaning as the term "protected health information" as defined by 45 C.F.R. 164.501.

2.  **Term.** This Contract shall commence as of compliance date for the HHS Privacy Regulations (the "Effective Date"), and shall expire when all of the Information (as defined in the next sentence) provided by Covered Entity to Cerner is destroyed or returned to Covered Entity pursuant to Clause 14 below.

3.  **Limits On Use And Disclosure Established By Terms Of Contract.** Cerner hereby agrees that it may not use or disclose the Information provided or made available by Covered Entity for any purpose other than as expressly permitted or required by this Contract, the software agreement with Cerner, or by the HHS Privacy Regulations. (ref. 45 C.F.R. 164.504(e)(2)(i)).

4.  **Stated Purposes For Which Cerner May Use or Disclose Information.** The parties hereby agree that Cerner shall be permitted to use and/or disclose Information provided or made available from Covered Entity relating to and as necessary to maintain and support Client's health information systems, to provide other services on behalf of the Covered Entity as may be entered into under contract and to aggregate data as set forth below.

5.  **Use of Information For Management, Administration and Legal Responsibilities.** Cerner is permitted to use Information as necessary for the proper management and administration of Cerner or to carry out legal responsibilities of Cerner. (ref. 45 C.F.R. 164.504(e)(4)(i)(A-B)).

6.  **Disclosure of Information For Management, Administration and Legal Responsibilities.** Cerner is permitted to disclose Information received from Covered Entity for the proper management and administration of Cerner or to carry out legal responsibilities of Cerner, provided: (i) the disclosure is required by law; or (ii) Cerner obtains reasonable assurances from the person to whom the Information is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, the person will use appropriate safeguards to prevent use or disclosure of the Information, and the person immediately notifies Cerner of any instance of which it is aware in which the confidentiality of the Information has been breached. (ref. 45 C.F.R. 164.504(e)(4)(ii)).

7. **Data Aggregation Services.** Cerner is also permitted to use or disclose Information to provide data aggregation services, as that term is defined by 45 C.F.R. 164.501, relating to the health care operations of Covered Entity. The parties agree that any Information provided to Cerner hereunder which is later de-identified and therefore no longer identifies a patient (i.e. is no longer "protected health information" as defined by 45 C.F.R. 164.501) will no longer be subject to the provisions set forth in this Contract. (ref. 45 C.F.R. 164.504(e)(2)(i)(B)).

8. **Appropriate Safeguards.** Cerner will establish and maintain appropriate safeguards to prevent any use or disclosure of the Information, other than as provided for by this Contract. (ref. 45 C.F.R. 164.504(e)(2)(ii)(B)). Cerner will implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic Information that it creates, receives, maintains or transmits on behalf of Covered Entity by the compliance date for the HHS Security Regulations. (ref. 45 C.F.R. 164.314(a)(2)(i)(A)).

9. **Reports Of Improper Use Or Disclosure.** Cerner hereby agrees that it shall report to Covered Entity any use or disclosure of Information not provided for or allowed by this Contract and, after the compliance date for the HHS Security Regulations, any Security Incident (as that term is defined in the HHS Security Regulations) of which Cerner becomes aware. (ref. 45 C.F.R. 164.504(e)(2)(ii)(C); 45 C.F.R. 164.314(a)(2)(i)(C)).

10. **Subcontractors and Agents.** Cerner agrees that if Cerner provides Information to any subcontractors or agents, Cerner will ensure that such agent or subcontractor agrees to the same restrictions on the use and disclosure of such Information that apply to Cerner. (ref. 45 C.F.R. 164.504(e)(2)(ii)(D)).

12. **Designated Record Set.** To the extent Cerner maintains Information in a designated record set, as that term is defined by 45 C.F.R. 164.501, Cerner will:

    a. to the extent applicable, make available Information in accordance with 45 C.F.R. § 164.524. (ref. 45 C.F.R. 164.504(e)(2)(ii)(E)).
    b. to the extent applicable, make available Information for amendment and incorporate any amendments to Information in accordance with 45 C.F.R. 164.526. (ref. 45 C.F.R. 164.504(e)(2)(ii)(F)).

13. **Provide Accounting.** Cerner agrees to make information available as required to provide an accounting of disclosure of Information received from, or created or received by Cerner on behalf of Covered Entity in accordance with 45 C.F.R. 164.528. (ref. 45 C.F.R. 164.504(e)(2)(ii)(G)).

14. **Access to Books and Records.** Cerner hereby agrees to make its internal practices, books, and records relating to the use or disclosure of Information received from, or created or received by Cerner on behalf of the Covered Entity, available to the Secretary of the Department of Health and Human Services or the Secretary's designee for purposes of determining compliance with the HHS Privacy Regulations. (ref. 45 C.F.R. 164.504(e)(2)(ii)(H)).

15. **Return or Destruction of Information.** At termination of this Contract, Cerner hereby agrees to return or destroy all Information received from, or created or received by Cerner on behalf of Covered Entity. Cerner agrees not to retain any copies of the Information after termination of this Contract. If return or destruction of the Information is not feasible, Cerner agrees to extend the protections of this Contract for as long as necessary to protect the Information and to limit any further use or disclosure. If Cerner elects to destroy the Information, it shall certify to Covered Entity that the Information has been destroyed. (ref. 45 C.F.R. 164.504(e)(2)(ii)(I)).

16. **Termination of Contract.** If Cerner materially breaches this Contract, Covered Entity may terminate this Contract and the software agreement under which Cerner received or had access to the Information that is the subject of the breach after sending written notice to Cerner describing

Cerner's failure in detail and affording Cerner a sixty (60) day period in which to cure such failure. (ref. 45 C.F.R. 164.506(e)(2)(iii)).

17. **Disputes.** Any controversy or claim arising out of or relating to the Contract will be finally settled by compulsory arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA").

18. **Binding Nature and Assignment.** This Contract shall be binding on the Parties hereto and their successors and assigns, but neither Party may assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.

19. **Notices.** Whenever under this Contract one party is required to give notice to the other, such notice shall be deemed given if mailed by First Class United States mail, postage prepaid, and addressed as follows:

**Covered Entity:**

Jennifer Fung
50 West 97th Street
Suite 1A
New York, NY 10025


**Cerner Physician Practice, Inc:**

2800 Rockcreek Parkway
Kansas City, Missouri 64117

Either Party may at any time change its address for notification purposes by mailing a notice stating the change and setting forth the new address.

20. **No Third Party Beneficiaries.** This Contract shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and successors and nothing herein, express or implied, is intended to or shall confer upon any other person or entity, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Contract.

21. **Entire Agreement.** This Contract consists of this document, and constitutes the entire agreement between the parties with respect to the confidentiality of Information. No change, waiver or discharge of obligations arising under this Contract shall be valid unless in writing and executed by the Party against whom such change, waiver or discharge is sought to be enforced.

**IN WITNESS WHEREOF,** Cerner and Covered Entity have caused this Contract to be signed and delivered by their duly authorized representatives, as of the date set forth above.

**CERNER PHYSICIAN PRACTICE, INC**

By: _____

Name: _____
(Typed or Printed)

Title: _____

**COVERED ENTITY**

By: _Jennifer Fung-Schwartz_

Name: _JENNIFER FUNG SCHWARTZ_
(Typed or Printed)

Title: _DPM_