UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                        :

JENNIFER FUNG-SCHWARTZ, MD, et al.,  :
                        :

              Plaintiff,    :

                        :

        - against -       :

                        :

CERNER CORPORATION, et al.,      :

                        :

            Defendant.  :

                        :

---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/13/2019__

17-CV-233 (VSB)

**OPINION & ORDER**

Appearances:

Elizabeth Shieldkret
Elizabeth Shieldkret, Attorney at Law
Forrest Hills, NY
*Counsel for Plaintiffs*

John Michael Lyons
Shook, Hardy & Bacon, LLP
Philadelphia, PA
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

      Plaintiffs, Jennifer Fung-Schwartz, DPM, LLC (the "Practice") and Jennifer Fung-

Schwartz, D.P.M., ("Fung-Schwartz," and together with the Practice, "Plaintiffs"), bring this

action against Defendants Cerner Corporation ("Cerner Corp.") and Cerner Healthcare Solutions,

Inc. ("Cerner Solutions" and, collectively, "Cerner") asserting multiple claims stemming from

certain contracts Fung-Schwartz and/or the Practice executed with Cerner. Before me is

Defendants' partial motion to dismiss under Federal Rules of Civil Procedure 9(b) and 12(b)(6)

for failure to plead with particularity and failure to state a claim. For the reasons stated herein,

Defendants' motion is GRANTED IN PART and DENIED IN PART.

# I.    <u>Background</u>[1]

Fung-Schwartz, a board-certified podiatrist, entered into a contract with Cerner Physician

Practice, Inc., in March 2006 for the provision of electronic medical records ("EMR") services

(the "2006 Agreement").  (SAC ¶¶ 16–17; *id.* Ex. 1.)[2]  Fung-Schwartz entered into an additional

contract with Cerner Solutions in 2014 to provide "revenue cycle management" ("RCM"),

including billing and insurance services (the "2014 Agreement"), and around the same time also

entered a new agreement with Cerner Solutions for the continued provision of EMR services.

(*Id.* ¶¶ 25–27; *id.* Exs. 2–3.)  Defendant Cerner Corporation directs the day to day activities of

Cerner Solutions, including managing contracts and providing e-billing and customer service and

support.  (*Id.* ¶¶ 6–9.)

Prior to entering into the 2014 Agreement, Cerner Solutions made several representations

to Fung-Schwartz about its services, including that:  (1) it would provide "[w]ell trained and

experienced revenue cycle and billing professionals," (SAC ¶ 28; *id.* Ex. 3 at 3); (2) it aligned

itself with industry standards and guidelines to "provide. . .a high level of compliance with

applicable laws and regulations," (*Id.* ¶ 29; *id.* Ex. 3 at 3); (3) it would "[r]eview, scrub and

process claims (primary, secondary, tertiary) daily," (*Id.* ¶ 30; *id.* Ex. 3 at 4); (4) it would

"[g]enerate and mail patient statements in the Client's name and according to a standard

statement cycle," (*Id.* ¶ 31; *id.* Ex. 3 at 5); and (5) it would "manage[] calls for all Cerner

Revenue Cycle Ambulatory Services Clients. . . "  (*Id.* ¶ 32)  In addition, "prior to contracting

with [Fung-Schwartz], Cerner Solutions represented that it was capable of handling [Fung-

Schwartz's] billing and timely obtaining re-imbursement for her services from private insurers

---

[1] I assume Plaintiffs' allegations contained in the Second Amended Complaint, (Doc. 54), to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  However, my references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.
[2] "SAC" refers to plaintiff's Second Amended Complaint, filed on December 7, 2018.  (Doc. 54.)

and government industry programs." (*See id.* ¶ 35.) However, Plaintiffs allege, at the time Cerner Solutions entered into the contract with Fung-Schwartz, "Cerner knew that it had problems with its system for processing claims and obtaining reimbursements from insurers, particularly for Medicare claims, that it had no plans to fix the problems and that it would not be able to provide her with the high level of compliance that it promised before she chose Cerner as her RCM provider." (*Id.* ¶ 40.) In addition, Cerner "had no plan to provide well trained and experienced revenue cycle and billing professional[s]" and "had no[] plan to improve training, hire more experienced personnel or otherwise address its issue of inexperienced and poorly trained personnel. . ." (*Id.* ¶¶ 70, 72.)

Despite and in contrast to its representations, Cerner improperly processed billing and insurance claims, including by submitting duplicate and late claims and writing off charges without consulting Fung-Schwartz. (*Id.* ¶¶ 40–52, 55.) This decreased revenues for the Practice and affected patients. (*Id.* ¶¶ 43, 50, 55–68.) Fung-Schwartz repeatedly contacted Cerner Solutions, including Cerner customer support and Plaintiffs' designated account representative, in an attempt to resolve the issues with Defendants' performance. (*Id.* ¶ 74.) Nevertheless, Cerner never resolved the issues or fixed the problems, despite making representations that it would do so. (*Id.* ¶¶ 73–74.) Fung-Schwartz claims that she terminated the RCM services associated with the 2014 Agreement, effective June 1, 2016. (*Id.* ¶ 83.)

The last payment Fung-Schwartz admits making to Cerner Solutions was tendered in April 2016, although she continues to use the EMR services. (*Id.* ¶¶ 87, 89.) In September 2016 Cerner Corp., claiming to be doing business as Cerner Physician Practice, Inc., initiated efforts to collect more than $100,000 it claimed was owed under the 2014 Agreement. (*Id.* ¶ 91.) After additional discussions between the parties, during which Fung-Schwartz offered to settle for

$10,000, Cerner terminated Fung-Schwartz's EMR services on October 13, 2016, including Plaintiffs' ability to access existing electronic records. (*Id.* ¶ 95.) Without access to their patients' records, Plaintiffs were unable to contact patients, schedule appointments, enter lab results, prescribe medications, or otherwise treat patients. (*Id.* ¶¶ 96.)

Cerner has offered to export the text portion of Plaintiffs' medical records to another EMR system. (*Id.* ¶ 100.) However, Fung-Schwartz also stored drawings she had made of patients' feet to indicate their condition in the EMR system. (*Id.* ¶ 99.) Plaintiffs assert that upon information and belief, "Cerner does not have a method for exporting the drawings." (*Id.* ¶ 100.)

## II.   Procedural History

Plaintiffs filed their complaint on January 11, 2017. (Doc. 1.) On May 31, 2017, Defendants filed a motion to dismiss the complaint. (Doc. 17.) On June 15, 2017, Plaintiffs filed their amended complaint. (Doc. 18.) On August 18, 2017, Defendants filed a motion to dismiss the amended complaint. (Docs. 38, 39.) On September 9, 2017, Plaintiffs filed their brief in opposition, (Doc. 43), and on September 15, 2017, Defendants filed a reply, (Doc. 44).

On July 6, 2017, Plaintiffs filed a motion for preliminary injunction to prohibit Defendants from denying Plaintiffs access to their patients' medical records. (Docs. 23–28.) On July 25, 2017, Defendants filed an opposition to the motion for preliminary injunction, (Doc. 34), and on August 2, 2017, Plaintiffs filed a reply, (Doc. 35). On August 4, 2017, I held a hearing on the preliminary injunction motion and denied Plaintiffs' application. (Doc. 36.) On August 31, 2017, Plaintiffs appealed my denial, (Doc. 42), and on June 13, 2018, the Second Circuit vacated and remanded the decision for further proceedings because it was "unable to discern the intended effect of [my] various written and oral pronouncements regarding Plaintiffs-

4

Appellants' motion for preliminary and permanent injunctive relief," (Doc. 45). On June 7, 2019, I issued an order denying Plaintiffs' motion for a preliminary injunction, (Doc. 62), which Plaintiffs have since appealed, (Doc. 63). That appeal remains pending.

On September 13, 2018, I issued an Opinion and Order granting Defendants' motion to dismiss with respect to Counts 1–8, 10, 12, and 14–16, and denying the motion with respect to Counts 9, 11, 13, and 18. (Doc. 49.)

Plaintiffs then sought leave to amend their complaint on September 27, 2018. (Doc. 51). Because Defendants did not oppose, I granted the requested leave on October 4, 2018. (Doc. 52). On October 26, 2018, Plaintiffs filed a Second Amended Complaint and Jury Demand, ("Second Amended Complaint"; Doc. 53), which was rejected as overdue. Plaintiffs re-filed their Second Amended Complaint on December 7, 2018, seeking to reassert four of the previously dismissed counts and to add two new counts. (Doc. 54.) Defendants then filed a motion to dismiss Counts 4, 6, 15, 16 and 19 of the Second Amended Complaint. (Docs. 57, 58.) Plaintiffs filed their brief in opposition to Defendants' motion on January 11, 2019, (Doc. 60), and Defendants filed their reply on January 18, 2019, (Doc. 61).

## III.  **Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations:

the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. AT &T Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

IV.     **Discussion**

The Second Amended Complaint asserts eleven counts. (SAC ¶ 102–154.) Defendants move to dismiss Plaintiffs' claims of fraud (Counts 4, 6, and 20)[3] and unfair competition and misappropriation of trade secrets (Counts 15 and 16, respectively), and new claim of negligence (Count 20). Defendants do not seek dismissal of Plaintiff's breach of contract claim (Count 17) or the claims that survived Defendants' prior motion to dismiss: conversion (Count 9), tortious interference with business relations (Counts 11 and 13), and negligence (Count 18).

I address each of the claims Defendants seek to dismiss in turn below.

---

[3] Plaintiffs re-assert two previously dismissed fraud claims, as well as one new claim.

## A. *Fraud (Counts 4, 6, 20)*

To state a claim for common law fraud under New York law, a plaintiff must allege facts showing: "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [1] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996)).

In addition, Rule 9(b) of the Federal Rules of Civil Procedure provides that a party alleging fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Specifically, the pleading must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (citation omitted). Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally[,]" Fed R. Civ. P. 9(b), "this leeway is not a license to base claims of fraud on speculation and conclusory allegations." *Eternity*, 375 F.3d at 187 (internal quotation marks omitted). "Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent, which may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* (internal quotation marks omitted).

### 1. Count 4 (Fraud Preceding the 2014 Agreement)

In Count 4, Plaintiffs allege that Defendants committed fraud by knowingly making false representations on which Plaintiffs relied in entering into the 2014 Agreement. In my September 2018 Opinion, I dismissed this fraud claim because Plaintiffs had failed "to plead that Defendants never intended to follow through on the allegedly fraudulent representations or that the promisors knew the representations to be false at the time the statements were made." (Sept. 2018 Op. 24–25.)[4] Plaintiffs' reassertion of Count 4, pled simply as fraud, (SAC, at 18), but referred to once as "promissory fraud" in their opposing brief, (Pls.' Mem. 2)[5], is supported by additional factual allegations.

#### a. <u>Applicable Law</u>

A claim for fraud in the inducement requires a misrepresentation of a present fact or omission that induced a party to enter into a contract. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir. 2007). New York law permits a breach of contract claim and a claim for fraud in the inducement of that contract to co-exist only where the misrepresentations are distinct from the terms of the parties' agreement. *See Alpha Capital Anstalt v. Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 339 (S.D.N.Y. 2017); *Wyle Inc. v. ITT Corp.*, 13 N.Y.S.3d 375, 376 (1st Dep't 2015).

"[F]raud in the inducement can be supported by a false statement of present fact, or by a false statement of future intent which concerns a matter collateral to a contract between the parties." *Id.* (internal quotation marks omitted). The latter scenario is occasionally termed

---

[4] "Sept. 2018 Op." refers to my Opinion & Order on Defendants' motion to dismiss the first amended complaint, filed on September 13, 2018. (Doc. 49.)

[5] "Pls.' Mem." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss, filed on January 11, 2019. (Doc. 60.)

"promissory fraud." *See, e.g., PKFinans Int'l Corp. v. IBJ Schroeder Leasing Corp.*, No. 96 CIV 1816 (SAS), 1996 WL 363138, at *4 (S.D.N.Y. June 28, 1996) (citing *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 121 (N.Y. 1995)). However, "a misrepresentation [that] is merely a statement of intent to perform under the contract[ ] cannot constitute fraud . . . ." *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 401 (2d Cir. 2001); s*ee also Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001) ("[S]imply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim.").

b. <u>Application</u>

In Count Four, Plaintiffs claim that prior to entering into the 2014 Agreement, Defendants made multiple false representations collateral to the contract. They claim that Defendants represented they had the capability to properly process all billing claims, although the source of this representation is not identified and appears to be an inference drawn from the "Cerner Ambulatory Business Office Services Proposal" ("Proposal") as a whole, (*see* SAC ¶ 103; *id.* Ex. 3 at 3), and that Defendants represented in the Proposal that they provide a "high level of compliance" with applicable laws, regulations, and guidelines, and that her account would be handled by well-trained and experienced personnel, (*see id.*; *id.* Ex. 3 at 3). Plaintiffs also claim that Defendants represented that Plaintiffs' total cost for RCM and EMR services would not increase; however, Plaintiffs do not point to a specific source of this representation, but infer it from Cerner's representation that the Plaintiffs would be charged a monthly minimum fee, which was calculated based on the "expected monthly transaction volumes." (*Id.* ¶ 37; *id.* Ex. 2 at 2–3; *id.* Ex. 3 at 2; Pls.' Mem. 8–9).

Plaintiffs have not stated a claim based on Defendants' misrepresentation that Plaintiffs' total cost for RCM and EMR services would not increase. Plaintiffs do not state that Defendants made this representation explicitly, but appear to suggest it should be implied by the fact that Defendants calculated Plaintiffs' monthly fee as a percentage of monthly billing. (*Id.* ¶ 37; *id.* Ex. 2 at 2–3; *id.* Ex. 3 at 2). Even accepting the inference Plaintiffs suggest, the statement upon which it is purportedly based is a term of the contract, not a representation collateral to it. If in fact Plaintiff's allegation refers to an actual, separate statement— "that *if* [Fung-Schwartz] maintained her then-current level of billing the new Cerner contract would not cost more than her previous combined costs for RCM and EMR services"—this allegation fails both for lack of particularity, and for the fact that the statement was not one of present fact, but rather a future-oriented prediction about costs that was conditional upon billing level. (*See* SAC ¶¶ 37–38 (emphasis added).) In addition, Plaintiffs do not plead that their costs for the EMR and RCM services in fact increased—only that revenues dropped—thereby failing to allege falsity, and they provide no allegations suggesting Defendants knew when the prediction was made that it "would not come to pass," *GMA Accessories, Inc. v. ePartners Inc.*, No. 07 Civ. 8414(LAK), 2008 WL 781188, at *1 (S.D.N.Y. Mar. 19, 2008), nor any other allegations that would give rise to a strong inference of fraudulent intent. *See also Passiglia v. Northwell Health, Inc.*, 252 F. Supp. 3d 129, 137 (E.D.N.Y. 2017) ("Representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sustain an action for fraud") (citing *Consolidated Bus Transit, Inc. v. Treiber Grp., LLC*, 948 N.Y.S.2d 679 (2d Dep't 2012))); *Ergowerx Int'l, LLC v. Maxell Corp. of Am.*, 18 F. Supp. 3d 430, 445 (S.D.N.Y. 2014) (noting that "predictions of the future, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently turned out not to be true") (citation omitted)).

However, Plaintiffs do state a claim with respect to Defendants' alleged misrepresentations related to their capability to properly process billing claims, their "high level of compliance" with applicable laws, regulations, and guidelines, and that Plaintiffs' account would be handled by well-trained and experienced personnel. (*See* SAC ¶ 103.) They allege the statements with sufficient specificity by pointing to the exact document in which they appear and alleging that they were made in order to induce Plaintiff to enter into a contract. (*See* SAC ¶¶ 40, 60, 70, 72, 103; *id.* Ex. 3 at 3.)[6] Plaintiffs allege that "she discussed her options with Cerner personnel" who went on to prepare a pre-contract proposal. (SAC ¶¶ 25, 27, 78.) As a result of various representations allegedly made by Cerner, "the Practice contracted with Cerner Solutions for Cerner Solutions and Cerner Corp. to provide billing services by submitting a signed sales order to Cerner Corp." (*Id.* ¶¶ 38–39.)

It is plausible that this claim is not duplicative of Plaintiffs' breach of contract claim. As an initial matter, on the face of the documents, the Sales Orders annexed by Plaintiff do not contain any language referring to the Proposal or incorporating it as part of the contract, even though they do explicitly incorporate the May 24, 2006 Agreement. (*See* SAC Ex. 2, Ex. 3, at 3–8.) Thus, at this stage of the litigation, drawing inferences in Plaintiffs' favor, I accept the Proposal as a pre-contractual sales document. In addition, the statements contained in the Proposal were not statements of the contractual terms or intent to perform the contract, but rather were collateral statements about present facts—the functional capabilities of Defendants' computer system and their staff to perform the contract—intended to obtain Plaintiffs' business.

---

[6] Plaintiffs' identification of "Cerner" as the source of the statements is permissible. (*See* SAC Ex. 3 at 3.) "[A] plural author is implied by the nature of the representations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015) (group pleading was appropriate when the alleged misrepresentations appeared in offering documents featuring the logo of a corporate subgroup). Here, the source of the alleged misrepresentations was a business proposal bearing the Cerner logo at the top and contains no individual names. And, as Plaintiffs point out, they identify the Cerner individuals who supplied the Proposal. (SAC ¶¶ 27.)

"New York law is clear that, at a minimum, false statements about a party's present financial condition or current ability to perform, made in order to induce a party to enter into a contract, will support a claim of fraudulent inducement." *Wild Bunch, SA v. Vendian Entm't, LLC*, 256 F. Supp. 3d 497, 506 (S.D.N.Y. 2017); *see also KCG Americas LLC v. Brazilmed, LLC*, No. 15 CIV. 4600(AT), 2016 WL 900396, at *4 (S.D.N.Y. Feb. 26, 2016) ("Representations about an entity's ability to perform under a contract are distinct from representations that the entity will perform."). Plaintiffs have also sufficiently alleged justifiable reliance and injury, based on their allegations that they did in fact enter into the contract and were harmed by the fact that Defendants were incapable of processing claims in the manner they promised.

In addition, Plaintiffs have remedied their prior pleading deficiencies by alleging the following facts that give rise to an inference of fraudulent intent: "Cerner knew . . . it had no plan to fix the problems and that it would not be able to provide her with the high level of compliance that it promised," (SAC ¶ 40); "Cerner knew [its representation about its well trained and experienced employees] was false and . . . had no[] plan to improve training, hire more experienced personnel or otherwise address its [personnel] issue," (*id.* ¶ 72); "Cerner had no plan to improve the quality of its RCM submissions of Medicare claims and took no additional measures to address the issue," (*id.* ¶ 75). In addition to these assertions, Plaintiffs allege facts to support its claim that Cerner had knowledge that its representations were false at the time it made them, including that it "had received complaints from customers about the inadequacy of its employees," (*id.* ¶ 71); and that "[a]s early as June 2013, at least one doctor had problems with Cerner's RCM for submitting Medicare claims and complained to Cerner," (*id.* ¶ 41). These facts suggest a plausible inference that Defendants had a motive to commit fraud (to induce Plaintiffs to enter into a contract with them and turn a profit) as well as opportunity (because the

representations they made concerned facts solely within Defendants' own knowledge, and which

Plaintiffs had no way of discovering). *See Lerner*, 459 F.3d at 290–91. Plaintiffs' allegations

that Defendants were on notice of personnel and system issues affecting compliance with

Medicare billing rules prior to the execution of the 2014 Agreement also serve as circumstantial

evidence of "conscious misbehavior." *See id.*

      The fact that Plaintiffs make certain allegations about Defendants' intent "upon

information and belief" is no barrier. Fraud allegations may be made on information and belief

"as to facts peculiarly within the opposing party's knowledge, in which event the allegations

must be accompanied by a statement of the facts upon which the belief is based." *DiVittorio v.*

*Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Defendants' intent and

knowledge are within their own knowledge, and Plaintiffs' allegations are supported by "facts

upon which the belief is based," *see id.*, such as Plaintiffs' allegations that Cerner was unable to

perform the contract from the outset and Plaintiffs' allegations about events that would have put

Cerner on notice as to the deficiencies in its staff and software.

      Finally, Defendants argue that the representations in the Proposal are mere "puffery."

(Defs.' Mem. 13.)[7] "[A] seller's mere general commendations of the product sought to be sold,

commonly known as 'dealer's talk,' 'sales talk,' or 'puffery,' do not amount to actionable

misrepresentations." *Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.,* 888 F. Supp. 2d

508, 513 (S.D.N.Y. 2012) (finding that the statement, "[a] partner that will earn your trust by

delivering both the competence and the confidence you need to get the job done," was puffery").

"Puffing has been described as making generalized or exaggerated statements such that a

---

[7] "Defs.' Mem." refers to Defendants' Memorandum of Law in Support of Defendants' Partial Motion to Dismiss Counts 4, 6, 15, 16, 19 and 20 of the Second Amended Complaint, filed on December 29, 2018. (Doc. 58.)

reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely." *DeBlasio v. Merrill Lynch & Co.*, No. 07 Civ 318(RJS), 2009 WL 2242605, at *23 (S.D.N.Y. July 27, 2009) (internal quotation marks omitted); *see also EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 276 (S.D.N.Y. 2004) (holding that statements that defendant "would be building the 'greatest boats'" and director "was personally 'committed'" to company were nonactionable puffery, but statement that defendant "had the capability and wherewithal to properly construct the yacht sought by Goldman in a timely manner" was actionable fraud).

Although the term "well trained" is admittedly generalized and vague, in conjunction with the term "experienced," Defendants' alleged representation about the nature of its employees may plausibly be read to be actionable fraud. Similarly, Defendants' alleged representation that it maintains a "high level of compliance" with laws and regulations was a concrete statement. *See id.*

Drawing all inferences in favor of Plaintiffs, I find that Plaintiffs have stated a claim for fraud in the inducement of the 2014 Agreement based on the assertions set forth in the Proposal: (1) that Defendants had the capability to properly process the claims, (2) that Defendants would provide "a high level of compliance with applicable laws and regulations" and (3) that Plaintiffs' account would be handled by well-trained and experienced personnel. However, Plaintiffs have not stated a claim with respect to Cerner's alleged representations about the total cost of their RCM and EMR services.

## 2. **Fraud Preceding the EMR Contract (Count 20)**

Plaintiffs attempt to assert a new claim for fraudulent representations relating to the EMR agreements. Plaintiffs claim that Defendants represented to them that Defendants would comply with their duties under the law to return complete patient medical records to Fung-Schwartz "before she signed the contract, while they have provided EMR services and during this litigation." (SAC ¶¶ 150–51.) Plaintiffs allege they relied on these representations in contracting with Cerner and in using the EMR system, but that Defendants turned out to have had no ability to export the foot drawings, only the text portion of the records, and as a result Fung-Schwartz has been injured. (*Id.* ¶¶ 152–54.) Plaintiffs do not specify whether the alleged representations were proffered in inducement of the 2006 EMR agreement or the 2014 Agreement that supplemented and incorporated the 2006 Agreement.

These allegations are not particularized enough to support a fraud claim. Plaintiffs do not state what representations Defendants made, who made them, or when they were made. In addition, Plaintiffs also (1) do not plead why the representations were fraudulent, (2) claim only in a conclusory fashion that Defendants had a "duty . . . to return complete patient medical records," without specifying what law creates this duty, and (3) fail to plead that they do not have access to the drawings or that Defendants cannot or have refused to return the drawings at all. (*Id.* ¶¶ 145–148, 150–54.) Instead, Plaintiffs assert only that Defendants "have only offered to export the text portion." (*Id.* ¶ 100.) Besides failing to allege facts to meet these basic requirements for a fraud claim, Plaintiffs also plead no facts giving rise to an inference of fraudulent intent. *See Eternity Glob. Master Fund Ltd.*, 375 F.3d at 187. In the absence of the detail required by the Federal Rules of Civil Procedure, Plaintiff's fraud claim in Count 20 must fail. *Id.*

### 3. Fraud in Claiming to Be a Party to the Contract (Count 6)

In Count 6, Plaintiffs re-allege fraud by Cerner Corp. in asserting that it was a party to the 2014 Agreement when it was not. Plaintiffs' new allegations are not materially different than those I found insufficient, and therefore do not remedy the defects identified in my September 2018 Opinion.

In her First Amended Complaint, Plaintiffs claimed that Cerner Corp.'s outside counsel sent an e-mail to Plaintiffs on September 23, 2016, stating in relevant part that the Practice owed a debt of over $100,000 to Cerner Corp, (FAC ¶ 87)[8], that she relied on this representation by retaining counsel and offering to settle, and that she was thereby injured, (*Id.* ¶ 117). Plaintiffs now plead roughly the same facts; however, Fung-Schwartz now claims that her reliance on Cerner Corp.'s assertion was justifiable because "she knew she had a contract with Cerner," and because Cerner Corp.'s name was on the EMR login screen and on the materials she received from Cerner. (*See* SAC ¶¶ 91–94, 110.)

First, it is not clear even on the face of the pleading that Cerner Corp.'s representation was, in fact, false since in the e-mail transcribed by Plaintiffs, Cerner Corp. represents that it was "dba Cerner Physician Practice, Inc." and that "a debt obligation [is] owed to it," pursuant to the 2006 Agreement, not that Cerner Corp. had contracted with Fung-Schwartz. (*Id.* ¶ 91.) It is true that the parties to the 2006 Agreement were Fung-Schwartz and Cerner Physician Practice, Inc., (*see Id.* Ex. 1), while the 2014 Agreement was between Fung-Schwartz and Cerner Solutions. However, corporate entities can change names, and debt obligations can be bought, sold, and transferred—indeed, as Plaintiffs acknowledge, the Agreement specifically authorizes Cerner to assign its interest in payments due under the contract. (*See id.* Ex. 2, at 3; Pls.' Mem. 12.)

---

[8] "FAC" refers to Plaintiffs' first Amended Complaint, filed on June 15, 2017. (Doc. 18.)

Plaintiffs do not plead, even in a conclusory fashion, that the debt was not actually owed or that it was not actually owed to Cerner Corp. They only plead that that $100,000 exceeded any amount previously demanded. (*Id.* ¶ 134.) They have therefore failed to meet the basic requirement of pleading a misrepresentation of fact. Even if the representation was false, Plaintiffs have also not asserted any facts that could give rise to the inference that Cerner Corp. made the representation with fraudulent intent, given Plaintiffs' own allegations that Cerner Corp. managed Cerner Solutions' contracts and provided customer service and support for Cerner Solutions. (*Id.* ¶¶ 6–9.) *See L-7 Designs*, 647 F.3d at 430 ("Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, *and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable*" (emphasis added)).

Accordingly, Plaintiffs' fraud claim set forth in Count Six is dismissed.

### B.     *Unfair Competition (Count 15)*

#### 1.  Applicable Law

Under New York law, the tort of unfair competition is a "broad and flexible doctrine" that encompasses "taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another." *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (internal citation and internal quotation marks omitted). The essence of the tort "is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Telecom Int'l Am., Ltd.* 280 F.3d at 197 (internal quotation marks omitted). Bad faith is an essential element of an unfair competition claim. *See*

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34–35 (2d Cir. 1995); *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478(GEL), 2009 WL 399221, at *13 (S.D.N.Y. Feb. 18, 2009); *see also MiniFrame Ltd. v. Microsoft Corp.*, No. 11 Civ. 7419(RJS), 2013 WL 1385704, at *8 (S.D.N.Y. Mar. 28, 2013) ("Under New York law, the gravamen of an unfair competition claim is the bad faith misappropriation of a competitor's commercial advantage.").

"'[T]he tort [of unfair competition] is not all-encompassing,'" and "'[t]he New York Court of Appeals in rejecting the notion that unfair competition is equivalent to the amorphous term 'commercial unfairness' has stated that misappropriation of another's commercial advantage is a cornerstone of the tort.'" *Nationwide CATV Auditing Servs., Inc. v. Cablevision Sys. Corp.*, No. 12–CV–3648 (SJF)(ETB), 2013 WL 1911434, at *10 (E.D.N.Y. May 7, 2013) (quoting *CA, Inc. v. Simple.com, Inc.*, 621 F. Supp. 2d 45, 53 (E.D.N.Y. 2009)). The term "commercial advantage" has been used interchangeably with "property" within the meaning of the misappropriation theory. *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478–79, 880 N.E.2d 852 (2007).

### 2. Application

As in their First Amended Complaint, Plaintiffs' unfair competition claim is premised on Defendants' submission of duplicate claims to insurers, sending statements to Plaintiffs' patients falsely implying that they owed money to Plaintiffs, knowingly submitting claims that would be rejected, and secretly writing off "botched claims." (SAC ¶ 129.) I previously dismissed this claim for failure to plead how Defendants benefited from these actions and failure to plead that Defendants acted in bad faith. (Sept. 2018 Op. 21–23.) I also noted that Plaintiffs had failed to show how Defendants were "competitors" within the meaning of the doctrine. (*Id.* 22 n.8.) Plaintiffs now plead that Defendants engaged in these tactics "intentionally and for their

commercial advantage because they were paid on a percentage of the Practice's billing." (SAC ¶ 130.)

Plaintiffs' new allegations do not solve the previously identified pleading deficiencies. Plaintiffs fail to allege, for example, how the alleged writing off of "botched claims'" and "submitt[ing] claims that would be rejected" resulted in revenues for Defendants, even if they were paid on a percentage of the Practice's billing. (*See* SAC ¶ 129.) More generally, Plaintiffs' claim is still missing material elements; Plaintiffs do not allege how they and Defendants were competitors or how their own "skill, expenditures and labors" were "misappropriate[ed]." *Roy Export*, 672 F.2d at 1105. Here, Defendants' services appear to support and rely on Plaintiffs' business, such that the two are engaged in a symbiotic rather than competitive relationship. As the New York Court of Appeals has observed, "[u]nder New York law 'an unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property.'" *ITC Ltd.*, 9 N.Y.3d at 478. Such property can be tangible property or merely goodwill, *id.*, but the Court of Appeals explicitly declined to extend the doctrine of unfair competition to encompass "any other new theory of liability under the New York law of unfair competition." *Id.* at 479. "By definition, competition is fundamental to any unfair competition claim. Where there is no competition, there can be no unfair competition." *EMI Music Mktg. v. Avatar Records, Inc.*, 317 F. Supp. 2d 412, 423 (S.D.N.Y. 2004) (finding no unfair competition where record producer alleged record distributor undermined sales, because "their relationship was symbiotic . . . [defendant's] financial success turned at least in part on [plaintiff's]" success, and vice versa). *See also MiniFrame Ltd,* 2013 WL 1385704, at *8.

Accordingly, Plaintiffs have not stated a plausible claim of unfair competition, and Count 15 must be dismissed.

## C. *Misappropriation of Trade Secret (Count 16)*

Plaintiffs also replead Count 1, previously labeled as "Unfair Competition and Misappropriation of Trade Secret" and now labeled as "Misappropriation of Trade Secret." Plaintiffs allege that Defendants maliciously misappropriated and concealed from Dr. Fung-Schwartz and the Practice their patient medical records and other trade secrets, such as financial information, their calendar, and customer lists. In response to my prior finding that Plaintiffs had fail to explain exactly how Defendants had benefited from these actions, Plaintiffs add the new allegation that this misappropriation was an effort to intentionally ransom their information for a $100,000 payment, an amount that far exceeded any amount they had ever previously claimed was due under the contract.

### 1. Applicable Law

Misappropriation of trade secrets is distinct from the tort of unfair competition. To make out a claim for misappropriation of trade secrets, a plaintiff must show: "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999). "A trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors who do not know or use it." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 453 (2018) (internal quotation marks omitted). In determining whether information constitutes a trade secret, New York courts apply the following factors from the Restatement of Torts:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt., Inc. v. Janien,* 82 N.Y.2d 395 (N.Y. 1993)).  Of these, the most important consideration is whether the claimant kept the information secret.  *Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 298 (2d Cir. 1986); *see also Defiance Button Mach. Co. v. C & C Metal Prod. Corp.,* 759 F.2d 1053, 1063 (2d Cir. 1985).

Misappropriation is also the name for one of two theories of common law unfair competition, also discussed *supra*.  *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d at 476 (contrasting misappropriation with "'palming off'—that is, the sale of the goods of one manufacturer as those of another.")  Under this theory, a party is liable if they unfairly exploit "the skill, expenditures and labors of a competitor" in "an unethical way."  *E.J. Brooks Co.*, 31 N.Y.3d at 449.

## 2. Application

Although Plaintiffs label Count 16 as "misappropriation of trade secret," Plaintiffs' brief only discusses, and cites law relevant to, unfair competition by misappropriation.  Moreover, the Second Amended Complaint does not plead facts supporting either of the two elements of misappropriation of trade secrets.  Plaintiffs have not asserted that any of the information withheld by Defendants was protected as secret by Plaintiffs or that it was valuable to Plaintiffs or its competitors, nor have they made even a conclusory statement that it was a trade secret.  *See N. Atl. Instruments*, 188 F.3d at 44.  Plaintiffs also do not allege that Defendants used that information in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means, and so have not alleged misappropriation.  *See id.*  Therefore, I

find that Plaintiffs have not stated a claim for misappropriation of trade secrets. *See Alexander Interactive, Inc. v. Leisure Pro Ltd.*, No. 14-cv-2796 (PKC), 2014 WL 4651942, at *5 (S.D.N.Y. Sept. 16, 2014) (dismissing misappropriation of trade secrets claim in part because "conclusory assertion that the Deliverables constitute[d] trade secrets [was] insufficient")*; Jinno Int'l Co. v. Premier Fabrics, Inc.*, No. 12 Civ. 07820(LGS), 2013 WL 4780049, at *5 (S.D.N.Y. May 24, 2013) (dismissing misappropriation of trade secrets claim where counterclaimant failed to "allege facts sufficient to show that the information in fact is secret" and failed to show that opposing party misappropriated the information); *Thayil v. Fox Corp.*, No. 11 Civ. 4791(SAS), 2012 WL 364034, at *5 (S.D.N.Y. Feb. 2, 2012) (dismissing misappropriation of trade secrets claim where plaintiff failed "to plead factual content that would allow the Court to draw an inference that the Marketing Plan was in fact treated as a trade secret or that there was any duty of trust or confidentiality" between the parties).

With regard to unfair competition by misappropriation, although Plaintiffs now plead facts to establish how Defendants benefited from its actions, they have failed to allege any new facts demonstrating that Defendants were acting in bad faith, beyond a conclusory statement that "Defendants illegally cut off access to the EMR system" that does not specify what law they allege this conduct violated. (*See* Sept. 2018 Op. 22–23 (citing *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 275 (S.D.N.Y. 2014) (internal quotation marks omitted).) More importantly, as in Count 15, they do not show how they and Defendants were competitors. *See E.J. Brooks Co.*, 31 N.Y.3d at 449.

Accordingly, Plaintiffs misappropriation claim in Count 16 is dismissed.

### D. *Negligence (Count 19)*

#### 1. Applicable Law

To establish a claim of negligence, a plaintiff must demonstrate that: "(1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach." *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539(NRB), 2004 WL 1444868, at *9 (S.D.N.Y. June 25, 2004).

Under New York law, "a statute or regulation may provide the Court with the relevant standard of care" for a negligence action. *Sampaio v. Atl.-Heydt, LLC*, 294 F. Supp. 2d 466, 469–70 (S.D.N.Y. 2003) (citing *Wolfson v. Glass,* 754 N.Y.S.2d 82, 83–84 (3d Dep't 2003)). "The determination as to whether a statute imposes a statutory standard of care turns on whether the underlying policy of the legislation is the protection of a certain class of individuals and whether judicial recognition of a statutory standard will further that policy of protection." *Lugo v. St. Nicholas Assocs.*, 772 N.Y.S.2d 449, 453 (Sup. Ct. 2003) (citation omitted), *aff'd*, 795 N.Y.S.2d 227 (1st Dep't 2005); *see also German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1397 (S.D.N.Y. 1995).

#### 2. Application

In Count 19, Plaintiffs attempt to add a second claim of negligence, alleging that Defendants are unable to return Fung-Schwartz' foot drawings to Plaintiffs', breaching their duty under federal and New York law to return complete patient medical records to them. As an initial matter, as noted above, the allegations in the Second Amended Complaint do not demonstrate that Plaintiffs do not have access to the foot drawings or that Defendants cannot or have refused to return the drawings. This claim fails on this basis alone.

In my September 2018 Opinion, I held that Plaintiffs had stated a claim for negligence in Count 18 based on Plaintiffs' allegations that Defendants wrongfully withheld patient medical information from Plaintiffs and failed to properly and timely submit insurance claims, in violation of federal and state laws, including the federal Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d, which some courts have held may be used to supply the requisite standard of care for negligence claims. (*See* Sept. 2018 Op. 16–17.) In contrast to Count 18, Count 19 does not identify the source of the alleged duty violated by Defendants, nor does the Second Amended Complaint mention a specific statute or regulation. Plaintiffs only make a conclusory statement in their opposing brief that "Defendants owe an independent duty under HIPAA and other statutes." (Pls.' Mem. 22.)

This allegation is clearly insufficient, since without knowledge of the text that allegedly creates the standard of care, it is impossible to determine if Plaintiffs' have stated a claim for violation of that standard or how this alleged violation is a separate violation from that alleged in Count 18.

Accordingly, Plaintiffs' negligence claim in Count 19 must be dismissed.

## V.  <u>Conclusion</u>

For the foregoing reasons, Defendants' motion to dismiss, (Doc. 57), is GRANTED in PART and DENIED in part. Defendant's motion to dismiss is GRANTED with respect to the following counts, which are dismissed with prejudice: Counts 6, 15, 16, 19, 20, and the portion of Count 4 premised on Defendants' alleged misrepresentations about the total cost of RCM and EMR services. Defendants' motion to dismiss is DENIED with respect to the remainder of Count 4.

Defendants shall file an Answer to the Second Amended Complaint within twenty-one

(21) days of the date of this Opinion and Order.

The Clerk of Court is respectfully directed to terminate the open motion at Doc. 57.

SO ORDERED.

Dated: September 13, 2019
      New York, New York

Vernon S. Broderick
United States District Judge