UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER FUNG-SCHWARTZ, et al.,

      Plaintiffs,

  -against-

CERNER CORPORATION, et al.,

      Defendants.



17-CV-0233 (VSB) (BCM)

**ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

By motion dated June 22, 2020 (Dkt. No. 104), augmented by a Corrected Memorandum of Law filed on June 25, 2020 (Pl. Corr. Mem.) (Dkt. No. 106), plaintiffs Jennifer Fung-Schwartz, D.P.M. (Dr. Fung-Schwartz) and her wholly-owned podiatry practice, Jennifer Fung-Schwartz, D.P.M., LLC (the Practice), seek reconsideration of the portions my discovery order dated June 3, 2020 (the June 3 Order) (Dkt. No. 98), declining to compel defendants Cerner Healthcare Solutions, Inc. (Cerner Solutions) and its affiliate Cerner Corporation (collectively Cerner) to produce additional documents in response to (i) plaintiffs' Request for Production (RFP) No. 52 (Dkt. No. 90 at ECF page 30), which sought "[d]ocuments sufficient to identify Defendants' cost for providing electronic medical records [EMR] services to Plaintiffs"; and (ii) plaintiffs' RFP No. 59 (Dkt. No. 90 at ECF page 33), which sought "[a]ll documents concerning any other doctors, hospitals, or other medical providers whose EHR [electronic health records service] was cut off by Cerner." *See* June 3 Order at 1, 3.[1] Plaintiffs also request clarification of my ruling as to two other RFPs, *see* Pl. Corr. Mem. at 18, and a written order memorializing defendants' representation, made on the record during a discovery conference on May 27, 2020, concerning the scope of their quantum meruit counterclaim.

    For the reasons that follow, plaintiffs' motion is DENIED.

---

[1] The parties appear to use the terms EMR and EHR interchangeably.

## Background

In 2006, Dr. Fung-Schwartz contracted with Cerner Physician Practice, Inc. to provide EMR services to the Practice, and in 2014 she contracted with Cerner Solutions to provide revenue cycle management (RCM) services. *See* Second Amended Complaint (SAC) (Dkt. No. 54) ¶¶ 17, 24-27 & Exs. 1-3. Under the RCM contract, Cerner Solutions was responsible for reviewing, submitting, and processing insurance claims for Dr. Fung-Schwartz's patients. *See id.* ¶¶ 30-31. Plaintiffs allege that defendants made fraudulent representations concerning the Cerner Solutions system, services and capabilities in order to secure the RCM contract, *see id.* ¶¶ 28-37, 40, 70, 103, and that during the contract period they improperly processed billing and insurance claims, which caused Medicare and other insurers to reject numerous claims, decreased revenues for the Practice, *id.* ¶¶ 43, 81-82, and damaged the value of the Practice itself. *See* Transcript of May 11, 2020 Telephone Conference (May 11 Tr.) (Dkt. No. 91) at 28:8-10, 30:20-24.

Dr. Fung-Schwartz terminated the RCM contract in 2016, SAC ¶ 84, but continued to use "the EMR software" to access patient medical records online. *Id.* ¶¶ 19, 87. Thereafter, a billing dispute arose between the parties, *id.* ¶¶ 91-94, and on October 13, 2016, "Cerner abruptly cut off access" to Dr. Fung-Schwartz's EMR. *Id.* ¶ 95. Although access was quickly restored, plaintiffs allege that Cerner unlawfully converted Dr. Fung-Schwartz's patient records by failing to turn them over outright or migrate them *in toto* (including her drawings of patients' feet) to another EMR system. *Id.* ¶¶ 100, 117. Plaintiffs seek several hundred thousand dollars in compensatory damages, of which the largest component is approximately $200,000 in patient billing that defendants "failed to submit or obtain from third parties." *Id.* at 25-26; *see also* May 11 Tr. at 11:7-15:19.

Cerner Solutions, for its part, complains that Dr. Fung-Schwartz "remains on [its] electronic health record platform to this day," but has made no payments for her EMR service since 2016. *See* Answer to Second Amended Complaint and Counterclaim (Counterclaim) (Dkt. No. 65) ¶¶ 7-8. 14, 21, 29. Cerner Solutions seeks damages for breach of contract – or, in the alternative, quantum meruit recovery – in the principal amount of approximately $56,000,[2] and a declaration that Dr. Fung-Schwartz must "migrate her practice to another electronic health record platform," which in turn would permit Cerner to terminate her access to its system and cut its ties with plaintiffs. *Id*. at 19-21.

On March 2, 2020, the case was referred to me for general pretrial management. (Dkt. No. 77.) Two days later, I issued an Order Regarding General Pretrial Management (the March 4 order) (Dkt. No. 80) advising the parties, *inter alia*:

> Discovery applications, including letter-motions requesting discovery conferences, must be made promptly after the need for such an application arises and must comply with Local Civil Rule 37.2 and § 2(b) of Judge Moses's Individual Practices. It is the Court's practice to decide discovery disputes at the Rule 37.2 conference, based on the parties' letters, unless a party shows good cause why more formal briefing should be required.

March 4 Order ¶ 3(b).

Discovery has been contentious. On May 6, 2020, the parties submitted a 15-page joint letter (Dkt. No. 86) outlining numerous discovery disputes, some of which were resolved during the course of a two-hour discovery conference on May 11, 2020. On May 22, 2020, at my direction, the parties submitted another joint letter (Joint Ltr.) (Dkt. No. 90), outlining the discovery disputes that remained unresolved at that time. Among other things, plaintiffs sought to compel the production of additional documents in response to 27 of the 61 RFPs contained in

---

[2]According to Cerner, the principal amount of the unpaid bill was $54,207.08 as of November 2019. Counterclaim ¶¶ 8, 14. By March 2020, this figure had grown to $56,383.86. *See* Defendants' Corrected Memorandum of Law (Def. Corr. Mem.) (Dkt. No. 111) at 8.

their First Set of Requests for the Production of Documents. Joint Ltr. at 2-5. As to RFP No. 52, plaintiffs argued that defendants' costs incurred in providing EMR services to plaintiffs were relevant to the quantum meruit counterclaim, because "Cerner has just revealed that its quantum meruit damages theory will be based on the costs and profitability of the entire company." Joint Ltr. at 3. As to RFP No. 59, plaintiffs asserted generally that records showing that Cerner had "cut off" EMR services to other doctors, hospitals, or medical providers were "central to, *inter alia*, Cerner's counterclaims for breach of contract and quantum meruit, as well as Plaintiffs' claims for conversion, tortious interference, negligence, breach of contract and fraud." *Id*. at 4 (emphasis in original).

The parties presented argument concerning the issues raised in the Joint Letter during a one-hour discovery conference on May 27, 2020, followed by a two-hour conference on June 2, 2020. During the May 27 session, defendants' counsel explained that Cerner's quantum meruit counterclaim was pleaded as alternative to its breach of contract counterclaim ("if for some reason plaintiffs successfully invalidated the contract, which I do not believe is happening"), and sought "the exact same damages a[s] the reasonable value of the services, what we charged under the contract[.]" Transcript of May 27, 2020 Telephone Conference (May 27 Tr.) at 15:19-23. Plaintiffs' counsel then repeated the assertion that, during a recent meet-and- confer, defendants' counsel had "said they were going to rely on the company profitability to submit an alternative calculation. So I just want to know[.] [I]f that's no[t] what they're going to do, that's fine, but if they have an alternative view, then we need to know it." *Id*. at 16:4-7. Defendants' counsel denied having ever made such a statement. *Id*. at 16:14-15. He elaborated, "We're certainly never going to inject profitability" into the calculation of quantum meruit damages "because that is irrelevant to us in any quantum meruit submission." *Id*. at 16:21-22. With this clarification, I

4

ruled that plaintiffs were not entitled to "additional [cost] documents with regard to the quantum meruit damages that are or may be claimed by defendants." *Id*. at 16:25-17:4.

Nonetheless, plaintiffs' counsel returned to the same topic during the June 2 session, this time arguing:

> [W]e believe that there are other damages theories that we should be able to propose for the measure of quantum meruit damages, including what a reasonable fee would be for the services based on the costs and a reasonable profit for the services. And they have not produced any documents for us to be able to propose any other calculation for the damages.

Transcript of June 2, 2020 Telephone Conference (June 2 Tr.) (Dkt. No. 102) at 6:1-9. Counsel did not make any showing that Cerner – or any other provider of EMR services – calculated or negotiated the prices it charged for those services based on the underlying costs incurred. Nor did counsel explain what kinds of costs plaintiffs sought to investigate, or how Cerner was to go about satisfying its RFP.[3] Unconvinced as to the relevance of the discovery sought, and concerned about its potentially burdensome reach (particularly in the context of a counterclaim pleaded in the alternative and seeking relatively modest damages), I declined to authorize it:

---

[3] The 2006 EMR contract between Dr. Fung-Schwartz and Cerner Physician Practice, Inc. (SAC Ex. 1) is titled "Software License, Hardware Purchase, Services and Support Agreement," and includes a sales order under which it appears that Dr. Fung-Schwartz paid $11,250 for a package of goods and services including seven "third party software" licenses, an "annual support" contract for each of them, and four days of "EMR Onsite Training @ Customer's Location," *Id*. at ECF page 7. It is not clear whether plaintiffs seek information concerning only the direct costs incurred in providing these goods and services (reported on a company-wide basis as "costs of revenue" in Cerner Corporation's audited financial statements, available at https://www.cerner.com/about/investor-relations/annual-reports), or whether they also wish to discover the associated indirect costs (reported as "operating expenses," including "sales and client service" expense, "software development" expense, "general and administrative" expense, and amortization). Nor is it clear how defendants would go about isolating (and producing "documents sufficient to identify") the costs associated with the EMR services provided to a single medical practice. Plaintiffs' confident assertion that defendants' burden would be "minimal" because plaintiffs seek information for "exactly one customer," as to whom "Cerner certainly knows its costs," Pl. Corr. Mem. at 6, does not begin to answer these questions.

5

> [Y]ou are perfectly free to go out into the marketplace, if you wish to do so, and look, this is by way of example only, you can look at what comparable products and services were out there in the marketplace and what people charged for them. You have a number of avenues at your disposal, [but] you do not get to do a forensic audit of Cerner Corporation from to top bottom in the guise of trying to figure out what alternative quantum meruit damages your opponent[s] might make other than the very simple one that they are making.

*Id*. at 8:12-22.

Also on June 2, plaintiffs argued that defendants should be compelled to produce documents concerning other Cerner customers whose EMR (or "EHR")  services were cut off because "we want to know what makes the difference when they actually decide to cut off the services, was that something that they did just to Dr. Fung-Schwartz or was it something that was more systemic, where, you know, if there were certain criteria they would do it to anybody." June 2 Tr. at 40:9-14. I rejected that argument as well, ruling:

> I'm not going to give you discovery into other doctors who had their EHR cut off. Number one, I deem it disproportional to the stakes in this litigation. Number two, it would get us way down the rabbit hole of essentially litigating other doctors' cases, even cases they haven't brought, but litigating the pros and cons of what happened to Dr. X versus Dr. Y versus Dr. Fung-Schwartz. And number three, it implicates substantial issues of privacy and confidentiality regarding those other patients which would come to the [fore] if we did try to actually compare and contrast what happened to them to what happened to Dr. Fung-Schwartz. So 59 is denied.

*Id*. at 41:3-17.

The June 3 Order memorialized these and other rulings made during the May 27 and June 2 conferences.[4] At no time prior to or during those conferences did plaintiffs ask to file a formal motion or submit additional briefing as to any of the issues in contention.

---

[4] The June 3 Order directed defendants to produce additional documents or information in response to ten of the 27 RFPs at issue in the Joint Letter, including documents relevant to defendants' potential quantum meruit damages and to plaintiffs' claim that Cerner wrongfully cut off their EMR access. *See* June 3 Order at 1 (directing defendants to produce "documents sufficient to identify the lowest price that they charged during the period 2015-16 for EMR services, comparable to those provided to plaintiffs, furnished to other solo medical practices");

**Legal Standards**

Reconsideration is an "extraordinary remedy to be applied sparingly in the interests of finality and conservation of scarce judicial resources." *Parrish v. Sollecito*, 253 F. Supp. 2d 713, 715 (S.D.N.Y. 2003) (quoting *In re Health Mgmt. Sys. Inc. Sec. Litig.*, 113 F. Supp. 2d. 613, 614 (S.D.N.Y. 2000). In this district, reconsideration motions are governed by Local Civil Rule 6.3, which requires the party seeking reconsideration to identify the "matters or controlling decisions which counsel believes the Court has overlooked." The standard for granting such a motion is "strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "The burden is on the movant to demonstrate that the Court overlooked controlling decisions or material facts that were before it on the original motion, and that might materially have influenced its earlier decision." *In re Facebook, Inc., IPO Securities and Derivative Litigation*, 43 F. Supp. 3d 369, 373 (S.D.N.Y. 2014) (quoting *Polsby v. St. Martin's Press, Inc.*, 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000)) (internal quotation marks omitted).

"A motion for reconsideration is . . . not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Joint Stock Company "Channel One Russia Worldwide" v. Infomir LLC*, 2020 WL 1480465, at *2 (S.D.N.Y. Mar. 26, 2020) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012)) (internal quotation marks omitted). *See also Stone v. Theatrical Inv. Corp.*, 80 F. Supp. 3d 505, 506 (S.D.N.Y. 2015) (quoting *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005)) (a reconsideration motion "is

---

*id*. at 2 (directing defendants to produce "all internal checklists or protocols, in effect for the year 2016, describing the circumstances or preconditions required for Cerner to terminate a customer's EMR services for nonpayment," as well as associated "training materials provided to the Cerner employees serving solo or small medical practices").

'neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced'"). Absent "manifest injustice," new facts and new theories are not permitted. *S.E.C. v. Ashbury Capital Partners, L.P.*, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001); *see also Ferring v. Alleregan, Inc.*, 2013 WL 4082930, at *1 (S.D.N.Y. Aug. 7, 2013).

"The decision to grant or deny a motion for reconsideration 'rests within the sound discretion of the district court.'" *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 5408171, at *1 (S.D.N.Y. Sept. 27, 2016) (quoting *Williams v. Rosenblatt Sec. Inc.*, 2016 WL 590232, at *4 (S.D.N.Y. Feb. 11, 2016)). "Similarly, resolution of the underlying discovery application was 'entrusted to the sound discretion of the district court.'" *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1088020, at *1 (S.D.N.Y. Feb. 12, 2018) (quoting *Pegoraro v. Marrero*, 281 F.R.D. 122, 127 (S.D.N.Y. 2012)).

### **Plaintiffs Are Not Entitled to Reconsideration**

Plaintiffs have not met the high standard required for reconsideration under Local Civil Rule 6.3 and *Shrader*. In their briefs, they rely heavily on argument and case law that they did not raise in the Joint Letter or during the lengthy conferences on May 27 and June 2. For example, after originally arguing that they were entitled to discovery of Cerner's costs incurred in providing EMR services because Cerner intended to rely on cost information in order to prepare its own calculation of quantum meruit damages, plaintiffs now contend that, under New York law, the costs incurred in providing services are always relevant in ascertaining the reasonable value of those services and therefore discoverable whenever a quantum meruit claim is asserted. Pl. Corr. Mem. at 2-4.

Perhaps because their arguments evolved so rapidly, plaintiffs make no effort to show that the Court overlooked any "controlling decisions or data," *Shrader*, 70 F.3d at 257, that were before it when the challenged ruling was made. Nor do they identify any "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust,* 729 F.3d 99, 104 (2d Cir. 2013) (citation omitted). Instead, plaintiffs argue that the *Shrader* standard should not apply here because I ordered "only limited letter briefing" of the underlying discovery disputes. Pl. Corr. Mem. at 1. However, they identify no authority – and the Court is aware of none – making an exception to the *Schrader* standard for discovery rulings made after letter-briefing (and, in this case, extensive argument) rather than formal motion practice. In this district, any such exception would inevitably swallow the rule, since most discovery rulings are made, pursuant to Local Civil Rule 37.2, with similar informality. Moreover, as noted above, plaintiffs could have requested more formal briefing, *see* March 4 Order ¶ 3(b), but did not do so. I therefore conclude that reconsideration is unwarranted.

## The Challenged Discovery Rulings Stand

Even if I were to reconsider the challenged portions of the June 3 Order, nothing in plaintiffs' motion papers would persuade me to alter those rulings.

## RFP No. 52

As noted above, Cerner Solutions alleges that Dr. Fung-Schwartz continues to use its EMR services but has not paid her bill since 2016. Counterclaim, ¶ 7. In its breach of contract claim, Cerner Solutions seeks the unpaid contract price of $56,383.86. *Id*. ¶ 14. In its quantum meruit claim, pleaded in the alternative, Cerner Solutions seeks payment for "the value of the benefits [Dr. Fung-Schwartz] has received," *id*. ¶¶ 18, 20, which it contends to be equivalent to

the contract price.[5] The issue that was before me on May 27 and June 2 – and would be before me again on reconsideration – is whether the discovery sought in RFP No. 52 ("[d]ocuments sufficient to identify Defendants' cost for providing electronic medical records services to Plaintiffs") is relevant to the calculation of Cerner Solutions' potential quantum meruit damages and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1).

Under New York law, quantum meruit damages are measured by the "reasonable value" of the goods or services provided. *Mid-Hudson Catskill Rural Migrant Ministry*, 418 F.3d at 175 (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)). Plaintiffs argue that "New York law allows for different theories and methods of establishing the reasonable value of the services performed," Pl. Corr. Mem. at 3, one of which is based on the costs incurred by the provider of the services, *id*. at 3-4, and therefore that plaintiffs are entitled to discovery of those costs regardless of whether Cerner Solutions intends to use any cost-based measure to calculate its quantum meruit damages. *Id*. at 5-6. They further argue, as noted above, that defendants' burden in producing the requested cost information would be "minimal" and contends that I

---

[5] "New York law does not permit recovery in quantum meruit . . . if the parties have a valid, enforceable contract that governs the same subject matter." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). Thus, the parties agree that quantum meruit damages need not be determined unless the underlying contract is found to be invalid or unenforceable. *See* Counterclaim ¶ 18; Pl. Reply Mem. at 4 ("it will only be an issue if the unsigned Sales Order is found to be unenforceable"). They disagree, however, as to the likelihood of that event. Because the 2014 sales order (SAC Ex. 2) is "unsigned," plaintiffs suggest, in their motion papers, that it is unenforceable under the Statute of Frauds or was simply "a proposal that never became a contract." Pl. Corr. Mem. at 2. However, the 2006 EMR contract (SAC Ex. 1) was signed by both parties. Moreover, plaintiffs' current position is sharply contradicted by their pleading, which (1) affirmatively alleges that the Practice "contracted with Cerner Corp. d/b/a Cerner Physician Practice, Inc." for EMR services in 2006, SAC ¶ 17; (2) affirmatively alleges that the Practice "contracted with Cerner Solutions for Cerner Solutions and Cerner Corp. to provide billing services by submitting a signed sales order to Cerner Corp." in 2014, *id*. ¶ 39; and (3) asserts a claim for breach of "the contract." *Id*. ¶¶ 135-38.

made no other findings that could support a determination that the discovery sought would be disproportional to needs of the case. *Id*. at 6-7.

"The standard for measuring the value of [the claimant's] services, of course, is the amount for which the services and materials supplied could have been purchased from one in [the claimant's] position at the time and place the services were rendered." *Scaduto v. Orlando*, 381 F.2d 587, 595 (2d Cir. 1967). If the law recognizes more than one way to estimate this amount in a given case, damages discovery need not be limited to the method chosen by the plaintiff (or, as here, the counterclaimant). *See* Order dated May 22, 2020 (Dkt. No. 89) at 4-5; *DG&A Mgt. Servicess., LLC v. Securities Indus. Assn. Compliance & Legal Div*., 76 A.D.3d 1316, 1319, 910 N.Y.S.2d 242 (3d Dep't 2010) ("the fact that plaintiff has elected to employ [a] particular methodology does not foreclose other avenues of proof") (internal quotation marks omitted). However, plaintiffs have failed to show that that defendants' costs incurred in providing plaintiffs with EMR services bears any relationship to the amount for which those services – or comparable services – "could have been purchased from one in [Cerner's] position at the time and place the services were rendered." *Scaduto*, 381 F.2d at 595.

In the construction industry, where it is "customary" to price a job based on "actual job costs plus an allowance for overhead and profit," it is also customary to calculate quantum meruit damages in that manner. *See Najjar Indus., Inc. v. City of New York*, 87 A.D.2d 329, 331-32, 451 N.Y.S.2d 410, 413 (1982), *aff'd sub nom. Najjar Indus., Inc. v. City of New York (Greenpoint Incinerator)*, 68 N.Y.2d 943, 502 N.E.2d 997 (1986) (collecting cases); *accord Maris Equip. v. Morganti, Inc.,* 163 F.Supp.2d 174, 186 (E.D.N.Y.2001).[6] In many service

---

[6] In such cases, the damages calculation may include "overhead" as well as "direct costs" if "specific evidence" of such costs is presented. *Aniero Concrete Co. v. Aetna Cas. & Sur. Co.*, 2002 WL 31410641, at *1 (S.D.N.Y. Oct. 25, 2002).

11

industries, however, the "customary" manner of determining value – and hence, quantum meruit damages – is an "hourly rate for the amount of time services are rendered." *Carlino v. Kaplan*, 139 F. Supp. 2d 563, 565 (S.D.N.Y. 2001) (consulting services); *accord Lebetkin v. Giray*, 2020 WL 1445752, at *8 (S.D.N.Y. Mar. 25, 2020) (consulting services); *Wong v. Michael Kennedy, P.C.*, 853 F. Supp. 73, 81-82 (E.D.N.Y. 1994) (legal representation); *Brennan Beer Gorman/Architects, LLP v. Cappelli Enterprises, Inc.*, 85 A.D.3d 482, 484, 925 N.Y.S.2d 25, 27 (1st Dep't 2011) (architectural and engineering services).[7] In other fields, where commission structures or other "clear and accepted market place conventions" prevail, those conventions also govern the calculation of quantum meruit damages. *Carlino*, 139 F. Supp. at 565; *see also Thomas J. Hayes & Assocs., LLC v. Brodsky*, 101 A.D.3d 1560, 1562–63, 957 N.Y.S.2d 473, 475-76 (3rd Dep't 2012) ("In real estate transactions, the value of the services rendered are routinely measured as a percentage of the sale price, as opposed to the number of hours expended to broker the deal.")

There is no evidence in the record before me that EMR service providers customarily price their product based on "costs and profits," which is how plaintiffs describe their proposed valuation methodology. Pl. Reply Mem. at 6. Nor have plaintiffs otherwise shown that "costs and profits" is an appropriate valuation method for the complex package of hardware, software and services that comprises Cerner's "EHR solution." Def. Corr. Mem. at 11 n.5. In their briefs, plaintiffs rely heavily on *DG&A* (which involved seminar management services provided to an industry association) for the proposition that "financial documents demonstrating the actual costs

---

[7] In *Brennan Beer Gorman/Architects*, the court rejected the argument that plaintiffs could not recover in quantum meruit without "itemized billing records," noting that "[t]here are other means of establishing the reasonable value of services rendered, including the plaintiff's invoices," "evidence of the number of hours of service rendered," and "the affidavit of a licensed architect who, based on his review of the record, opined that plaintiff's schematic design work had a fair market value of at least $1.3 million." 85 A.D.3d at 484, 925 N.Y.S.2d at 27.

incurred by plaintiff in providing services to defendant were relevant in ascertaining the reasonable value of the services plaintiff rendered." 78 A.D.3d at 1318, 910 N.Y.S.2d at 244. *See* Pl. Corr. Mem. at 2-3; Pl. Reply Mem. at 6. This was indeed the ruling of the trial court in *DG&A*, which the Appellate Division upheld. However, New York trial courts – like this Court – are vested with "broad discretion in overseeing the discovery and disclosure process," 78 A.D.2d at 1318, 90 N.Y.S.2d at 244, and the defendant had failed to timely object to the challenged discovery demand; thus, the question before the Appellate Division was limited to "whether the requested material is privileged . . . or the demand is palpably improper." *Id*. (internal quotation marks and citation omitted). Here, by contrast, plaintiffs must establish that my initial ruling constituted "clear error" or would lead to "manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov,* 729 F.3d at 104. Moreover, the plaintiff in *DG&A* opened the door to discovery of its financial documents by estimating its quantum meruit damages at $1.6 million based on "industry ratios" which required analysis of "a lengthy list of revenue and expense components, including, among other things, costs incurred for salaries, benefits, taxes, occupancy, telephone, office equipment and supplies, postage and travel." *DG&A*, 78 A.D.2d at 1319, 90 N.Y.S.2d at 245. Cerner Solutions, unlike DG&A, has never "placed its actual costs in issue." *Id*. Consequently, I remain unpersuaded that the discovery plaintiffs seek is relevant to its quantum meruit counterclaim.

Even if there were some minimal relevance to the cost information sought, RFP No. 52 would not clear the proportionality hurdle. Not only is the quantum meruit counterclaim worth – at most – a relatively modest $56,383.86 (as of March 2020); the claim comes into play only if the underlying contract is deemed invalid or unenforceable, which seems unlikely given that plaintiffs seek damages for breach of the same contract. *See generally Morgan Art Found. Ltd. v.*

13

*Brannan*, 2020 WL 469982, at *16 (S.D.N.Y. Jan. 28, 2020) (applying doctrine of judicial estoppel to prevent a party from denying "the continuing validity of the same contracts that it has affirmed – and upon which it sues" in a related proceeding). If the quantum meruit claim is tried, moreover, defendants will bear the burden of proof as to damages. According to plaintiffs, they cannot carry that burden, because the contract price, on which they propose to rely, "cannot be used as evidence of value for the quantum meruit claim." Pl. Reply Mem. at 3 (citing *Revson*, 221 F.3d at 69). If plaintiffs are correct, no alternative damages calculation will be required. The "marginal utility of the discovery sought," *Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016), is therefore low, while the potential burden is high – particularly given that RFP No. 52 does not distinguish between the direct and indirect "cost for providing electronic medical records services to Plaintiffs." As written, this request would require Cerner to produce reams of information concerning its operating expenses and/or undertake sophisticated accounting techniques to allocate those expenses to plaintiffs' contract.[8] I therefore conclude, having considered all of plaintiffs' post-decision arguments, that I was well within my discretion when I declined to compel defendants to produce cost documents in response to RFP No. 52.

**RFP No. 59**

Plaintiffs contend that the documents sought in RFP No. 59 ("documents concerning any other doctors, hospitals or other medical providers whose EHR was cut off by Cerner") are probative of defendants' "knowledge" and "intent," and thus "highly relevant" to plaintiffs' promissory fraud, tortious interference, negligence, and conversion claims, as well as their

---

[8] Plaintiffs could, of course, lessen the burden of RFP No. 52 by narrowing it to sublicense expenses or other direct costs. This Court, however, is not required to edit a party's discovery request to make it more palatable, *see*, *e.g*., *Hunnewell v. BakerCorp*, 2018 WL 1505579, at *4 (D. Conn. Mar. 27, 2018) (declining to "re-write" plaintiff's interrogatories), and certainly has no obligation to do so on reconsideration.

demand for punitive damages. Pl. Corr. Mem. at 8-11. Plaintiffs fail, however, to connect the dots between any of these claims and the information they seek.

Plaintiffs' promissory fraud claim, for example, alleges that defendants induced them to enter into the 2014 RCM contract by making various misrepresentations as to Cerner's billing capabilities, compliance, and cost-effectiveness. SAC ¶ 103. The alleged cut-off of Dr. Fung-Schwartz's access to patient medical records – for nonpayment of her bill – occurred two years later, *see id*. ¶ 95, and implicated defendants' EMR services (services that they had been providing to plaintiffs since 2006) rather than the new RCM services that plaintiffs allegedly purchased in reliance on "Cerner's false representations." SAC ¶ 104. The 2016 incident is thus irrelevant to the promissory fraud claim. If defendants also cut off *other* customers' EMR access – for nonpayment of those *other* customers' bills – that evidence would be doubly irrelevant to plaintiffs' promissory fraud claim.

Plaintiffs' tortious interference claim alleges that defendants interfered with Dr. Fung-Schwartz's patient relationships by, among other things, cutting off her EMR access, which prevented her from prescribing medications. SAC ¶ 123. Plaintiffs are correct that, in order to succeed on this claim, they must show that the alleged cut-off amounted to a "crime or an independent tort." Pl. Corr. Mem. at 10. What they fail to explain is how evidence of Cerner's stewardship of *other* customers' EMR could shed light on whether its stewardship of *plaintiffs'* EMR violated any criminal statutes or constituted a tort.[9] Similarly, plaintiffs' conversion claim, which is arguably based, in part, on the alleged cutoff of EMR access, *see* SAC ¶ 117, must stand or fall on defendants' handling of plaintiffs' records, not the records of other customers. Plaintiffs

---

[9] The disconnect between plaintiffs' theory and their actual RFP is particularly jarring here. RFP No. 52 asks for documents concerning all doctors, hospitals, and other medical providers "whose EHR was cut off by Cerner." As written, the request would cover any loss of access, for any reason.

15

likewise fail to connect the dots with respect to their negligence claim, which alleges that defendants violated their "duty . . . to keep medical records available to their [sic] physician." SAC ¶ 141.

The only case that plaintiffs cite for the proposition that "[p]rior similar incidents are discoverable" is *Woelfle v. Black & Decker (U.S.) Inc.*, 2020 U.S. Dist. LEXIS 43308, at *14 (W.D.N.Y. Mar. 12, 2020)), which was a products liability case concerning a miter saw. *See* Pl. Corr. Mem. at 11 n.5. In *Woelfle*, the court permitted limited discovery into miter saw models that were similar to the subject model, nothing that, "Courts typically allow discovery of different models of a product 'if they share with the accident-causing model those characteristics pertinent to the legal issues raised in the litigation.'" *Id.* (quoting *Fine v. Facet Aerospace Prods. Co.*, 113 F.R.D. 439, 441 (S.D.N.Y.1990)). *Woelfle* is inapposite.

Finally, plaintiff cannot justify the discovery she seeks as "relative to the issue of punitive damages." Pl. Corr. Mem. at 10. On the contrary: "to permit punishment for injuring a nonparty victim would add a near standardless dimension to the punitive damages equation," and for that reason is not permitted. *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007). *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) ("Due process does not permit courts . . . to adjudicate the merits of other parties' hypothetical claims against a defendant under the guide of the reprehensibility analysis.").

Even if, as plaintiffs argue, the "degree of Cerner's noncompliance" with its alleged duty to maintain EMR access were relevant to one or more of plaintiffs' claims, Pl. Corr. Mem. at 10, they fail to explain – or even address – why they seek information concerning all of the doctors, hospitals or other medical providers "whose EHR was cut off by Cerner," regardless of the reason for the cutoff – and regardless of whether it was done intentionally or resulted from some

technical malfunction.[10] They also fail to explain why they need "all documents" concerning those other medical providers, which would include the identity of an unknown number of Cerner's nonparty customers and sensitive information about those customers' business arrangements and payment history with Cerner.[11] Even where such information is clearly relevant to a plaintiff's claims, the courts are reluctant to let that plaintiff "invade the confidentiality of private . . . transactions by [customers] not involved in this litigation." *Reed v. Smith, Barney & Co.*, 50 F.R.D. 128, 130 (S.D.N.Y. 1970); *see also Ne. Women's Ctr., Inc. v. Mc Monagle*, 1987 WL 6665, at *3 (E.D. Pa. Feb. 10, 1987) (citing *Reed* for the proposition that "discovery has not been allowed when the information would unnecessarily invade the private records of non-litigants," and denying request for financial records of "several nonparties"). The scope of the request thus suggests strongly that the purpose of RFP No. 59 is not to establish whether Cerner wrongfully cut off plaintiffs' EMR access, but rather to amass "other bad acts" evidence for purposes prohibited by Fed. R. Evid. 404(b).[12]

---

[10] In their moving brief, plaintiffs claim that defendants "will only have to produce the information for instances where Cerner cut off electronic medical records services to doctors *over a fee dispute*." Pl. Corr. Mem. at 10 (emphasis added). In fact, RFP No. 59 demands more.

[11] Plaintiffs made no effort to modify RFP No. 59 until they moved for reconsideration. They now propose that the Court order Cerner to produce (in lieu of "all documents") two "lists" that describe, in detail, "each instance," over a 6-year period, when "any doctor's medical records were cut off by Cerner," either "deliberately for lack of payment" or "inadvertently," for any reason. Pl. Corr. Mem. at 17. Like the original document request, the reformulated discovery proposal would give plaintiffs the names of an unknown number of nonparty customers, together with presumptively confidential information concerning, *inter alia*, their ability to pay their bills when due.

[12] Plaintiffs' response – that information relating to other customers would be admissible as evidence of Cerner's "routine practice," *see* Pl. Reply Mem. at 8 – is unconvincing. "Routine practice" evidence is admissible "to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice." Fed. R. Evid. 406. The purpose of such evidence is to establish that the conduct occurred as alleged "on a particular occasion," Fed. R. Evid. 406 advisory committee's note, not to prove the "degree" of a party's culpability, Pl. Corr. Mem. at 10, or the "intent" with which it acted on that occasion. *Id*.

I therefore conclude, once again, that plaintiffs have failed to establish the relevance of the sprawling discovery sought in RFP No. 59. Even if minimally relevant to plaintiffs' claims, the requested discovery would multiply the issues in this action – leading, inevitably, to collateral litigation as to the circumstances under which other Cerner customers lost their EMR access and quarrels over whether their circumstances were sufficiently comparable to be probative as to plaintiffs' claims – and is therefore disproportional to the "needs of this case." Fed. R. Civ. P. 26(b)(1). *See Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1088020, at *8 (S.D.N.Y. Feb. 12, 2018) (denying discovery motion on proportionality grounds where the documents sought "would inevitably generate collateral disputes"). Additionally, the order that plaintiffs seek would unnecessarily "invade the confidentiality of private . . . transactions by [customers] not involved in this litigation," which is an independent reason for disallowing even relevant discovery. *Reed v. Smith, Barney & Co.*, 50 F.R.D. at 130.

### RFPs No. 57 and 58

Plaintiffs seek a "clarification" that my written order requiring defendants to produce documents in response to RFP Nos. 57 and 58, *see* June 3 Order at 3, covers the same two-year time period (2015-16) specified in my oral ruling, *see* June 2 Tr. at 38:21-39:17, with respect to those RFPs. Pl. Corr. Mem. at 18. That oral ruling remains part of the record of this action, and plaintiffs make no showing that defendants have violated or will violate it. I therefore agree with defendants that there is no need for "clarification." Def. Corr. Mem. at 14.

### Quantum Meruit Order

Finally, plaintiffs request a written order limiting Cerner Solutions's quantum meruit claim to "the period starting with the time in 2015 when Cerner believes Plaintiffs stopped paying" their bill. Pl. Corr. Mem. at 19. During the June 2 conference, defendants' counsel

stipulated, on the record, that defendants were not seeking quantum meruit damages prior to 2015. *See* June 2 Tr. at 14:17-15:15. While the June 3 order does not formally memorialize the full representation made by counsel the prior day,[13] the record is clear, and plaintiffs make no showing that defendants have violated or will violate the limitation to which they agreed. Nor do they explain how Local Civil Rule 6.3 (or any other rule) entitles them to a confirmatory written order as to an issue lacking any live controversy.

## Conclusion

For the foregoing reasons, plaintiffs' motion for reconsideration is DENIED.

Dated: New York, New York
August 21, 2020

**SO ORDERED**.

**BARBARA MOSES**
**United States Magistrate Judge**

---

[13] The written order states that "[d]efendants have confirmed that they do not seek quantum meruit recovery for services provided during the time period covered by RFP No. 21." June 3 Order at 2.