```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   JENNIFER FUNG-SCHWARTZ, MD,

 4                 Plaintiff,

 5          v.                        17 cv 233 (VSB) (BCM)

 6   CERNER CORPORATION, et al,

 7                 Defendants.

 8   ------------------------------x
                                      New York, N.Y.
 9                                     August 27, 2020
                                      11:20 a.m.
10
     Before:
11
                      HON. BARBARA C. MOSES,
12
                                      Magistrate Judge
13
                         APPEARANCES
14
     ELIZABETH SHIELDKRET
15        Attorney for Plaintiff

16   PEAK LITIGATION LLP
     BY:  PATRICK FANNING
17         -AND-
     HEIDELL, PITTONI, MURPHY & BACH, LLP
18        Attorneys for Defendants
     BY:  LAURA ANNE DELVECCHIO
19

20

21

22

23

24

25
```

```
1              (Case called)

2              THE DEPUTY CLERK:  Counsel, will you please make your

3     appearances, beginning with plaintiff.

4              MS. SHIELDKRET:  Elizabeth Shieldkret for plaintiff.

5              THE COURT:  Good morning, Ms. Shieldkret.

6              MS. SHIELDKRET:  Good morning, your Honor.

7              MR. FANNING:  Patrick Fanning for defendants.

8              THE COURT:  Good morning, Mr. Fanning.

9              MS. DEL VECCHIO:  Laura Anne Del Vecchio for the

10    defendants.

11             THE COURT:  Good morning, Ms. Del Vecchio.

12             Counsel, Let me remind you.  I don't think that the

13    court reporter with any of your last names because are counsel

14    of record.  But let me remind you as we go forward, for the

15    benefit of both me and our court reporter, that when you

16    mention proper names, including companies and individuals, you

17    should spell them the first time that you mention them so that

18    we get a clear record.

19             In addition, the court reporter can hear you, but I

20    don't think she can see you.  So if you haven't spoken for a

21    while, please reintroduce yourself so that the transcript

22    accurately reflects who is saying what.

23             We are together this morning for yet another discovery

24    dispute or group of discovery disputes.  Let me tell you what I

25    have reviewed.  I have reviewed the defendants' letter
```

application for a protective order with regard to the 30(b)(6)

depositions at document 117 and a responding letter brief at

docket number 118.  That is what I referred to as the 30(b)(6)

motion.

I have also received and reviewed the plaintiff's

letter application at docket number 119 with respect to billing

data that plaintiff wishes to have produced in electronic form

and the defendants' responding letter brief at docket number

120.

Last but not least, I have reviewed the parties' joint

letter, which is dated August 25 but was filed August 26, at

docket number 124 and its attachments.  I will note at the

outset that my order of August 21, which is at docket number

122, asked the parties to file that joint letter in order to

tell me "which of the discovery disputes remain pending."  The

reference to "the discovery disputes" was a reference to the

discovery disputes outlined in the first two motions.

However, the joint letter appears to introduce yet a

third discovery dispute.  This one is introduced by the

plaintiff who takes about a page of the four-page joint letter

introducing and arguing a new dispute having to do with

potential witnesses, newly disclosed.  Well, not to newly

disclosed.  Disclosed on July 31 by the defendants.

I am going to put any discussion of that subject off

until we get through the two motions that I asked the parties

1   to update you on their positions.  And when we get through

2   those two motions, we will then circle back to determine

3   whether anything should be done on the third issue and, if so,

4   what should be done.

5         I had been hoping when I asked for the joint letter --

6   I always hope, no matter how slim my hope is.  I had been

7   hoping when I asked for the joint letter that the parties would

8   have resolved or at least narrowed some of their disputes.  My

9   hopes have, once again, been dashed.

10        So let us start with the 30(b)(6) dispute, which first

11  came in in the form, as I mentioned, of a protective order

12  request from the defendants.

13        Whose motion is this for the defendants?

14        MR. FANNING:  Your Honor, it's Pat Fanning, me.

15        THE COURT:  That's yours.  I note that you asked in

16  your opening letter for a protective order under Rule 26(c)(4).

17  There isn't any Rule 26(c)(4), at least not at the moment.  I

18  think you mean Rule 26(c)(1)(D), if I'm not mistaken.

19        If you could just confirm for me who you have agreed

20  to produce as to what issues on 30(b)(6) and, consequently,

21  where the points of dispute are.

22        MR. FANNING:  Yes, your Honor.  This is Pat Fanning on

23  behalf of Cerner, as well as Cerner Corporation.

24        Your Honor, I apologize.  I apparently got the wrong

25  reference within Rule 26.  I assume that the Court's reference

1    is correct.

2            THE COURT:  I mention that merely for your

3    edification.  I'm not focused on that.

4            MR. FANNING:  I must confess I get lost in Rule 26

5    sometimes.  Apparently I don't quite get the numbers correct.

6            Your Honor, we've agreed to produce witnesses -- if

7    the Court is okay with it, I will just walk through each of the

8    four topics that are at issue.

9            We've agreed to produce witnesses on all four of the

10   topics.  It's just the overbreadth of the topics themselves

11   that creates a problem for the defendants.

12           We had a meet-and-confer conference with plaintiff's

13   counsel on July 23 to try to narrow the topics down.

14           THE COURT:  I'm going to ask you to pause for one

15   minute, Mr. Fanning.  I'm getting a fair amount of noise.  I

16   have a feeling that perhaps one of the other counsel is writing

17   or typing or doing something while listening, which is fine.

18   But it would be helpful for you to mute your mike while

19   multitasking until it's time for you to speak.

20           Go ahead, Mr. Fanning.

21           MR. FANNING:  Thank you, your Honor.

22           So we had a meet-and-confer phonecall on July 23.  The

23   Court may recall that on July 24, we had not reached a

24   resolution with plaintiff's counsel, but plaintiff's counsel

25   had filed a document with the Court identifying topics in the

     1    30(b)(6) motion.  And it was not found to be in compliance with

     2    the Court's local rules.  So we ultimately filed a motion for a

     3    protective order, which was our intent the entire time.

     4            In any event, category number 1, plaintiff asks for

     5    contracts and sales orders between plaintiff and any defendant,

     6    including which defendant was outside contractor was

     7    responsible for performing each of the services and contract

     8    management.

     9            So based upon our conversation with plaintiff's

    10    counsel on July 23, we had agreed to produce a witness to talk

    11    about defendants' contract management system.

    12            We had agreed to produce a witness to testify about

    13    which persons or person and who they were employed by within

    14    the two defendants would be responsible for roles within each

    15    of the contracts.  And we had agreed to produce information, to

    16    the extent plaintiffs needed it, about third-party contractors,

    17    such as the Court may call, we talked about TriZetto.

    18            THE COURT:  Right.

    19            MR. FANNING:  For those items we would produce

    20    witnesses, to the extent plaintiff needed, to talk about what

    21    those various third parties would provide.  We thought that was

    22    within the scope of the case.  We thought that was relevant.

    23            Where things got challenging was plaintiff's counsel

    24    indicated that plaintiff's counsel wanted us to basically offer

    25    a witness to basically testify about all the contracts.

1              From our perspective, there is no breach of contract

2     action with respect to any contract, other than the business

3     office services or BOS sales order that plaintiff business

4     office services ––We would agree to produce a witness to talk

5     about the terms of that BOS sales order.

6              Defendants take the position, and have taken the

7     position throughout this litigation, that plaintiffs do not

8     have any complaint with the electronic medical contracts or

9     sales orders.  And that is EMR for short.  We would suggest

10    that that is not within the scope of plaintiff's pleading.

11             Additionally, plaintiff's witness, Dr. Jennifer

12    Fung-Schwartz, who is the named plaintiff in this case,

13    testified that she had no problem with Defendants' EMR

14    contracts.

15             So we think this is fairly straightforward.  We would

16    like to be able to produce witnesses on the topics we

17    identified, and we do not see a need to get into a discussion

18    of anything other than the BOS sales order.  So that's topic

19    one.

20             THE COURT:  Let's stop there, and I will give

21    Ms. Shieldkret an opportunity to address topic one.

22             I guess the main question for you, Ms. Shieldkret, is:

23    How is it both relevant and proportional for you to take

24    Rule 30(b)(6) testimony with respect to what the parties have

25    referred to as the EMR contract?

 1           MS. SHIELDKRET:  So there are at least two reasons:

 2    The first is defendants are asserting that there is a

 3    limitation of liability clause, and that clause on its face

 4    says it's the sum of all the payments she's made for any of the

 5    contracts.

 6           Judge Broderick has reserved judgment on that, and he

 7    noted in his ruling that there is a conflict between the

 8    limitation of liability clauses in the various contracts.

 9           And that's what he said:  "I decline to rule at this

10    stage regarding the applicability of the limitation of

11    liability clause contained in the 2014 agreement, particularly

12    in light of potentially conflicting liability clauses in that

13    agreement, the 2006 agreement, or other contracts agreed to by

14    the parties."

15           That's docket 49, page 29.

16           THE COURT:  I'm not sure I understand what the

17    argument is.  The limitation of liability issue was raised by

18    the defendants.

19           Is that correct?

20           MS. SHIELDKRET:  Yes, your Honor.

21           THE COURT:  As a potential limitation of their,

22    monetary liability as to what?  Your contracts?  Your tort

23    claims?  All your claims?

24           MS. SHIELDKRET:  There I believe they are saying it's

25    all the claims.  I don't believe that's true, but I believe

 1    that's what they're pleading.

 2              THE COURT:  All right.  What would a 30(b)(6) witness

 3    have to say about this?

 4              MS. SHIELDKRET:  They may explain how they, the

 5    different contracts, which is the main contract and which one

 6    is under the contract, which one they consider to be the

 7    dominant contract.

 8              But the other issue is the first contract, the 2006

 9    contract, which is the EMR --

10              THE COURT:  That's the one attached to your second

11    amended complaint as Exhibit 1?

12              MS. SHIELDKRET:  Exhibit 1, yes.  That contract says

13    anything else, any sales order, has to be signed by Cerner to

14    become effective.  And there is a series of sales orders that

15    are not signed, including the 2014 sales order that defendants

16    claim is at issue in this case.

17              THE COURT:  Wait.  Ms. Shieldkret, it's not just the

18    defendants' claim that's at issue in this case.  You have sued

19    on the 2014 contract as well.  And you, meaning plaintiff, have

20    repeatedly alleged that that's a contract.

21              Isn't that right?

22              MS. SHIELDKRET:  No, your Honor.  We thought -- when

23    we pleaded, we thought Cerner had signed it, but they have not.

24    And what we don't want to be in a position, because there are

25    other contracts where they also have not signed it, a position

```
 1    of them being able to say they have a pattern or practice of

 2    signing these things, because we already have a series of them

 3    where they have not signed them.

 4            So we'd like to be able to ask -- and counsel has said

 5    they can't find signed copies of any of these.  So we'd like to

 6    be able to ask the witness and know before trial whether they

 7    were going to say they were signed but lost or they were never

 8    signed or whether they were going to say there was a pattern

 9    and practice of signing these things.

10            So even sales that are not the subject of the

11    complaint are still relevant evidence for whether there was a

12    pattern or practice.  That's one of the things we want to ask

13    about.

14            THE COURT:  Ms. Shieldkret, you have a breach of

15    contract claim in your second amended complaint which remains

16    live for summary judgment or trial.

17            Correct?

18            MS. SHIELDKRET:  Yes.  Based on the 2006 contract that

19    is signed.

20            THE COURT:  The 2006 contract doesn't say anything

21    about BOS services and doesn't contain any promises by either

22    defendant to handle your billing and collections, and it

23    doesn't cover any of the services that you claim the defendants

24    failed adequately to perform and for which you are seeking

25    several hundred thousands worth of damages.
```

1        Isn't it a little late in the day for you to say that

2   wasn't really a contract and you're suing on some contract that

3   was entered many years earlier and didn't contain any of those

4   terms?

5        You can't have it both ways.  If you're suing for

6   breach of the contractual promises made in 2014, then it's a

7   contract.  Make up your mind.

8        MS. SHIELDKRET:  No, your Honor.  We found out during

9   discovery that it wasn't a contract.

10       THE COURT:  Are you prepared to drop your breach of

11  contract claim?  Do you want to dismiss that?

12       MS. SHIELDKRET:  No, your Honor.  The only contract is

13  the 2006 contract.  What that says is you can have these other

14  sales orders.  There is no other contract.

15       There is only one contract in the case.  The other

16  things are sales orders.  And what we learned in discovery thus

17  far is that the 2014 sales order was never executed.

18       So by definition under the terms of the 2006 contract,

19  which controls everything that comes subsequently, all the

20  subsequent interactions between the parties, the 2014 sales

21  order is not a contract.

22       THE COURT:  So what is it?  What are you suing for

23  breach of?

24       MS. SHIELDKRET:  The 2006 contract.

25       THE COURT:  What in the 2006 contract says that Cerner

1    was going to process your Medicaid and other insurance claims

2    and collect your receivables and all that stuff?

3         MS. SHIELDKRET:  What it says is that Cerner will

4    provide services, if she agrees to them, if Cerner agrees to

5    them.  And they never did that.  What we have now is an issue.

6    I don't know -- this is why we need a 30(b)(6) deposition.

7         I don't know if they're going to come in and say, no.

8    The 2014 sales order was actually signed and there is a

9    contract.

10        THE COURT:  But you haven't answered my question,

11   which is a little more fundamental.

12        What are you suing for breach of?  You have a breach

13   of contract claim.

14        What are you suing for breach of?  Because if you are

15   going to tell me that there is no contract, no enforceable

16   contract under which Cerner was required to provide you with

17   BOS services, with billing and selection services, then that

18   claim is going to have to go.

19        MS. SHIELDKRET:  And what I'm saying is I can't make

20   that determination until I find out whether Cerner signed the

21   2014 sales order.

22        THE COURT:  And if it didn't sign the 2014 sales

23   order, will you be dismissing your breach of contract claim?

24        MS. SHIELDKRET:  We will be pursuing other claims

25   that -- I don't think I should have to decide that on this

1   call.  I think I should have the full information, and then we

2   can make that determination.

3          We are pleading in the alternative on the 2014, just

4   like on the same contract, defendants are pleading in the

5   alternative.

6          THE COURT:  What's your alternative claim,

7   Ms. Shieldkret, to the breach of contract claim on the billing

8   and collection services?

9          MS. SHIELDKRET:  We have a negligence claim, a

10  conversion claim, a fraud claim.  She was induced to turn over

11  the information and the claims to them.  And they didn't do the

12  thing they told her they would do.

13         THE COURT:  Sure.  But let's think about this for a

14  minute.  Let's think this through.  On your fraud claim, it's

15  fraud in the inducement.

16         If you prevail on fraud in the inducement claim, then

17  you're entitled to be put in the position you would have been

18  in, had you never entered into the -- I'm going to use the word

19  "contract" -- you're not  to contract damages.

20         That is, you're not entitled to be in the position you

21  would have bee put in, had they adequately performed on the

22  contract, which you claim you were induced to entered into.  So

23  that doesn't duplicate your contract claim or your contract

24  damages.  And I'm not sure that any of your other claims do

25  either.

1          What concerns me here is I have always thought, in the

2    months that I have been supervising discovery and other

3    pretrial matters in this case that, that your primary claim,

4    the claim that carries your most substantial items of damages,

5    at least as you explained those damages to me some months go

6    when I first asked, was your claim for breach of the 2014 BOS

7    contract?

8          And if your case is going to be a very, very different

9    case, fact discovery was supposed to have concluded.  It's

10   awfully late in the day for that to be happening.

11        MS. SHIELDKRET:  The information that we need to make

12   that determination is entirely within Cerner's control.  The

13   documents we have are not the documents that we thought

14   existed, and they're telling us they can't find other

15   documents.  So I want to take testimony to find out what Cerner

16   says happened when that sales order got returned to them.

17        THE COURT:  So the additional 30(b)(6) topics, as I

18   now understand them -- and I thank you, Ms. Shieldkret, because

19   until this moment, I'm not sure I did understand that that was

20   the issue.

21        Mr. Fanning, it appears that the plaintiff wishes to

22   take 30(b)(6) testimony concerning the status of what

23   Ms. Shieldkret has referred to as sales orders, whether they

24   were or weren't signed, whether they were signed but cannot be

25   produced, whether they were not signed.  And it sounds like she

1    wants to hear whether Cerner thought that enforceable contracts

2    were formed with respect to those sales orders.

3            It also sounds like she wants to take testimony,

4    although, I'm not sure this is a fact issue.  It sounds like a

5    legal issue to me.  But it sounds like plaintiffs want 30(b)(6)

6    testimony with respect to the limitation of liability clauses

7    and which of them -- I don't want to put words in

8    Ms. Shieldkret's mouth -- which of them dominate.

9            Your response?

10           MR. FANNING:  Your Honor, the first time I heard about

11   this limitation of liability issue was during this call.  We

12   had a meet-and-confer call on July 23 where that probably

13   should have come up, if it was something she wanted.

14           From defendants' perspective, the limitation of

15   liability issue is a legal question, and which one applies is a

16   legal question.  And there is no Cerner witness, save me, who

17   is going to be able to offer an argument as to which limitation

18   of liability applies.  I'll be happy to do it in a legal brief

19   at the appropriate time.

20           THE COURT:  I take it you're not going to call

21   yourself as a witness, Mr. Fanning.

22           MR. FANNING:  I don't think so, your Honor.  But that

23   is entirely a legal question.  So there is no witness who is

24   going to be able to opine on which one would apply.  And,

25   frankly, it would not be helpful to the Court anyway because

1    it's entirely a legal question.

2          As for the issue with respect of the signed sales

3    order, Cerner had already agreed to produce a witness on

4    contract management, we which interpreted to mean what do we do

5    when we receive a signed sales order.

6          And we already agreed with Ms. Shieldkret that we

7    would provide that testimony on July 23.  So I'm not sure what

8    the remaining issue is with respect to defendants' position

9    because we already aid we would provide somebody on contract

10   management.  The answer is simple.

11         THE COURT:  And that contract management witness will

12   be prepared to answer the questions that Ms. Shieldkret just

13   proposed, including, for example, whether each of the relevant

14   sales orders here was signed.  If so, what happened to it; and

15   if not, what Cerner believes the implications of that are.

16         MR. FANNING:  Yes, your Honor.  That was always our

17   understanding -- and they are not signed, and there is no

18   question about that.  It's not a dispute.  It's not something

19   Ms. Shieldkret is just learning today.  She has the documents

20   we produced, which did not include signed 2014 BOS sales

21   orders.  It's not a surprise.

22         THE COURT:  And you're telling me that you did not

23   produce signed BOS sales orders because they weren't signed,

24   not because they were signed and mislaid, for example.

25         MR. FANNING:  That's correct.  It's Cerner's policy.

1      We're happy to have it described to Ms. Shieldkret on the

2      record, but it's not a surprise because we don't have them and

3      we never did have them.

4              THE COURT:  All right.

5              MS. SHIELDKRET:  Your Honor.

6              THE COURT:  Yes, ma'am.

7              MS. SHIELDKRET:  Two things:  First of all, the exact

8      language that I quoted to you from Judge Broderick's opinion

9      was cited in my July 23, 2020, email to Mr. Fanning about the

10     limitation of liability clause.

11             But what we're talking about is which contracts had

12     the limitation of liability clauses.  But we're also talking

13     about not just the 2014 BOS contract.  Mr. Fanning just

14     mentioned the word "Cerner's" policy.

15             What we're saying is there are other sales orders

16     during the course of this relationship that Cerner also never

17     seemed to have been signed.  It's not a one off.

18             THE COURT:  Are those sales orders in issue?  That is,

19     in other words, is there a claim that they were breached?

20             MS. SHIELDKRET:  No.  It's a Rule 406 issue of whether

21     there's a pattern or practice.  We don't get to trial and have

22     them say what he just said, Cerner's policy, without having had

23     some testimony about that there actually were numerous sales

24     orders that never got signed by Cerner.

25             THE COURT:  It sounds to me like that's exactly what

1   the testimony is going to be.  It sounds to me that this

2   witness --

3          Who is the witness who is going to handle this issue,

4   Mr. Fanning?

5          MR. FANNING:  On that one, it's John Richie.

6          THE COURT:  John Richie.  It sounds to me that what

7   Mr. Richie is going to say is that not only was the 2014 sales

8   order not signed, but that Cerner generally -- I don't know if

9   generally or always.  I'm not Mr. Richie.  I don't know what he

10  knows -- but that Cerner's policy was not to get those things

11  signed.

12         Is that correct, Mr. Fanning?

13         MR. FANNING:  Yes.  Let me make a quick correction.

14  Mr. Richie is on another topic.  I apologize.  I just threw

15  that out off the top of my head.  We've got to find the name of

16  the other individual, and we will do that.

17         THE COURT:  But Mr. or Ms. Contract Management Witness

18  is going to, in effect, agree with what plaintiffs think was

19  going on, which is to say that Cerner routinely did not have

20  these sales orders signed.

21         MR. FANNING:  That's correct, as a matter of practice.

22         THE COURT:  Ms. Shieldkret, whether you did or did not

23  raise the limitation of liability issue in an email, you didn't

24  raise it until today.  It's not in your joint letter, and it's

25  not in your August 4 letter at docket number 118.

1          MS. SHIELDKRET:  That email was filed with the Court

2     at docket 117-3.

3          THE COURT:  Thank you.

4          It does appear to be a legal issue rather than one

5     that a fact witness could address.  I'll also add, so I don't

6     have to say it on each topic, but there is an underlying

7     problem with respect to all of these 30(b)(6) disputes, which

8     is that the 30(b)(6) notice was not served until very late in

9     the fact discovery, I think about nine or ten days before the

10    fact discovery cutoff.  And that is not a helpful fact to the

11    plaintiffs.

12         Now, as it has --

13         MS. SHIELDKRET:  Your Honor, we consented to an

14    extension --

15         THE COURT:  Ms. Shieldkret, please don't interrupt the

16    Court.

17         MS. SHIELDKRET:  Okay.

18         THE COURT:  Now, that is going to turn out not to be

19    the dispositive factor here because as a result of the parties'

20    inability to agree on what day of the week it is, we are now

21    having this significantly post-fact discovery/closed discovery

22    conference on this and other matters, and I'm going to have to

23    end up extending deadlines.

24         However, when I set those deadlines to begin with,

25    including the fact discovery deadline at the end of July, I

1  expected counsel to get all of their discovery notices and

2  requests out sufficiently in advance of those deadlines to

3  allow the opposing party to respond.

4       And it generally does take more than a week and a half

5  to respond adequately to a complex, multi-part 30(b)(6)

6  deposition notice.  So that is by way of backdrop.

7       With respect to topic 1, as long as the contract

8  management designee testifies as to the issues that Mr. Fanning

9  has just outlined, including specifically whether the 2000

10  sales order was or was not signed and, more generally, Cerner's

11  policies and practices regarding signing or not signing sales

12  orders, I will not require the defendants to produce or further

13  or other witness with respect to different or further or other

14  topics under number one.

15       Let's go on to the next topic, which is in dispute.

16  The second topic in dispute is what the parties have sometimes

17  referred to as HHS FAQ, standing for frequently asked

18  questions, 2074 or more generally HIPAA compliance.

19       What's in dispute here?

20       MR. FANNING:  Your Honor, this is Pat Fanning again.

21  On topic number 2, defendants would agree to produce a witness

22  concerning its interpretation of this September 2016 HIPAA FAQ

23  2074, which we believe was issued in late September of 2016.

24       THE COURT:  Now just to catch me up here, number 2074

25  is the one cited by plaintiffs for the proposition that you

1    shouldn't be cutting off access to EMR over billing disputes.

2         Correct?

3         MR. FANNING:  That's correct, your Honor.  So we've

4    agreed to produce a witness to testify concerning that

5    particular issue, which is, to our understanding, the issue

6    that has been put in controversy in the case by plaintiff's

7    negligence claim.

8         The challenge we have with plaintiffs is this second

9    tail to the corporate representative notice which says:

10   "And/or HIPAA compliance."  As the Court is well aware, HIPAA

11   is a very broad statute.  We are an electronic health records

12   company with more than 25,000 associates.  We have extensive

13   HIPAA requirements that we follow.

14        As a result, we believe that plaintiff's request is

15   overly broad, outside the scope of the relevant issues in the

16   lawsuit, and seeks to get testimony about issues that, frankly,

17   we don't even know how to prepare for.

18        So we have asked that the Court issue a protective

19   order to restrict the discussion to the issue in the lawsuit,

20   which is HIPAA FAQ 2074.

21        THE COURT:  When I look at counsel's letter dated

22   August 4 on this subject, I see that Ms. Shieldkret identifies

23   three questions that she seeks to investigate at the 30(b)(6)

24   deposition on this point.

25        Going from the bottom up, one of them is Cerner's

1    procedures, policies, and practices, both before and after FAQ

2    2074, concerning changing a doctor's access to medical records

3    when there is a fee dispute.  I think that one is covered.

4            Are you prepared to have your witness testify about

5    before and after, as well as the interpretation of 2074?

6            MR. FANNING:  Yes, your Honor.  We put that within the

7    discussion of 2074.

8            THE COURT:  All right.  She also wants -- I'm sorry.

9    This is at the tail end of her paragraph.  I should have

10   mentioned it earlier, if I was going from the bottom to the

11   top.  The training that Cerner personnel received concerning

12   changing a doctor's access to medical records.

13           Will that be included with your witness?

14           MR. FANNING:  No, your Honor.  From our perspective,

15   we don't know what that necessarily means.  We had a protocol.

16   We produced a witness, Jeff O'Hare, who testified about

17   Cerner's practices, as well as the training that would be

18   received is one that, frankly, we don't know.  That is

19   overbroad from our perspective.

20           If the training is about HIPAA FAQ 2074, we are happy

21   to have a witness who can testify about whether there was

22   training -- and we believe there was not -- from that late

23   September date to October 13, 2016, which was about a two-week

24   window there.  So if that's about HIPAA FAQ 2074, we'll talk

25   about it.  But if it's just general training, that's more

1    challenging for us.

2         THE COURT:  In the August 4 letter, Ms. Shieldkret

3    states that she wants to know the circumstances surrounding

4    Cerner's failure to produce a signed business associates

5    contract.  I don't actually know what that means.

6         What does that have to do with HIPAA compliance,

7    Ms. Shieldkret?

8         MS. SHIELDKRET:  Yes.  That's part of Exhibit 1 to the

9    complaint.  A business associate contract is the contract under

10   HIPAA that gives Cerner the right to access the

11   patient-protected data.

12        So that's the mechanism between the doctor and the

13   company that is completely governed by HIPAA for how the data

14   will be handled.  So that's related to improper -- it actually

15   says it will only -- for example, Cerner will only do certain

16   things with the data, and it does not include turning it off if

17   you don't pay your bill.

18        But it's the governing document for HIPAA compliance.

19        THE COURT:  I'm not sure what the "it" was in your

20   last sentence, Ms. Shieldkret.  "It" says this, and "it" says

21   that.

22        MS. SHIELDKRET:  The business associates contract is

23   the governing document for HIPAA compliance.  It's a standard

24   contract that is drafted by HHS essentially.

25        THE COURT:  And you're saying that it should have been

1   included back in 2006 in Exhibit 1 and it wasn't?

2           MS. SHIELDKRET:  No.  What we're saying is it's

3   another example of a document that Cerner didn't sign.  So we

4   want to know what Cerner's HIPAA compliance procedures are if

5   you could end up with a document that they're supposed to sign

6   for HIPAA purposes that didn't get signed.

7           THE COURT:  All right.  I'm trying to follow the

8   reasoning here.

9           Where does this fit in?  I'm taking a look now at the

10   second amended complaint.  Give me a moment.  I'm looking at

11   Exhibit 1 of the second amended complaint, which is the 2006

12   contract.

13           Correct?

14           MS. SHIELDKRET:  Yes, your Honor.

15           THE COURT:  And there is a business associates -- what

16   do you call it?  A business associates -- is this a business

17   associates contract?  Or is it incorporated within this

18   somewhere?

19           MS. SHIELDKRET:  I believe it's the last three pages

20   of the document.

21           THE COURT:  The one that says business associate

22   contract.  Okay.

23           MS. SHIELDKRET:  Yes, your Honor.

24           THE COURT:  Looking at that now, it is a business

25   associate contract entered into, it says, on this 24 day of

1       March 2006, between Jennifer Fung -- I take it that was her

2       name at the time -- and Cerner Physician Practice, Inc.

3              It contains several pages of provisions, and it

4       appears to be signed at the bottom by Jennifer Fung-Schwartz

5       using both last names.  And it does not appear -- at least this

6       copy does not appear -- to be signed by Cerner Physician

7       Practice.

8              Now tell me how that relates to your claims.

9              MS. SHIELDKRET:  Sure.  So, for example, the standard

10      of care for the negligence claim -- and the Court has said you

11      can use HIPAA to determine the standard of care.

12             One of the things that shows an inattention to their

13      duties under HIPAA is the failure to sign that document or the

14      failure to retain a signed -- that's one of the things we want

15      to know, if they did sign it but they lost it.  That's not a

16      sales order, and it goes to how seriously they take their

17      obligations under HIPAA.

18             So we'd like to be able to ask about it because a core

19      function of this company is to handle protected patients' data.

20      Why wouldn't they be signing a business associates agreement.

21      She thought that they had.  So it's part of the inducement for

22      her to turn over that patient information to them in the first

23      place.

24             If they don't have a signed agreement, then when they

25      gave that information to third parties they didn't protect --

1   the information may not have been protected in that chain.

2   That's what we're trying to determine.

3        THE COURT:  All of this would seem to have more

4   traction, Ms. Shieldkret, if the defendants were taking the

5   position that they somehow either were not bound by HIPAA or

6   were not bound by this business associate contract.

7        Is that your contention, Ms. Shieldkret?  Is that what

8   you're dealing with here?

9        MS. SHIELDKRET:  No.  What I'm saying is that it's an

10  indication of a systematic failure to comply with HIPAA, just

11  like the failure to comply with FAQ 2074.  From the very

12  beginning of the relationship to the end of the relationship,

13  they had a disregard for the controlling law for protecting

14  patients.  And the end of that was they cut off the services to

15  the patients.

16       But I actually want to go back and just qualify

17  something on FAQ 2074.  FAQ 2074 did not change the law.  It

18  was an interpretation.  It's concerning regs that existed when

19  this contract was signed.

20       So it is not a two-week period.  It is what Cerner's

21  understanding was of those regulations that are interpreted in

22  FAQ 2074.  That predates when that FAQ came out.

23       THE COURT:  Getting back to this unsigned business

24  associate contract, is it your contention, Ms. Shieldkret, that

25  HIPAA requires Cerner to sign it, or HIPAA requires Cerner to

1   comply with it?

2          MS. SHIELDKRET:  HIPAA requires Cerner to comply with

3   it, but it also required them to maintain the records that

4   showed they complied with it, and that's a failure to comply

5   with HIPAA.

6          THE COURT:  All right.  Mr. Fanning, it sounds like

7   Ms. Shieldkret wants a witness as to whether the business

8   associate FAQ was signed or not and, if not, whether that was

9   SOP at Cerner.

10          MR. FANNING:  Yes, your Honor.  I would like to

11   clarify a few of the things that Ms. Shieldkret said, just to

12   make sure it's clear for the record.

13          The business associates agreement, signed or unsigned,

14   is the provider's duty.  The provider has to have a business

15   associates agreement before the provider shares information

16   with a third party.

17          So to the extent there is a suggestion in this case

18   that the lack of a signed business associates agreement is

19   Cerner's fault or responsibility, that is actually undermined

20   by HIPAA, which requires the provider to keep the signed

21   version.

22          The fact that Dr. Fung-Schwartz did not have a signed

23   version from Cerner, to the extent she is making this argument,

24   Dr. Fung-Schwartz would be the one who would be at potential

25   risk for letting information go to a third party without having

1    appropriate safeguards.

2          With that said, Cerner obviously abides by the

3    business associates agreement, follows it, and has always

4    followed it, indeed to the extent that it follows FAQ 2074.

5          Where it gets confusing for Cerner if plaintiff's

6    position is that we do not have a valid business associates

7    agreement because Cerner did not sign the 2006 version, then

8    Cerner is not a business associate and FAQ 2074 does not apply

9    because it only applies to business associates.

10          So as I explained to Ms. Shieldkret during our July 23

11    call, if the argument is we have to run to the bottom of what

12    the situation is with the business associates agreement, then

13    we're going to be in a situation where Cerner doesn't have any

14    duty to her whatsoever.

15          So if Dr. Fung-Schwartz's position is that she needs a

16    signed version, then we are not under 2074.  We don't have a

17    signed version.  We did not sign the 2006 FAQ.  We did follow

18    it.  We did abide by it.  That's always been Cerner's practice.

19    There is no dispute about that issue.

20          THE COURT:  All right.  I've heard enough about the

21    2006 business associates contract.

22          Ms. Shieldkret also asks in her August 4 letter brief

23    how -- or at least she indicates that she wants to ask

24    Mr. O'Hare:  "A finance manager with no HIPAA training or

25    solely able to change patient's access to patients' medical

1  records without any review by Cerner's legal team or anyone

2  else."

3         That sounds to me like a specific instance of a more

4  general topic, which is who can change access to the medical

5  records and under what circumstances.

6         Who is your potential witness on this set of topics,

7  Mr. Fanning?

8         MR. FANNING:  I believe this one is John Richie.  I

9  was just premature, your Honor.  John Richie is the HIPAA

10  testifier.

11         THE COURT:  Is he going to generally be able to

12  testify about, to adopt the plaintiff's language here, who can

13  cut off access to EMR and who had to sign off on it?

14         MR. FANNING:  He'll be able to testify to the measures

15  that Cerner took at the time and could take at the time to

16  provide Dr. Fung-Schwartz with read-only access, which is not

17  cutting off access.

18         THE COURT:  I don't want you fighting over what it was

19  that actually happened.

20         MR. FANNING:  I can't say "cut off access," your

21  Honor.  That's not what happened.

22         THE COURT:  I'm not asking either side to adopt the

23  other side's characterizations.  So let me put the question

24  more neutrally.

25         Will your witness, who we think now is Mr. Richie, be

1    prepared to testify as to what Cerner's policies and procedures

2    were for what could do the thing that happened to

3    Dr. Fung-Schwartz's EMR in October of 2016 and who had to sign

4    off on that?

5              MR. FANNING:  Yes, your Honor.

6              THE COURT:  Have I missed any of the

7    back-and-forth with respect to topic 2?  Ms. Shieldkret?

8              MS. SHIELDKRET:  No.  I think you've got it, your

9    Honor.  Thank you.

10             THE COURT:  So in addition to the topics that Cerner

11   has indicated that it is prepared to produce a witness on, I

12   will direct Cerner to also make sure that its witness is

13   prepared to testify as to whether the 2006 business associate

14   contract was not signed; whether, if it was unsigned, that was

15   consistent with Cerner's policies, procedures, or ordinary

16   course of doing business; and whether -- I don't know how I

17   want to put this -- whether the lack of signature, from

18   Cerner's perspective, had any effect on its obligations, either

19   to Dr. Fung-Schwartz under the parties' contract or under

20   HIPAA.

21             Got that, Mr. Fanning?

22             MR. FANNING:  Yes, your Honor.

23             THE COURT:  All right.  Taking a look at topic number

24   3, which, as listed in the 30(b)(6) notice, were "the

25   circumstances surrounding each change in plaintiff's access to

1   their electronic medical records in October 2016 and

2   January 2017."

3           The primary dispute here appears to be whether

4   whatever happened in January 2017 is part of this case or not.

5           Is that your point, Mr. Fanning?

6           MR. FANNING:  Yes, your Honor.

7           THE COURT:  Ms. Shieldkret, it's not pleaded.

8           How is it part of your case?

9           MS. SHIELDKRET:  First of all, there are three

10  incidents.  We didn't know -- it's not pleaded because at the

11  time we did the pleading, Mr. Fanning had represented to me

12  that it wasn't intentional.  But we discovered documents that

13  showed that Cerner did do it intentionally.  We didn't know

14  that until we got the document production.

15          So there are actually three instances where they

16  interfered with Dr. Fung-Schwartz's access.  The first is in

17  early October 2016.  Then there's the October 13, 2016.

18          The January 2017 incident was not the medical records.

19  It was part of the package that she used, but they had

20  represented to us that it was inadvertent.  And it turned out

21  that it was intentional, and we only learned that from the

22  document production.

23          THE COURT:  When you say it was not the medical

24  records, what do you say happened in January, Ms. Shieldkret?

25          MS. SHIELDKRET:  They cut off her ability to verify

1    patients' insurance.  So when the patient walks in the door,

2    you want to make sure they have insurance.  Or the day before

3    they come in, you want to make sure they have insurance before

4    you treat them.  And they cut off that feature.

5            THE COURT:  "They" meaning defendants.

6            MS. SHIELDKRET:  Defendants cut off that feature.

7    Yes.

8            THE COURT:  For how long?

9            MS. SHIELDKRET:  A couple of days.  I think it was

10   four or five days.  What's material is that it was intentional.

11   At that point, we had had a TRO hearing, they knew that there

12   was an issue with interfering with her practice, and it was not

13   inadvertent.

14           It wasn't a third party's independent doing it.  It

15   turned out that they sent a request to the third party to turn

16   that off.  We did not learn that until the document production.

17           THE COURT:  So your position is that the documents

18   reveal that one of the Cerner defendants asked the third party

19   to make that change.

20           MS. SHIELDKRET:  Yes, your Honor.

21           THE COURT:  Okay.  Verifying the patient insurance

22   module -- can I call it a "module"?  Is that what it was?

23           MS. SHIELDKRET:  I'm not sure.  Module or function.

24           THE COURT:  Right.  Was it part of the EMR services

25   that Cerner had been providing since 2006?

1           MS. SHIELDKRET:  Yes.

2           THE COURT:  Or was it part of the BOS services that

3    were the subject of the 2014 contract or sales order, depending

4    on which term you want to use?

5           MS. SHIELDKRET:  I believe it went back to 2006.  I'm

6    not positive, as I sit here now.

7           THE COURT:  Mr. Fanning, Ms. Shieldkret's position, as

8    I understand it, is that although it wasn't pleaded, it is now

9    part of the case, I guess part of their breach of contract

10   claims.

11          MS. SHIELDKRET:  Tortious interference, your Honor.

12          THE COURT:  And tortious interference.  Maybe it's

13   part of the negligence claim as well because Ms. Shieldkret

14   contends it was not a technical glitch or something that was

15   done by a nonparty.  It was a decision by Cerner, and she

16   should be able to inquire about it at deposition.

17          Your response?

18          MR. FANNING:  Thank you, your Honor.

19          Just briefly, the procedural history in this case is

20   Dr. Fung-Schwartz filed her lawsuit on October 14, 2016, a day

21   after this alleged -- the day she was read-only.  So that was

22   filed October 14, 2016.

23          Dr. Fung-Schwartz now claims that there is an

24   interruption, which is all it was, it was an interruption to

25   her Citrix service in early October, which, to our knowledge,

1  did not cause anyone any issue and was quickly restored when

2  Dr. Fung-Schwartz's office called that is now part of the case.

3       She would have been fully aware of that interruption

4  in Citrix when she filed her October 14 lawsuit and put

5  together an affidavit as to her interruptions.

6       Dr. Fung-Schwartz never served her October 14 lawsuit.

7  Instead, we had a telephone conference.  It was not a TRO

8  hearing.  It was a telephone conference.

9       THE COURT:  Let me jut interrupt you.  I was looking

10  for an affidavit from Dr. Fung-Schwartz.  When I was looking

11  through the record in preparation for today's hearing, I

12  actually found two declarations from Plaintiff Fung-Schwartz,

13  one dated -- hold on -- October 14, I guess which came in with

14  the initial TRO application; and one dated a few days later, a

15  supplemental declaration in which Dr. Fung-Schwartz complained

16  that things were not fully restored as of October 17.

17       This is the place you are suggesting where

18  Dr. Fung-Schwartz should have spoken up about a problem earlier

19  in October if there was one?

20       MR. FANNING:  Yes, your Honor.  It was a service

21  interruption to her Citrix, and it was quickly rectified when

22  her office called Cerner.  So that's what happened.  It was a

23  service interruption in any event.

24       THE COURT:  What is Citrix, Mr. Fanning?

25       MR. FANNING:  My understanding of Citrix is it's a

1   dial-in portal, C-i-t-r-i-x, that allows you to interface with

2   a third-party server or otherwise.  So if that's down, it

3   hinders your ability to interface with information that's held

4   in a third-party location.

5          THE COURT:  All right.  So if you could get to the now

6   alleged January 2017 incident.

7          MR. FANNING:  Okay.  Just real quick, Judge, just one

8   clarification.  We did not have a TRO hearing.  We had a

9   telephone call with Judge Broderick where I advised

10  Judge Broderick that we were getting her restored from the

11  read-only access to full access.  And that was in October of

12  2016, and that happened.  She never served her lawsuit.

13         In January 2017 after this TriZetto issue arose, she

14  re-filed the identical lawsuit, rather than serving the earlier

15  lawsuit.  And in that lawsuit that she filed in January 2017,

16  which has the 17 case identifier in the Southern District, she

17  did not make any allegations that this interruption to

18  insurance eligibility was something that Cerner should be

19  responsible for.

20         I will tell you that I've had this thrown in my face

21  several times.  The reason I was under the impression that

22  Cerner was not involved with it was because Ms. Shieldkret said

23  that when we were on our phonecall with Judge Broderick after

24  we had the 2017 lawsuit filed.

25         So what happened with 2017's interruption was back in

1    October when Dr. Fung-Schwartz's BOS relationship was being

2    terminated, Cerner started the process of terminating the

3    licenses that would be associated with the BOS relationship

4    because Cerner pays third parties, like TriZetto, to provide

5    services, and then Dr. Fung-Schwartz pays Cerner for those

6    third-party services.

7            That had been set in place in October.  That was what

8    through discovery we learned was the January incident.  But I

9    must emphasize that Dr. Fung-Schwartz's TriZetto access is not

10   an electronic medical record.  It is not patient data.  It is

11   not information she is entitled to under HIPAA.  It is

12   something she pays extra for or, in this instance, something

13   Cerner provides for her by contracting with TriZetto.

14           THE COURT:  Which contract covers this module, this

15   TriZetto module?

16           MR. FANNING:  You asked Ms. Shieldkret that question.

17   Honestly, your Honor, I am not certain.  I thought it was the

18   2014 BOS contract, but it might be the 2011 wisdom contract.

19           In any event, it is not part of her EMR.  She has not

20   paid for several years.  The fact that she's currently on this

21   EMR and has insurance eligibility that she can use with

22   TriZetto, despite not paying for it -- it's not part of the

23   EMR.

24           So these allegations could have been brought at any

25   time.  They certainly could have made their way into a

1    disclosure.  If she thought there was anything that caused her

2    harm with TriZetto, it could have been brought up.  It was

3    never pled.

4         We've been in this case for four years.  And when we

5    produced the discovery, she's amended her pleading multiple

6    times.  This could have been through an amended pleading.

7         We currently have a pleading that talks about one

8    incident, October 2016.  And we want to keep the case on the

9    issues that are actually pleaded.

10        THE COURT:  All right.  Thirty seconds,

11   Ms. Shieldkret.  We're going to need to get to some other

12   issues.

13        MS. SHIELDKRET:  He just said we don't know about it

14   until discovery.  The Citrix -- in early October we also found

15   out through discovery through Cerner's documents that they

16   intentionally cut off her access.

17        When he says from a third-party server, what he's

18   saying is she couldn't get from her office to any of the

19   documents.  She couldn't get to anything when they cut off her

20   Citrix server.

21        Her assistant made two requests to get it turned back

22   on, and it was.  But it was part of them cutting off access to

23   medical records in early October.

24        THE COURT:  Then why isn't that pleaded in your

25   original complaint, your amended complaint, or your seconded

1    amended complaint?

2              MS. SHIELDKRET:  Because we did not know.  They

3    thought it happened because it changed her password.  That's

4    what they told her, we think it happened because you changed

5    your password.  We'll reset the password.  We didn't know until

6    we got their log what they did to terminate her service when

7    she said she didn't pay her bill.

8              We didn't know until we got that document that they

9    actually had done it on purpose.  It wasn't what they told her.

10   It was something completely different.

11             THE COURT:  When did you get that document?

12             MS. SHIELDKRET:  I'm not sure.  The document number is

13   in the range of -- we got it in the spring.  It's in the 9,000

14   range.  So we got it this year.  So when he says this pleading

15   is from 2017, do you want us to amend the pleading now?  We

16   found out about this in March or April.

17             THE COURT:  It's now August.  I'm not asking you --

18             MS. SHIELDKRET:  Right.  Because often things come up

19   in discovery that you didn't know about.  That's what discovery

20   is about.

21             THE COURT:  Ms. Shieldkret, please do not interrupt

22   the Court.  Perhaps I'm not clear that I haven't finished

23   asking my questions, but give me a couple more seconds to get

24   it out, if you would.

25             I'm not asking you to amend your complaint now.  What

1    I am wondering is what you did between March when you say you

2    got this document and late July when you issued your very broad

3    Rule 30(b)(6) deposition notice to alert the defendants that

4    this was an issue in the case, both the earlier October

5    incident and the January 2017 incident.

6          MS. SHIELDKRET:  We served interrogatories.  We served

7    document requests.  We repeatedly asked them about all three

8    incidents once we knew about them.  They knew it was an issue

9    in the case because we asked them for more information.  We

10   served interrogatories, including contention interrogatories,

11   about how this happened.

12         THE COURT:  Mr. Fanning, did Cerner understand that

13   whether pleaded or unpleaded, plaintiffs contended that there

14   were two new issues in the case, namely, an incident in early

15   October and an incident in January 2017?

16         MR. FANNING:  Your Honor, we, I believe sometime in

17   July, learned through Ms. Shieldkret's questioning during

18   depositions that she had some issue in early October with

19   respect to the Citrix interruption, which, by the way, it was a

20   very brief period of time.  It was corrected.  It did require a

21   password change.

22         The grand conspiracy here is how did this harm her

23   practice, which didn't happen.  If Cerner was bound and

24   determined to cut off her access, it makes no sense that she

25   was immediately turned back on when she notified Cerner.

1          THE COURT:  Small potatoes, Mr. Fanning, but if you

2     could just answer my question.

3          MR. FANNING:  I'm sorry, your Honor.

4          We learned sometime in July that this was an issue

5     with Ms. Shieldkret.

6          With respect to this TriZetto issue, this is something

7     she's been aware of for many months because I know that I've

8     had my named dragged through the mud in multiple times with

9     communications with the Court, both before you got involved and

10    after, about how I lied about this January interruption.

11         So this isn't some new issue.  So I was aware that she

12    was complaining about TriZetto.  Again, it's not part of EMR.

13    It's not a damaged claim.  She has no damages articulated to

14    it.  We would not have tried it by consent, and we do not agree

15    this is part of the case because not only is it not plead, it's

16    not part of her EMR.

17         THE COURT:  Thirty seconds, Ms. Shieldkret.

18         MS. SHIELDKRET:  It's part of what they said they

19    would leave on for her after the October hearing.  The hearing

20    was called because of the TRO papers.  I don't know why he's

21    saying it wasn't a TRO hearing.

22         But they agreed to keep the services on, and they

23    intentionally went and turned them off.  That's what this is

24    about.

25         THE COURT:  Are you saying that during the October

1   proceeding, there was a specific discussion of the insurance

2   verification module operated by TriZetto?

3          MS. SHIELDKRET:  No.  There was a specific discussion

4   that Cerner would just restore whatever services she had and

5   leave it that way until we either reached an agreement or went

6   back to the Court, and that's what happened.

7          THE COURT:  And you knew then that there had been an

8   interruption in service to the TriZetto module in January of

9   2017.  But what you're telling me is you didn't know until

10  later, until the course of document discovery this year, that

11  that was done at Cerner's behest.

12         MS. SHIELDKRET:  Correct.

13         THE COURT:  Mr. Fanning, the witness that you produce

14  with respect to topic number 3 should be prepared to testify

15  about the incident in early October, the alleged incident in

16  early October, which the parties have described as a brief

17  interruption to the practices at Citrix it says to the EMR.

18         I will not require to you produce a witness with

19  respect to the alleged incident in January 2017.  In addition

20  to the arguments that have been made here today, I'm not

21  convinced that plaintiff's 30(b)(6) notice, which referred to

22  changes in plaintiff's access to their "electronic medical

23  records" actually covers what is alleged to have happened in

24  '17, which both parties appear to agree involved a brief

25  interruption to the plaintiff's ability to verify patient

1    insurance information.

2          Let's go on to topic number 4.  As pleaded in the

3    30(b)(6) notice, this topic was astonishingly broad:  "Problems

4    complaints, or issues with Cerner's BOS services."

5          Mr. Fanning, can you just remind me what you have

6    agreed to produce, what topics your witness will be prepared to

7    testify about.

8          MR. FANNING:  Yes, your Honor.  Defendants will --

9          THE COURT:  I'm hearing paper shuffling again.  This

10   sometimes happens because somebody's documents are too close to

11   their microphones, but sometimes you need to mute yourself.

12         Go ahead, Mr. Fanning.

13         MR. FANNING:  Thank you, your Honor.

14         The defendants will be prepared to offer a corporate

15   representative to testify concerning specific complaints that

16   Dr. Fung-Schwartz identified in her pleading that she had with

17   Cerner's BOS, not amorphous, it doesn't work, or it's not a

18   good system.

19         Because, again, BOS is services.  It's not software.

20   So we will provide testimony to address the specific issues.

21   For example, her suggestion that Cerner could not bill

22   Medicare, we'll happily provide a witness who will testify to

23   rebut that.

24         And this issue with respect to somebody who had a

25   white like a liquid paper or Whiteout on a record, we'll be

1    happy to talk about that specific instance.

2           But generally talking about complaints that may have

3    been received generally over a period of years from any number

4    of people about Cerner's BOS services is we think outside the

5    scope and not proportional.

6           THE COURT:  Remind me.  A version of this dispute came

7    up previously in the context of document demands.  My

8    recollection is that plaintiffs asked for a broad array of

9    documents revealing complaints from other customers about BOS.

10   And I think I limited that, first of all, to BOS and, second of

11   all, to a specific time period prior to the 2014 contract.

12          How many documents?  What's the volume that was

13   produced in accordance with that order?

14          MR. FANNING:  Your Honor, I don't know the specific

15   number of documents, but I believe there were six other

16   complaints that would have related to this physician practice

17   and would have been within that time period.

18          THE COURT:  All right.  Ms. Shieldkret, turning to

19   you, is that what you want testimony about?  The other

20   complaints by other practices revealed by the document

21   production?

22          MS. SHIELDKRET:  Yes.  Well, yes.  And we already told

23   them that we would limit it to the problems that

24   Dr. Fung-Schwartz had, the problems that are in the documents

25   that they produced.

1          And there is a third set of documents that came from

2     Cerner where they identified their own problem.  And that's the

3     550,000 claims that never got processed, some of which were

4     Dr. Fung-Schwartz's.  So we want to know more about that.

5          That happened -- obviously it wasn't precontract

6     because some of them were her claims.  So she never knew about

7     that because they didn't tell her we found out about that from

8     the document production.  So we want a witness to explain what

9     that problem was.

10          They produced complaints, but they've completely

11     redacted the names of the people.  It's going to be very

12     difficult to -- you told them to produce the documents, and

13     they produced a redacted version of the documents.

14          It's going to be very difficult to ask a witness and

15     to ask, for example, which response relates to which complaint

16     because they've deleted all the individually identifying

17     information.  We'd like unredacted documents for the

18     deposition.

19          THE COURT:  Well, with respect to these documents,

20     Mr. Fanning represented to me -- and I assume he's doing this

21     from memory because he's not waving any other papers around --

22     that there were six other complaints.

23          Is that right, Ms. Shieldkret?

24          MS. SHIELDKRET:  There may be 15 different documents,

25     but there may be some duplicates.  It's not a hundred.  It's a

1   handful of complaints, but I think it's more than six

2   documents.

3          THE COURT:  But it overlaps with Ms. Shieldkret's

4   complaints.  In other words, Ms. Shieldkret raises an issue --

5   I'm sorry.  Dr. Fung-Schwartz raises an issue -- I did this

6   when I was a lawyer too.  I overidentified with my clients, and

7   I used to say "we" when I meant my clients.

8          Dr. Fung-Schwartz alleges, for example, that there was

9   a particular problem involving Medicare.  These other

10  complaints, whether there are 16 of them or whether there are

11  15 of them or whether there are 6 of them -- do they make that

12  same complaint?

13         MS. SHIELDKRET:  What we know from a nonparty witness

14  is that that doctor had a complaint with Medicare.  I don't

15  know if it's in those letters, but we know -- and it's pleaded

16  in the complaint that at least one other doctor had a problem

17  with Medicare from the BOS service.

18         THE COURT:  Do you know if that doctor, who you did

19  not name in your complaint I don't think -- did you name that

20  doctor in your complaint?

21         MS. SHIELDKRET:  We definitely named him in initial

22  disclosures or in response to an interrogatory.  We named him

23  at some point.  We named him in a conference with the Court.

24  It's Dr. Hakim.

25         THE COURT:  All right.  It's coming back to me now.

1          Among the documents that Cerner produced in response

2     to my document production order, were Dr. Hakim's complaints

3     included?  Or were they from the wrong time period?

4          MS. SHIELDKRET:  They were from the right time period.

5     They're redacted.  So we can't know for sure, but there is a

6     letter that looks like it's consistent with the complaint from

7     Dr. Hakim.  But they have completely redacted the identifying

8     information.

9          THE COURT:  Yes.  I got that point.

10          Mr. Fanning, the two additional areas of testimony

11     that plaintiff wants are, first, with respect to the specific

12     complaints that were produced and, second, with respect to --

13     I'm not sure I'm describing this correctly -- with respect to

14     some sort of document or report that was produced by Cerner

15     about a problem affecting 550,000 claims, presumably across the

16     customer base, 54 of which were Dr. Fung-Schwartz's.

17          Would you address those two specific items, please.

18          MR. FANNING:  Yes, your Honor.  The suspended charges

19     issue, which is the second issue you referenced, the 54

20     claims -- we agreed that we would produce a witness to talk

21     about that issue already.  So I don't believe that that is in

22     dispute.  And we agreed to that during our meet-and-confer

23     call.

24          With respect to the other complaint, we don't believe

25     most of them do relate to issues that are similar to what

1  Dr. Fung-Schwartz raised.  We produced them consistent with the

2  Court's order.

3       But to the extent that there are complaints that would

4  relate to an issue similar to what Dr. Fung-Schwartz

5  specifically raised, we would be happy to have a witness

6  testify about those other complaints.

7       We do have, as the Court is aware, confidentiality

8  responsibilities to our clients that we can't waive.  And

9  that's why we redact that information.

10      THE COURT:  So with respect to the 30(b)(6) testimony,

11 I will not require Cerner to produce a witness with respect to

12 other complaints made by other doctors or medical practices.

13      I find that while the existence of such complaints

14 during the period I previously specified, namely, the very low

15 relevant threshold of Rule 26(b)(1) requiring Cerner to produce

16 a 30(b)(6) witness who can get up to speed on and testify about

17 the details of, response to, etc., each individual complaint by

18 a doctor or practice, other than plaintiff's, is going fairly

19 far afield here and is not proportional to the needs of the

20 case and also implicates significant issues or would

21 potentially implicate significant issues of the privacy of

22 those non-party practices.

23      I do understand the concern about not being able to

24 link documents if the names are redacted.  So what I will do on

25 that issue is I will not require Cerner to produce the

1    documents unredacted because of those privacy concerns.

2          But since the volume of documents here appears fairly

3    low, I will direct Cerner, instead, to use the following

4    workaround.  Give each doctor or practice, each complaining

5    doctor or practice, some kind of code number -- Dr. X, Dr. Y,

6    hospital A, hospital B.  It doesn't matter, as long as it's

7    understandable.

8          And where you have redacted the individually

9    identifying information of the customer, put that in instead.

10   Or simply indicate in some kind of chart or index which of the

11   produced documents relates to Dr. X and which ones relate to

12   Dr. Y and so forth so that Ms. Shieldkret can figure out what

13   goes with what and what is part of the same complaint.

14         I think that deals with motion number one, which is to

15   say the 30(b)(6).

16         In terms of timing, how soon, Mr. Fanning, will it

17   take your 30(b)(6) witness or witnesses up to speed in

18   accordance with the rulings I have just made?

19         MR. FANNING:  Your Honor, I would ask for two weeks to

20   get -- we will have dates in September.  We wouldn't postpone.

21   I guess a week to get Ms. Shieldkret dates because it's

22   multiple witnesses, but we will produce those witnesses within

23   three weeks from today, if the Court will be okay with that

24   schedule.

25         THE COURT:  Ms. Shieldkret, obviously I'm going to

1    have to split expert depositions as well accordingly.

2           MS. SHIELDKRET:  Yes, your Honor.  That's fine.  The

3    timing is fine.

4           THE COURT:  So the 30(b)(6) deposition, because you're

5    going to have multiple witnesses, will take place no later than

6    three weeks from today, which is September --

7           Mr. Salim, what's three weeks from today?

8           THE DEPUTY CLERK:  Three weeks from today, your Honor,

9    is the 17th of September.

10          THE COURT:  All right.  By September 17.  That means

11   that the parties are going to have to meet and confer promptly

12   and in good faith to arrange dates and times.

13          Have the parties conferred as to how long this

14   30(b)(6) deposition or depositions is going to take?

15          I ask because in other cases, I have found parties at

16   loggerheads as to whether a 30(b)(6) deposition is one

17   deposition that takes place in one day in seven hours in the

18   aggregate or whether each individual witness somehow counts as

19   a separate deposition and can be grilled for seven hours.

20          Have the two of you discussed this?

21          MS. SHIELDKRET:  No, your Honor.  It's two depositions

22   because it's Cerner Corp.  There are two defendants.  If they

23   designate the same witness for each of the defendants, that

24   will help speed it up.

25          We really weren't trying to get -- we're not looking

1   to get a full day's deposition from each witness.  We're trying

2   to get through these topics.

3          THE COURT:  So what you're telling me is that at the

4   most, you want two days in total?

5          MS. SHIELDKRET:  Yes, your Honor.  Unless there's

6   something that we didn't anticipate, yes.  That's all we're

7   asking for.

8          THE COURT:  Mr. Fanning?

9          MR. FANNING:  Defendants are only identifying one

10  witness per topic in a joint fashion.  So we would ask for one

11  day.  There are only four topics.  We're talking about merely

12  two hours per topic.

13         THE COURT:  If there is only going to be a single

14  witness testifying on behalf of both of the named defendants

15  per topic, then presumptively this is one deposition which

16  should take place in one day of seven hours or, since it's

17  different witnesses, that may be spread over more than one day,

18  but it shouldn't aggregate more than seven hours.

19         I will ask the parties to, number one, do their best

20  to keep it to one day of seven hours; and number two, if

21  somebody needs an extra 20 or 30 minutes, don't come back to me

22  with a motion.  Just work it out.  Okay?

23         MS. SHIELDKRET:  Thank you, your Honor.

24         One thing that's been happening with the remote

25  depositions is they do take a little bit longer.  Sometimes

1    there are some technical issues.

2            THE COURT:  Technical issues that can't be solved in a

3    minute or two obviously should not count against that.

4            That takes us to what my mind is the second motion

5    here which is whether Cerner should be giving this billing data

6    to plaintiffs in native or in electronic form.

7            I'm not sure whether this motion also includes some

8    new and separate 30(b)(6) witness issue.

9            Maybe, Ms. Shieldkret, you can address that first.

10           Are you asking for a fifth 30(b)(6) witness?

11       MS. SHIELDKRET:  What happened was on the very last

12   day of fact discovery, they identified four new witnesses with

13   four topics.

14           THE COURT:  That's not this.  That's not this.  I

15   haven't gotten to that yet.

16       MS. SHIELDKRET:  I'm sorry.

17           THE COURT:  The argument that you make in your

18   August 13 letter motion where you say in paragraph 1 you write

19   to request that the court orders defendants, pursuant to my

20   earlier order on June 2, to make the billing data and its

21   electronic billing system available to plaintiffs in electronic

22   form and to produce a 30(b)(6) witness in response to

23   plaintiff's notice.

24       MS. SHIELDKRET:  I'm sorry, your Honor.  I'm just

25   having trouble pulling up the document.

1          THE COURT:  It's docket number 119.

2          MS. SHIELDKRET:  Okay.  I probably have it open.  I'm

3     having trouble seeing it.

4          THE COURT:  If this was happening during a deposition,

5     we'd deduct a couple of minutes from the seven hours time.

6          MS. SHIELDKRET:  I'm sorry.  So I think we've

7     covered -- it's not an additional witness.  It was just

8     reiterating that there is testimony from witnesses on some of

9     these topics that are going to be needed, along with the data

10    for the expert.

11         THE COURT:  So now explain to me, if you would,

12    because this is your motion, what it is that you want Cerner to

13    produce to you in electronic form that you can't get yourself?

14    Not that would be more difficult to get yourself, which may be

15    part of the argument.  But I'd like to focus initially on

16    whether you contend that there is data that only Cerner can

17    produce.

18         MS. SHIELDKRET:  Their witness testified that there is

19    claim information that goes to the payors that is not in the

20    patients' ledgers that we can access.  So it does seem that

21    there is other information, according to Cerner's witness, that

22    is not in the database that we have access to.

23         But the other problem is we asked them to give us that

24    data, even the data we have access to electronically, because

25    what we would have to do is print it out, and we would have to

1   print it out individually and then rekey it in to create a new

2   database, and that's just ridiculous.  It's already in

3   electronic form.

4         THE COURT:  What is the "this"?  Understand the two of

5   you have been, I presume, living with these issues and looking

6   into databases and stuff for as long as you've been litigating

7   with each other.  I need to understand a little more granularly

8   what you're talking about here.

9         MS. SHIELDKRET:  Okay.  What we thought we would be

10  able to do is to take a period, a period from when Cerner was

11  submitting the claims, take the calendar to get all the

12  patients who came in to the office during that time period that

13  generated claims, and then be able to go into the database and

14  pull out all of that information so we would have the set of

15  claims that Cerner submitted on behalf of Dr. Fung-Schwartz.

16        THE COURT:  You say go into the database now.

17        We're talking about the BOS system.  Is that right?

18        MS. SHIELDKRET:  So it's the electronic medical

19  records includes financial data.  So it includes insurance

20  data.  It includes claims submission data.  All of that was

21  part of her records before she started using the BOS service.

22        But she does not have the ability to extract it

23  electronically.  So she can do searches.  She can print them.

24  We can maybe make a PDF out of them.  Defendants produced it in

25  TIFF format.  But we need to be able to put it in a spreadsheet

1   to do an analysis on it.

2          THE COURT:  How many patients or how many claims or

3   how many visits?  I don't know which is the right place to

4   start.  I'm trying to get a volume here.

5          MS. SHIELDKRET:  So my guess is that it's 40 or 50 a

6   week for 19 months.

7          THE COURT:  Forty or fifty visits a week?

8          MS. SHIELDKRET:  Yes.

9          THE COURT:  For 19 months.  That would be five days a

10  week I take it.

11         MS. SHIELDKRET:  No.  Just go by weeks because that

12  office is not open five days.  So 40 or 50 per week.  So that's

13  200 a month.  So 160 to 200 a month for 19 months.  So maybe

14  3,500.

15         THE COURT:  Maybe 3,500 patients.  Some of these

16  visits, presumably, would be by the same patient.  But each

17  visit would generate a separate claim.

18         Is that right?

19         MS. SHIELDKRET:  Correct.

20         THE COURT:  All right.  So let's say approximately

21  3,500 claims.

22         And you say you have the data, but you can't work with

23  it and manipulate it and have your expert cut it and paste it

24  and add it up and put it into an Excel spreadsheet and so forth

25  without printing it out and then rekeying it, which you deem to

1    be unduly burdensome.

2            MS. SHIELDKRET:  We can see the data.  The data exists

3    electronically.  We can see it in the system.  But if we want

4    to do anything with it, it's going to go into a paper form or a

5    PDF file where we can't manipulate it.  So it's like having to

6    rekey it in.

7            THE COURT:  Mr. Fanning.

8            MR. FANNING:  Your Honor, we're in no greater position

9    than plaintiffs are in this instance.  And that's what we've

10   advised before, that the specific requests that plaintiffs have

11   made -- plaintiffs have access to that information.

12           We can run a calendar report because she has access to

13   her calendars on all days.  That was the one area because I

14   don't know whether there was a database change or something in

15   2018, on the one issue she raised with the calendar, which,

16   again, could have been raised during discovery.

17           We could run a report that would generate her

18   calendar, but again, she can generate her own calendar by just

19   opening her system.  So we are going to have to do a lot of the

20   same types of thing.  It's not like we're holding a master key

21   and that we can go and crunch numbers for her on claims.

22           You have to look claim by claim in her case because

23   her claim is about alleged missteps allegedly in handling

24   claims.  So it's not 3,500.  It's how many were mishandled.

25           So you have to go and look at every single person and

1   figure out where the mistake was in her position of the case,

2   and that's what we have to do too.  So we don't have a special

3   power to figure out where her claim lies.

4           THE COURT:  I understand the complaint to be a little

5   different than that, Mr. Fanning.  I understand the complaint

6   to be that while Dr. Fung-Schwartz has access to the data, can

7   see it on the screen, and can print it out and then could have

8   it perhaps scanned or bring in a data processing person to

9   rekey it in, that she can't download it in whatever the native

10  format is in a way that would allow her to skip the scanning

11  and/or rekeying step and put the data into whatever form her

12  expert is ultimately going to want to put it in so that the

13  expert can crunch the numbers.

14          Mr. Salim, it's okay.  We know you have a cat.  We

15  don't mind looking at the cat during our conference.  We can

16  bring the cat back on line.

17          I know this cat.  I've seen this cat before.

18          THE DEPUTY CLERK:  Sounds good.

19          THE COURT:  So I think that's the problem,

20  Mr. Fanning.  You're muted, Mr. Fanning.  You're still muted,

21  Mr. Fanning.

22          Mr. Salim, can you unmute, Mr. Fanning, or does he

23  have to do that himself?

24          THE DEPUTY CLERK:  I think it just unmuted.

25          MR. FANNING:  Your Honor, the screen froze.  But I

1    could hear everybody talking.  So I could hear what you were

2    saying.  I just don't know what happened on my end.

3             THE COURT:  Now you've disappeared.

4             MR. FANNING:  Can you hear me now?

5             THE COURT:  Yes.  I can hear you now, Mr. Fanning.  Go

6    ahead.

7             MR. FANNING:  We are in a no better position to

8    download those reports.  There are financial transaction

9    summaries I think is she what she might be interested in.  She

10   can download those.

11            THE COURT:  Download them in electronic format?  And

12   if so, what?

13            MR. FANNING:  In an electronic report.  It's a

14   financial transaction summary.  I don't believe it's in

15   comma-separated value or in Excel.  That's an issue.  You'd

16   have to convert it using a converter.  We're in the same

17   position that she is in, and that's what she emphasized.

18            with that said, your Honor, we have hired experts.

19   And those experts have advised us that they can do a SQL or

20   other language to perform an extraction on the system, which is

21   what our experts are going to do for us.

22            Her expert could do the same thing I understand.  I

23   haven't seen the work product yet, but we've been through this

24   challenge and had the same question.  Her expert is a

25   physician.  She chose a physician as her expert.  We are using

1    folks who have technical expertise.

2            THE COURT:  Tell me again what it is that everybody

3    wants to download here.  Name the report for me again.

4            MR. FANNING:  I'm not certain.  I need

5    Ms. Shieldkret's help on that one.

6            THE COURT:  Which dataset do you want to manipulate in

7    electronic form?

8            MS. SHIELDKRET:  We want all of the data for that time

9    period of the transactions, all of the transactions that were

10   entered during the time --

11           THE COURT:  That means all of the transactions that

12   were entered during the time period.

13           MS. SHIELDKRET:  Right.  All of the claims and then

14   all of the reconciling, the named insured, what the patient

15   paid, all of those financial transactions.

16           THE COURT:  Do you have a technical person,

17   Ms. Shieldkret?

18           MS. SHIELDKRET:  Yes.  And what he said was he's

19   worked with many other EMRs.  There is a tool, and it looks

20   like Cerner has a tool and that it's disabled for

21   Dr. Fung-Schwartz.  She doesn't have access to the tool.  He

22   knows how to extract the data, and he was not able to do it

23   with the access that she has.

24           THE COURT:  Is your technical person going to be a

25   disclosed expert, or is this a consultant rather than a

1    testifier?

2          MS. SHIELDKRET:  He's a consultant.  He's not going to

3    testify.  His function is just to extract the data.

4          THE COURT:  And his function is to try and get this

5    data extracted so that your testifying expert can manipulate

6    it?

7          MS. SHIELDKRET:  Yes.  And we need a full dataset

8    because it's not just the transactions where there was a

9    problem.  It's how much Cerner was able to recover on the

10   transactions.

11         So there is a comparison to the next -- there may be a

12   comparison to -- her business was affected.  So it's all the

13   transactions during Cerner's time and then all the transactions

14   during other times.

15         THE COURT:  Mr. Fanning, you have a technical

16   consultant as well; right?

17         MR. FANNING:  Yes, your Honor.

18         THE COURT:  He is not going to be testifying.  He's

19   back office so to speak?

20         MR. FANNING:  No.  We will disclose ours at the time

21   of disclosure.

22         THE COURT:  Here's what I'm thinking, counsel.  I am

23   not capable of fully understanding what the issues are here,

24   much less who's right.

25         Counsel are more knowledgeable than I am, but they're

1    not the most knowledgeable people about these issues either.  I

2    think the technical consultants need to talk to each other.  I

3    think that counsel needs to be on that call to make sure that

4    all the proprieties are observed and nobody uses it

5    inappropriately.

6            But I think the two technical experts need to talk to

7    one another on the question of whether and how it is possible

8    for Cerner, on the one hand, or Dr. Fung-Schwartz on the other

9    hand, to electronically unload the data each side's experts

10   want to manipulate.

11           And I think that conversation needs to happen very

12   quickly.  I Don't want to hear more about this until after that

13   conversation had has happened.

14           If there is still a problem, if the two sides are

15   still literally disagreeing over whether it is possible to do

16   this and, if so, who can do it and how, then I am either going

17   to want affidavits from these technical people or possibly we

18   can have a little mini hearing and we can get them on the phone

19   or on the video and see what they have to say.

20           Generally speaking, the Court is not inclined to make

21   one side do work for the benefit of the other side if the

22   burden is equal or near equal for either side.

23           On the other hand, if Ms. Shieldkret is correct and

24   this is something that Cerner has the tools to do and a doctor

25   such as Dr. Fung-Schwartz just doesn't and, therefore, it would

1   require a significantly greater amount of work by

2   Dr. Fung-Schwartz, then I would be inclined to require that the

3   data be produced in electronic form by Cerner.

4          But nothing that I have heard today, despite best

5   efforts to explain it to me, really allows me to make that

6   decision.  So I think your technical guys need to talk to each

7   other.

8          I'm going to give you a week to make that happen.  And

9   your deadline to come back to me -- please don't, but if you

10  have to come back to me, your deadline is a week from tomorrow,

11  which is Friday, September what, Mr. Salim?

12         THE DEPUTY CLERK:  A week from tomorrow is

13  September 4.

14         THE COURT:  Counsel may have missed it, but

15  Mr. Salim's cat is putting on a performance in front of the

16  video camera.

17         September 4 you said?

18         THE DEPUTY CLERK:  Yes, your Honor.

19         THE COURT:  That's motion number 2.  Now let me get to

20  the matter that was raised in the very last minute, that is, on

21  the joint letter that was filed on the 6th.  And that is these

22  four additional witnesses.

23         First of all, in my mind, I think there are really

24  only three additional witnesses because one of them, the

25  nonparty whose name I now don't recall, was disclosed earlier

1        in response to an interrogatory.

2               Is that correct, Ms. Shieldkret?

3               MS. SHIELDKRET:  There were dozens of people from the

4        interrogatories.  We didn't know that this was a person that

5        they were going to rely on at trial.

6               THE COURT:  It sounds like they didn't either until

7        they got your 30(b)(6) deposition notice.

8               Let me look at the part that tells me when this person

9        was disclosed.  Hold on a minute.

10              So this is docket number 124.  It's a supplemental

11       interrogatory answer.  Actually, it is more or less the

12       equivalent of an automatic disclosure under Rule 26(a) because

13       it says:  "The defendants identified the following potential

14       witnesses who may offer testimony or information to support

15       defendants' claims, number 12, JD Slaughter."

16              That is functionally identical, I think, to a 26(a)

17       disclosure, and that was on June 30, 2020.  So I really think

18       we're only talking about three here.

19              As to those three, I take it that, Ms. Shieldkret, you

20       either want them to be precluded from testifying at all or you

21       want the opportunity to take their depositions now.

22              Is that right?

23              MS. SHIELDKRET:  Two things.  I'm not sure that the

24       topic for JD Slaughter was disclosed in the interrogatory

25       response.  There is a subject of information.

1          What we thought what might be helpful is, because

2   these are a lot of different people with different topics, that

3   maybe we could just add them to a 30(b)(6).  And then either

4   they can testify or someone with knowledge can just tell us

5   what the testimony is going to be about.

6          THE COURT:  I'm sorry.  I'm not following.

7          You want a 30(b)(6) witness to tell you what these

8   other people could testify about?

9          MS. SHIELDKRET:  What these topics are, what

10  information Cerner has on these new topics that were

11  identified.

12         These are people that there aren't documents for in a

13  production.  So we really don't know what it is that they're

14  being called for.  We'd like more of a disclosure.  We only did

15  three individual witnesses for the whole case.  We don't want

16  to do four more depositions.  We want to know what these people

17  are being called for.

18         THE COURT:  All right.  So I have great idea.  Rather

19  than requiring Cerner to produce a 30(b)(6) witness to tell you

20  what these people might be called for, let's ask Mr. Fanning.

21         Mr. Fanning, what might these people be called for?

22         MR. FANNING:  Thank you, your Honor.

23         First, I do need to correct the record.  We identified

24  three of the four individuals that Ms. Shieldkret takes issue

25  with on June 30, not one but three.

1          THE COURT:  Did I miss that?  Tell me where that

2     happened.

3          MR. FANNING:  Your Honor, if you look at the

4     interrogatory answers, we identified JD Slaughter as a former

5     employee, which is why he's called out specifically.

6          THE COURT:  Right.

7          MR. FANNING:  Then we also identified two of the other

8     individuals, who are Shawn Lerner and Alissa Walters.  So we

9     identified them as witnesses on June 30.

10          THE COURT:  Hold on.  Hold on.

11          On page 5 of your supplemental answer?

12          MR. FANNING:  I believe that's correct, your Honor.

13     Yes.  Page 5.

14          THE COURT:  And that's Shawn Lerner and Alissa

15     Walters.  Is that correct?

16          MR. FANNING:  That is correct.

17          THE COURT:  You are correct.  I do see those names.  I

18     apologize for not mention that earlier.

19          MR. FANNING:  Before we get into what those three will

20     testify about, the other individual we identified was Casey

21     Sanders.  As Ms. Shieldkret identified in a portion of her

22     letter at docket 124, there were, I believe, 12 documents

23     associated with Casey Sanders in the production.

24          THE COURT:  When you say four documents associated

25     with a particular witness, do you mean documents previously

 1   produced in regular document discovery?

 2          MR. FANNING:  That's correct, your Honor.  Now, Casey

 3   Sanders is not a witness that we were aware that we would need

 4   to call until this suspended charges issue was raised by

 5   Ms. Shieldkret in our July 23 meet-and-confer on the

 6   Rule 30(b)(6).

 7          We are going to produce a witness to talk about the

 8   suspended charges.  However, Casey Sanders has the core

 9   knowledge about the reports that were run to determine what

10   impact might have occurred with Dr. Fung-Schwartz.

11          So based upon that late issue becoming a relevant

12   issue, we identified Casey Sanders out of an abundance of

13   caution a week later to make sure that we would preserve the

14   right, if necessary, to call Casey Sanders to testify about

15   thwarts that had been run on the suspended charges issue, which

16   our 30(b)(6) witness will testify about and will provide

17   Cerner's position on.  So that information of Casey Sanders is

18   a placeholder for us.

19          THE COURT:  So when you say suspended charges, that's

20   the report about the 550,000 Medicaid claims?

21          MR. FANNING:  It's a charge report that

22   Dr. Fung-Schwartz's office -- they did not run it for about six

23   months.  So 54 was the number that Dr. Fung-Schwartz gave, but

24   it's like 36 claims.  Our witness will testify to that.

25          THE COURT:  Okay.  Will Mr. Sanders be your 30(b)(6)

1  witness on this topic?  Or have you not made that determination

2  yet?

3           MR. FANNING:  I'm sorry, your Honor.  No.  Mr. Sanders

4  will not be our 30(b)(6) witness.  But our 30(b)(6) witness

5  will rely upon information that was provided by Mr. Sanders to

6  give the testimony.  And Mr. Sanders is a witness, again, as a

7  placeholder, just in case we need more information at trial.

8           THE COURT:  Okay.  So that's what Mr. Sanders might

9  potentially testify about.

10          How about Ms. Walters?

11          MR. FANNING:  So Ms. Walters is the individual who ran

12  the report that would be on I think customer satisfaction which

13  is an issue that Dr. Fung-Schwartz had raised.

14          So, again, Alissa Walters could testify at trial

15  concerning Cerner's analysis of its customer satisfaction for

16  its BOS solutions.  She's a customer satisfaction person.  So

17  that's Alissa Walters' role.

18          Again, if it is necessary at trial for us to sponsor

19  information about customer satisfaction, Ms. Walters would

20  testify to that regard, since she would provide that

21  information as necessary.

22          THE COURT:  You said she ran a customer satisfaction

23  report.

24          Was that a document that was produced in discovery?

25          MR. FANNING:  Yes, your Honor.

1          THE COURT:  How about Shawn Lerner?

2          MR. FANNING:  There is a phrase that the Court may

3     have heard in this case, JIRA.  And Cerner would have initiated

4     a JIRA with respect to Dr. Fung-Schwartz's transition of her

5     BOS, as well as this issue with the Citrix thing that we talked

6     about in early October.

7          Mr. Lerner would be the person who would be able to

8     pull that report or get that information and attest to Cerner's

9     actions in respect to those JIRAs what Cerner did.  So

10    Mr. Lerner can interpret that reports, which have now become

11    relevant.  So that's what he would offer.

12          THE COURT:  What does JIRA stand for?

13          MR. FANNING:  I knew you were going to ask that

14    question, your Honor.  I don't remember.  It's a company I

15    think.  They provide a service, and it's basically you generate

16    reports for -- it basically reports on the changes to systems.

17          I'm going to do a terrible job, your Honor.  But

18    basically my understanding of a JIRA is it is effectively a

19    company that provides you with a system that allows you to

20    track progress when you are taking steps with respect to a

21    particular workflow.

22          I'm sorry.  It's not the early October.  It's the

23    October 13/14 issue.  Cerner initiated a JIRA to turn

24    Dr. Fung-Schwartz to read only, which is a key issue in the

25    case.

1    And Mr. Lerner will be able to interpret the JIRA

2    reports to identify what steps were taken by various people

3    within Cerner in conjunction with turning Dr. Fung-Schwartz to

4    read only.

5         THE COURT:  Now, that issue is not new to the case.

6         So why was Mr. Lerner not disclosed until so late?

7         MR. FANNING:  We disclosed him on June 30.  It was an

8    issue -- I think the reports became more relevant as we headed

9    into the summer.  So while they're not new issues, the JIRA

10   itself became a relevant issue as we went more and more through

11   this case because it was the testimony.

12        In fact, we identified him before the depositions were

13   even taken.  And we never forbid Ms. Shieldkret from taking a

14   deposition.  That was her decision.  So we disclosed him a

15   month before the close of discovery.

16        And we provided information in a supplemental Rule 26

17   disclosure to make sure that we could preserve the right to

18   call him, which is what I understood the Rule 26 disclosures

19   are --

20        THE COURT:  Ms. Shieldkret is correct that you

21   disclosed the name earlier but didn't provide a topic of

22   potential testimony until you amended your 26(a) disclosure and

23   the topic of intended testimony -- it looks like a little bit

24   of interpretation to translate it, at least for me, into what

25   these folks are actually going to testify about.

1          So you've now gotten a little bit more information,

2     Ms. Shieldkret.

3          Does that modify your request in any way?

4          MS. SHIELDKRET:  We might want to take -- if there are

5     not going to be 30(b)(6) witnesses, we might like to take a

6     deposition, perhaps of Mr. Lerner or Mr. Sanders.

7          If the Court is telling us we can't take testimony on

8     problems that doctors had with the system because it's too

9     disparate, why can defendants offer customer satisfaction

10    surveys from doctors whose practices are exactly the same

11    disparate doctors that the Court is ruling we can't introduce

12    them for information on?

13         THE COURT:  Isn't that a little premature?  I am not

14    ruling on motions in limine at this time.

15         MS. SHIELDKRET:  Okay.  If customer satisfaction is

16    relevant, then the customer complaint that you just said we

17    can't get testimony on are equally relevant.  They're saying

18    they're going to provide customer satisfaction testimony.  And

19    you just ruled that we can't do that for complaints, customer

20    dissatisfaction testimony.

21         THE COURT:  Ms. Shieldkret, focus.  Do you want to

22    take these peoples' depositions?

23         Do you want to preclude their testimony?  What are you

24    asking me for?

25         MS. SHIELDKRET:  I want to preclude Ms. Walters.

1          THE COURT:  You want to preclude Ms. Walters now it

2     sounds like on substantive grounds and not on grounds that she

3     was disclosed too late.  We are really only dealing with the

4     former at the moment, because that's the basis of your motion

5     and because any effort to preclude a potential witness, a

6     potential trial witness on relevance grounds, really is a

7     limiting motion for the district judge.  It's not a motion for

8     me now.

9          MS. SHIELDKRET:  Okay.  If that's your ruling, that's

10    your ruling.  But that's completely inconsistent with the

11    ruling you gave us before.  You are making one set of rulings

12    for the plaintiff and a different set of rulings for the

13    defendant because it's exactly the same information.

14         THE COURT:  Ms. Shieldkret, this is the second time

15    you've accused me of giving you inconsistent rulings.  This

16    time I'm completely confused because I'm not giving you any

17    ruling at all on whether Ms. Walters or anybody else can

18    testify as to customer satisfaction reports.  You are free to

19    make that motion at the right time to the right judge.  I'm

20    dealing with discovery.

21         MS. SHIELDKRET:  Okay.  But we're prevented from

22    getting discovery on a topic that you're telling defendants is

23    relevant and they can use in their case.

24         THE COURT:  I'm sorry.  When did I tell defendants

25    that it was relevant and they could use it in their case?  I

 1   must have missed that.

 2            MS. SHIELDKRET:  Right.  Because you're saying,

 3   Ms. Walters -- you're going to leave it so that defendants can

 4   call her as a witness.

 5            THE COURT:  I'm not ruling one way or the other that

 6   they can call her as a witness.

 7            How many times do I need to tell you that?

 8            MS. SHIELDKRET:  Thank you.

 9            THE COURT:  Do you want to take her deposition or not?

10   I will rule on that.

11            MS. SHIELDKRET:  No.  We don't want to take her

12   deposition.

13            THE COURT:  Okay.  Do you want to take Mr. Lerner's

14   deposition?

15            MS. SHIELDKRET:  We might want to take Mr. Lerner's

16   deposition.  We really can't make a decision on the spot now.

17   We just found out what these witnesses --

18            THE COURT:  You've already made a motion to take

19   Mr. Lerner's deposition.  You thought you knew the answer to

20   that on August 25.

21            Now you're not sure?

22            MS. SHIELDKRET:  No.  What we wanted to take is we

23   wanted to take the company's deposition, the 30(b)(6)

24   deposition, for example, on the JIRA.  So that's something

25   where if they're giving 30(b)(6) deposition testimony, then

1    that's fine.

2          But for the other witnesses for those other topics, it

3    is a complete -- Mr. Fanning is saying -- and he is incorrect

4    because we had the discussion about the 550,000 charges on

5    June 2, 2020.

6          He knew about that.  He did not identify the witness

7    until June 30.  If he's saying that we're going to get

8    testimony on that 30(b)(6) topics and we don't need the

9    individual witnesses, that's what I want to know.

10         THE COURT:  I'm sorry.  Didn't I just issue a set of

11   rulings about what you're going to get 30(b)(6) deposition

12   testimony on and what you're not?

13         MS. SHIELDKRET:  But these are new topics that we

14   don't know to notice because they didn't give us these topics

15   until July 31.

16         THE COURT:  Ms. Shieldkret, I think we're talking past

17   each other.  Let me try to be clear as I possibly can.

18         When a potential trial witness is disclosed late, as

19   you contend that these were, your options, the remedies which

20   are appropriately available to you, are either to seek a

21   preclusion order, which I am not going to give you, or to seek

22   to take a deposition of the late-disclosed witness, which I

23   will consider, if that's what you request.

24         The solution that you have just described to me,

25   namely, requiring the defendants to produce another witness

 1    pursuant to Rule 30(b)(6) to testify about the subjects that

 2    these deponents may or may not be called to testify about, is

 3    not efficient and is not sensible.  That is not a remedy that

 4    I'm going to give you.

 5         MS. SHIELDKRET:  Okay.  Then we'd like the ability to

 6    take these depositions, but I don't think we're going to take

 7    all four.  We'd like to be able to look at the witnesses, now

 8    that we have the description from Mr. Fanning.  And we'd like

 9    to be able to notice the depositions.

10         THE COURT:  You've just said no to Ms. Walters.  That

11    leaves three.

12         How long do you need to decide?

13         MS. SHIELDKRET:  How about a week?  We'll issue the

14    notices within a week if we're going to take them.

15         THE COURT:  And you will take them in what time?

16    Because, remember, we still have to get the 30(b)(6)s done, and

17    I have to give you a revised expert schedule.

18         MS. SHIELDKRET:  How about the following week of

19    September?

20         THE COURT:  The depositions would take place the week

21    of September.

22         MS. SHIELDKRET:  21.

23         THE COURT:  Wait.  I'm sorry.  September 21.  That's a

24    month out, the week of September 21.

25         MS. SHIELDKRET:  Because the other depositions are

1  going to be completed by the 17th.

2          THE COURT:  Right.  So you want these to go after the

3  30(b)(6)s?

4          MS. SHIELDKRET:  It's just not a lot of time with

5  Labor Day.  Rosh Hashanah is in there too.  It's just not a lot

6  of time with the holidays in between.

7          THE COURT:  Mr. Fanning, talk to me about timing.

8          These are not going to be full-day depositions because

9  the topics disclosed for each of these witnesses is quite

10 discrete.

11         MR. FANNING:  Your Honor, we haven't gotten specific

12 dates for the depositions, but we'd work with all due haste,

13 upon receiving a notice.  And we would need probably a week

14 just to prepare them and get them ready.

15         I should note that JD Slaughter -- he is not under our

16 control.  He is a former associate.  We may be able to get his

17 cooperation, but I can't guarantee it.

18         THE COURT:  And he's in Kansas?

19         MR. FANNING:  He's in the state of Kansas.  Right,

20 your Honor.

21         THE COURT:  Which means he would testify from Kansas

22 by video presumably.

23         MR. FANNING:  Certainly.  Again, I don't know that he

24 would not be cooperative.  We just have not had the overture

25 with him as to whether he would allow the subpoena and to

1   defend him as his attorneys.

2          THE COURT:  All right.  The expert depositions are now

3   going to be done, Mr. Salim, what did I say?  By the 17th?

4          MS. SHIELDKRET:  Your Honor, those are the 30(b)(6)s.

5          THE COURT:  You are correct.  That's a Friday.  So the

6   following Friday would be the 25th; correct?

7          THE DEPUTY CLERK:  Yes.

8          THE COURT:  Ms. Shieldkret, with respect to the three

9   newly disclosed potential trial witnesses, other than

10  Ms. Walters, if you want to take their depositions, you will

11  notice them by next Friday, September 4.

12         With respect to the nonparty witness, JD Slaughter,

13  you will also be required, of course, to proceed by Rule 45

14  subpoena, unless Cerner's counsel agrees either to accept

15  service of that subpoena or to arrange for Mr. Slaughter's

16  production without subpoena.  So you should probably talk to

17  Mr. Fanning about that before the 4th so that you know whether

18  you'll have to get that subpoena served or not.

19         These depositions must be completed, if you decide

20  that you want to go ahead with them, by September 25, which

21  will become our new close date for all fact discovery,

22  September 25.

23         These depositions, these two potential party

24  depositions and one potential nonparty deposition of late

25  disclosed witnesses will be limited to two hours, not counting

1   downtime for technical difficulties, if any.  So if you're

2   going to do them, you might want to stack them up and get more

3   than one done on the same date.

4          I believe that disposes of the matters that brought us

5   here, except for setting a new date for expert disclosures and

6   discovery.  Since fact discovery is now going to be extended

7   for these limited purposes to September 25, for these limited

8   purposes, this is not a general extension for people to think

9   of new things that they want discovery on.  No new notices; no

10  new document demands; no new interrogatories.

11         Since discovery is extended for these limited purposes

12  to September 25, let me hear a proposal from counsel as to a

13  schedule for expert reports and expert depositions.

14         Ms. Shieldkret.

15         MS. SHIELDKRET:  Your Honor, I'd like to ask the Court

16  for some guidance on an issue.  When the fact discovery

17  deadline was earlier in the year, we served contention

18  interrogatories 30 days before the close of fact discovery.

19         Defendants have said those were premature.  They did

20  not give us substantive answers.  But they've taken the

21  position that they do not need to serve responses until the

22  close of expert discovery.  My understanding was it's the close

23  of fact discovery when those responses are due.  And we do not

24  have substantive responses.

25         The guidance I would like is, because I would like

1  those responses to give to our expert, I would like to know if

2  the Court's position is that they're due at the close of fact

3  discovery.

4       THE COURT:  That kind of depends on what they ask.

5  Some contention interrogatories are genuinely fact contention

6  interrogatories and can and should be answered before expert

7  discovery.

8       There are other interrogatories labeled as

9  interrogatories, which, by the nature of the questioned asked,

10  they can't.  I don't have them before me.  So I'm not sure I

11  can give you an answer to that question.

12       MS. SHIELDKRET:  Okay.

13       THE COURT:  Turning to the expert schedule,

14  Ms. Shieldkret.

15       MS. SHIELDKRET:  We're going to need a little bit of

16  time possibly to get those transcripts.

17       Affirmative expert reports due October 15?

18       THE COURT:  How many experts do you have,

19  Ms. Shieldkret, that you expect to be serving reports on?

20       MS. SHIELDKRET:  One expert.

21       THE COURT:  Is that the same person who you --

22       MS. SHIELDKRET:  Yes.

23       THE COURT:  You served sort of a partner report that

24  didn't have much there to it?

25       MS. SHIELDKRET:  Dr. Chairon (phonetic), yes.

 1              THE COURT:  Does Cerner have affirmative experts?

 2              MR. FANNING:  Your Honor, we have a non-retained

 3   expert to testify concerning Cerner's counterclaim damages as

 4   defined from the invoices.  We've already identified that

 5   individual.

 6              THE COURT:  So you would have one as well.

 7              When you say "non-retained," do you mean someone who

 8   already works for Cerner?

 9              MR. FANNING:  That's correct, your Honor.

10              THE COURT:  Will they be serving a written report?

11              MR. FANNING:  We did not prepare a written report.

12   The expert identified the topics she would testify about.  It's

13   just connecting the dots of the invoices is just something that

14   could be within the fodder of expert testimony.  So we

15   disclosed her for that reason.

16              MS. SHIELDKRET:  Your Honor, we have an issue with

17   that disclosure.  I wonder if, rather than have briefing about

18   the inadequacy, because it's just what Mr. Fanning said.  It's

19   topics.  It's not facts or opinions, which are still required

20   under the rule.  And we'd like them to give a more detailed

21   disclosure.

22              THE COURT:  Hold on.  I'm taking a look at Rule 26,

23   which I believe is the operative rule here.

24              So you only need the full monty, the full written

25   report, in the case of a witness who is retained or specially

1   employed to provide expert testimony.

2          Witnesses who do not provide a written report must

3   instead disclose:  One, the subject matter on which the witness

4   is expected to present evidence -- 202, 203, or 205 -- and a

5   summary of the facts and opinions as to which the witness is

6   expected to testify.

7          Ms. Shieldkret, you contend that you have not received

8   an adequate summary of the facts and opinions?

9          MS. SHIELDKRET:  We just got topics.  They have not

10  given us a summary of the facts or opinions.

11         THE COURT:  Mr. Fanning?

12         MR. FANNING:  Your Honor, in our instance, it's

13  actually a witness who is a fact witness in the case as well,

14  Lisa Gallagher, who is in our Rule 26 disclosures.  She is not

15  specially employed for that purpose.  She is going to provide

16  testimony about the invoices.

17         It looks like October 15 is the deadline.  If we feel

18  that what we produced was inadequate, we'll revisit it.

19         THE COURT:  You've just identified her as both a fact

20  witness and as somebody who is going to provide opinion

21  testimony, testimony in the nature of -- maybe it's a

22  relatively simple opinion like my opinion is that

23  Dr. Fung-Schwartz owes $56,000 in change.  That's what the

24  invoices add up to.

25         But it does seem that the more prudent course on your

1  part would be that on the affirmative expert disclosure date,

2  you comply with the provisions of Rule 26 that apply to

3  non-specially retained experts with respect to anyone whose

4  testimony who could reasonably be characterized as falling

5  under that rule.  That would be the date as well.

6          Ms. Shieldkret.

7          MS. SHIELDKRET:  Your Honor, this witness, Lisa

8  Gallagher, does not work for the party that's asserting the

9  claim, and there are literally three emails in the production

10 that have her name on them.  She's cc'd.  We can't understand

11 how she's a percipient witness.

12         It doesn't appear that she had anything to do with

13 Dr. Fung-Schwartz's account at the time.  So either there were

14 documents about her role in the case or she's really not a

15 percipient witness.

16         THE COURT:  Why does she have to be a percipient

17 witness?

18         MS. SHIELDKRET:  Because that's what's required under

19 the case law for Rule 26(a)(2)(C).

20         THE COURT:  Mr. Fanning?

21         MR. FANNING:  We identified Lisa Gallagher in our

22 Rule 26 disclosure several months ago, your Honor.  She was

23 involved in calculating the damages based upon the invoices.

24 What your Honor states were opinions are exactly what we'll put

25 on her report.  Again, she's been on our Rule 26 disclosure

1    list since, at the very earliest -- it may have been before

2    that -- but by March.

3          THE COURT:  She's making a different point.

4          MR. FANNING:  I guess it will go to cross-examination.

5    I don't understand what it has to do with whether she's an

6    expert.

7          THE COURT:  Hold on.  I understand Ms. Shieldkret's

8    point, which I just heard for the very first time.  So I may

9    not be any wiser than you are, Mr. Fanning.

10          But as I understand Ms. Shieldkret's point, she's

11    saying that if Ms. Gallagher is going to present opinions, then

12    she should be treated as a specially retained expert because

13    she does not actually work in-house for the entity which is

14    asserting the counterclaim and Ms. Shieldkret does not believe,

15    regardless of who her paycheck comes from, that she has

16    percipient knowledge of the underlying facts, that is, that she

17    was involved in the billing process before someone asked her to

18    add up the invoices for damages purposes.

19          Is that right, Ms. Shieldkret?

20          MS. SHIELDKRET:  Yes, your Honor.

21          THE COURT:  All right.  That seems to be cutting it

22    awfully fine in terms of how much percipient information you

23    have to have.  But, Mr. Fanning, that is the complaint.

24          MR. FANNING:  She is an employee of Cerner

25    Corporation, and Cerner Corporation maintains as a centralized

1  accounting and finance department.  She's part of that

2  department.  So she does maintain the information that makes

3  its way into Cerner's invoices, or she is the one who looks at

4  the invoices and determines what's owed.

5          We are, again, to provide more detail on October 15,

6  if that's what is necessary.  But Ms. Gallagher will testify,

7  as the Court appropriately surmised, that Dr. Fung-Schwartz

8  owes $56,000 and growing for her continued use of Cerner

9  Solutions.  That's what Ms. Gallagher will testify to.

10          THE COURT:  We now know from the last round of

11  briefing that Ms. Shieldkret -- or it is a fact that

12  Ms. Shieldkret will make some effort to keep that testimony out

13  on the ground that the invoices are not -- that the contract

14  price is not admissible as evidence of the quantum meruit

15  value.  And the trial judge will deal with that.

16          So we'll hold this until we see what is produced on

17  October 15, and we will take it up then if necessary.  Or

18  perhaps I will direct you at that point to take it up with the

19  district judge in the form of in limine motion, but that is not

20  something we can resolve today.

21          So October 15 for affirmative reports.

22          When did I give you last time for rebuttal reports?

23          MS. SHIELDKRET:  We had set the schedule internally.

24  The rule says 30 days.

25          THE COURT:  So that would be November 15.

1              Is that a business day, Mr. Salim?

2              THE DEPUTY CLERK:  It's a Sunday, your Honor.

3              THE COURT:  November 14.

4              I take it you will have one or more reports in

5    rebuttal to Ms. Shieldkret's doctor, Mr. Fanning?

6              MR. FANNING:  Yes, your Honor.

7              MS. SHIELDKRET:  Your Honor, I'm sorry.  The 14th is a

8    Saturday.

9              THE COURT:  Friday, the 13th.

10             MS. SHIELDKRET:  Friday, the 13th.

11             THE COURT:  It's okay.  It happens once in a while.

12   One foot in front of the other.

13             Mr. Fanning, how many do you anticipate?

14             MR. FANNING:  It depends on her expert report, your

15   Honor.  I know for sure that we'll have one at this point, but

16   there are probably more, depending on what her expert testifies

17   about when he prepared a more fulsome report.

18             THE COURT:  November 13.  And then we don't know how

19   many expert depositions there will be.  So why don't we run it

20   out another month.

21             What day of the week is December 15, Mr. Salim?

22             THE DEPUTY CLERK:  Your Honor, December 15 is a

23   Tuesday.

24             THE COURT:  Perfect.  All expert depositions to be

25   completed on or before December 15.  We will be done with all

1  discovery and experts in the middle of December before the next

2  set of holidays.

3          Anything further for today?

4          MS. SHIELDKRET:  No, your Honor.  Thank you.

5          THE COURT:  Mr. Fanning?

6          MR. FANNING:  No, your Honor.

7          THE COURT:  Ms. Del Vecchio has been very patiently on

8  the call since the beginning.

9          Is there anything you want to bring to my attention?

10          MS. DEL VECCHIO:  No, your Honor.

11          THE COURT:  All right.  We'll be adjourned.  Thank

12  you, counsel.

13          MR. FANNING:  Thank you, your Honor.

14          MS. SHIELDKRET:  Thank you, your Honor.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.••••••
(212) 805-0300